UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,           Case No. 3:22-CR-00274-JRK-1
                                    Court of Appeals No. 24-3899
          Plaintiff,
                                    Toledo, Ohio
     vs.
                                    **TUESDAY, OCTOBER 1, 2024**
AMANDA HOVANEC,

          Defendant.



- - - - -


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JAMES R. KNEPP II
UNITED STATES DISTRICT JUDGE


- - - - -

```
APPEARANCES:

For the Government:          ALISSA M. STERLING,
                            MICHELLE M. BAEPPLER,
                            Assistant United States Attorneys
                            Office of the U.S. Attorney
                            Northern District of Ohio


For Pretrial/Probation:     PAUL SKARUPA, Deputy Chief
                            CHRISTINA TRUESDELL, Officer


For the Defendant:          DAVID LEE KLUCAS, Esquire
                            1900 Monroe Street
                            Toledo, Ohio 43624
                            419-255-1102

                            KENNETH R. BAILEY, Esquire
                            Bailey Legal Group
                            220 West Market Street
                            Sandusky, Ohio 44870
                            419-625-6740
```

```
Official Court Reporter:    Diana M. Ziegelhofer, RPR, RCR
                            United States District Court
                            1716 Spielbusch Avenue, Suite 118
                            Toledo, Ohio  43604
                            (419) 213-5538
```

```
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.
```

- - -


**INDEX**


**WITNESS**                                                           **PAGE**


**ANDREW EILERMAN**
          DIRECT EXAMINATION BY MS. STERLING:          24
          CROSS-EXAMINATION BY MR. KLUCAS:             88
          REDIRECT EXAMINATION BY MS. STERLING:       105

**BRIAN LITTLE**
          DIRECT EXAMINATION BY MS. BAEPPLER:         108
          CROSS-EXAMINATION BY MR. BAILEY:            131


- - -

```
 1                        - - -

 2              TUESDAY, OCTOBER 1, 2024

 3      (Proceedings commenced in open court at 9:15 a.m.)

 4              THE COURT:  This is the case of the United

 5  States of America versus Amanda Hovanec.  It's case number

 6  3:22-cr-274.  Matter comes on this morning for a sentencing

 7  hearing.

 8              Ms. Hovanec was charged in this court with a

 9  complaint back in May of 2022, an Indictment that same

10  month later.  She's been in custody since that time.  In

11  February of this year, there was a change of plea to the

12  Indictment with guilty pleas to Counts 1, 2, 4 and 5 of the

13  Indictment without -- without a Plea Agreement, so open

14  pleas to those counts.

15              Present in the courtroom this morning are,

16  of course, the defendant, Ms. Hovanec.  She's joined at

17  counsel table by her counsel, Attorneys David Klucas and

18  Kenneth Bailey.

19              Here on behalf of the government, we have

20  AUSA Sterling and AUSA Baeppler.  We've got several other

21  folks here as well including the case agent, Special

22  Agent Eilerman, and I think there is Auglaize Detective

23  Little here as another case agent.

24              And I'm not going to introduce everybody,

25  but that's probably the main players who we might hear
```

1    from.

2              We also have folks here from the United

3    States Pretrial and Probation Office.  We've got Officer

4    Truesdell, who prepared the Presentence Investigation

5    Report.

6              Paul, I'm sorry, I forgot your last name.

7              MR. SKARUPA:  Skarupa, Your Honor.

8              THE COURT:  Say it again?

9              MR. SKARUPA:  Paul Skarupa.

10             THE COURT:  Paul Skarupa, who is a Deputy

11   Chief of our Probation Department who is here as well.

12             And it's not wasted on me that we have a

13   roomful of folks who are interested in this case for one

14   reason or another.  Those of you who are here in

15   attendance, this is a brand new court -- brand new

16   courthouse, and we are just in about the third or

17   fourth week of using it, so there might be a technical bug

18   here or there that we are working on, but we are doing our

19   best to keep everybody comfortable with the lighting and

20   sound and so forth.  We've had a trial in this room

21   already, so I think we've got some of the wrinkles worked

22   out, but such as it is.

23             Let's talk about what I have in my file just

24   so we can talk about making sure that I have everything I

25   should have.

```
1                    Certainly, I have the Presentence
2    Investigation Report prepared by Officer Truesdell as well
3    as a sentencing recommendation from her.  I have the
4    government's sentencing memorandum filed under seal.  The
5    government filed several exhibits to that, some video
6    exhibits and also transcripts of video exhibits.  The video
7    exhibits, the audio was a little low, so I'll be candid, I
8    mostly relied on the transcripts as opposed to the videos,
9    but we did look at those.
10                   I have a sentencing memorandum contained
11   from Mr. Klucas to which was appended the report of
12   Dr. Brams.
13                   MR. KLUCAS:  Brams.
14                   THE COURT:  Brams.
15                   And I have received something of a mountain
16   of victim impact stuff, every bit of which I have read.
17   Sometimes tearfully, frankly, but, in all instances, with
18   clear enough eyes to read and appreciate it.
19                   Ms. Sterling, is there anything else that
20   you can think of that I ought to be looking at just about
21   now?
22                   MS. STERLING:  No, Your Honor.  Thank you.
23                   THE COURT:  Just to be clear, I think the
24   victim impact stuff was 248 pages, just so -- it was
25   something like that until we got all done with it.
```

```
 1              And then, Mr. Klucas, anything else that you
 2   can think of that I ought to be looking at?
 3              MR. KLUCAS:  No, Your Honor.
 4              THE COURT:  Okay.
 5              So that's what I have.  And I told -- I told
 6   counsel before we came on the record, but I'm going to tell
 7   the folks in the room, too, I have never -- I've never
 8   struggled more mightily with a case than I have with the
 9   sentencing determination in this case.  Well, frankly, I've
10   never had a case like this before.  I've been a district
11   judge for a little over four years and it's the first,
12   first instance I've had something like this.
13              Folks, could we get you guys to slide
14   together a little bit over there?  Make some room?  We've
15   got some more folks coming in.
16              Between all of the submissions that we have
17   and the issues, which are really pretty tough in this case,
18   a couple of them, anyway, in terms of we all sort of know
19   what happened here, but there are some legal implications
20   of some of the things that we'll have to talk about today
21   in determining what is the appropriate sentencing
22   determination, which could run anywhere from a mandatory
23   minimum of 20 years up to a maximum authorized sentence of
24   life.  And, in this court, life means life.  It's not life
25   with parole at some point.  When we give a sentence in this
```

1  court, it's definite.  It's not something where someone

2  comes before a Parole Board at some point in the future.

3  When a district judge sentences a defendant to a term or

4  whatever that term is, be it a number of months or life,

5  that's relatively final.

6           Let's talk about the Presentence

7  Investigation Report which Officer Truesdell prepared.  I

8  know there were some factual things pointed out along the

9  way, but, as I understand it, the only objections remaining

10  were by the defendant as to the -- a couple of

11  enhancements.

12           Ms. Sterling, looking at the report, and

13  let's just talk about the facts now.  I'm not talking about

14  enhancements or, frankly, I'm not even talking about

15  acceptance of responsibility points.  I'm talking about the

16  facts in the Presentence Investigation Report.  Do you see

17  any factual inaccuracies in there that we ought to talk

18  about?

19           MS. STERLING:  I do see a paragraph 9, Your

20  Honor, upon my review last night.  The last sentence of

21  paragraph 9 talks about a preliminary review of cellular

22  phone location information for the victim's cell phone and

23  it says that it appeared that his vehicle, after dropping

24  off the children, had taken a route that avoided

25  Interstate 75 from 7:01 to 7:56 p.m.  That timeframe is not

1  correct.  It didn't leave from the dropoff until 7:56 p.m.

2  From 7:01 to 7:56 p.m., the location information showed

3  that it remained at the Green residence there in Auglaize

4  county.

5          THE COURT:  Okay.

6       (Whereupon, a discussion is held off record.)

7          THE COURT:  Mr. Klucas, any objection to

8  fixing that timeframe that she's talking about?

9          MR. KLUCAS:  No.  Ms. Sterling's

10  representation is consistent with my review of the

11  material, also.

12          THE COURT:  So what are we going to -- what

13  are we going to change the times to, Ms. Sterling?

14          MS. STERLING:  I suppose we could change the

15  sentence to say:  During their preliminary review, it

16  appeared that the route T.H. had taken after dropping off

17  the children avoided Interstate 75.

18          THE COURT:  And just end there?

19          MS. STERLING:  Period, yeah.

20          THE COURT:  Mr. Klucas?

21          MR. KLUCAS:  Fine.

22          THE COURT:  Okay.

23          So we will strike everything after:  Avoided

24  Interstate 75.

25          And we'll fix that.

```
 1                    Anything else, Ms. Sterling?

 2                    MS. STERLING:  With regard to the facts,

 3    Your Honor?  No.

 4                    THE COURT:  The facts.  Okay.

 5                    And before we go any further, can you all in

 6    the back hear okay?  Is the sound working all right?

 7    Because we are still -- okay.  Thank you for the thumbs up

 8    signs back there.  We are just making sure everything is

 9    dialed in a little bit.

10                    Mr. Klucas, same question.

11                    MR. KLUCAS:  No, Judge.  We don't have any

12    additional corrections other than what Ms. Sterling pointed

13    out.

14                    THE COURT:  Okay.

15                    Ms. Hovanec, good morning.  Have you had a

16    chance to review the Presentence Investigation Report that

17    we are now talking about?

18                    THE DEFENDANT:  Yes, Your Honor.

19                    THE COURT:  Okay.

20                    So I'm sure your lawyers have explained this

21    to you because I've known them for a long time and I know

22    that they have done that.  But, so you understand, here, in

23    open court, at some point, we are going to adopt the facts

24    in this report as the factual background for about what

25    happened here.  Then that will be supplemented by anything
```

1    that gets said here today.  But that kind of becomes the

2    canvas that we do our painting on, okay.  So it's important

3    that this is right.

4                   Do you see anything in this report that's

5    not right?

6                   THE DEFENDANT:  No, Your Honor.

7                   THE COURT:  Okay.

8                   So without objection, I'm going to adopt the

9    facts set forth in the Presentence Investigation Report as

10   the factual basis for our sentencing determination to be

11   supplemented by anything that happens here this morning.

12                  I'll ask, is anybody planning to call any

13   witnesses this morning?

14                  Ms. Sterling?

15                  MS. STERLING:  Yes, Your Honor.

16                  THE COURT:  Okay.

17                  Mr. Klucas?

18                  MR. KLUCAS:  We are not.

19                  THE COURT:  Okay.

20                  Well, obviously, Ms. Hovanec can speak if

21   she wishes to, but other than that, there wouldn't be?

22                  MR. KLUCAS:  Correct.  Yeah, correct.

23                  THE COURT:  Okay.

24                  So, Ms. Hovanec, my job here today -- and

25   it's -- it's not even close, it's the worst part of what's

1    otherwise kind of a good job -- is I have to figure out

2    what's the right sentence for this case.

3              As I said coming out of the blocks, the

4    statute, pursuant to whatever the statutes, multiple, to

5    which you have been convicted for violating provide a

6    sentence at the low end of 20 years, at the high end of

7    life imprisonment.  We have to figure out where on that

8    continuum you go.

9              My job, under a statute called 18, U.S.C.,

10   Section 3553(a) is to figure out what sentence is

11   sufficient, but not excessive.  In plain speak, and I know,

12   I know you've gone to college and you understand those

13   words, but just to break it down into the plainest speak I

14   can, what is enough, but not too much.  And that's not --

15   that's not particularly scientific; it's something we have

16   to do.  It's something that I took an oath to do, and it's

17   what I try to do, and I've spent dozens of hours agonizing

18   over under all the facts in this case, and there are a

19   bunch, factors and facts, what is enough, but not too much.

20             And looking at that, I have to look at, to

21   begin with, the nature and circumstances of the offense.

22   And that, that goes into the realm into, frankly,

23   punishment.  There has to be punishment for violating the

24   law and committing a crime.  Depending upon how bad the

25   crime is, the punishment has to line up with that so that

1   people respect the law.  And it's really hard to think of a

2   crime that's worse than murdering the father of three

3   little girls, a husband, good, bad or otherwise, but the

4   father of three little, little girls, a son, a brother, an

5   uncle, a guy in service to his country, working, working

6   doing important work for our government, and he was

7   murdered, and by all accounts, premeditated, cold-blooded

8   murder.  I suppose there are worse crimes, but it's hard

9   for me to think of what they are right now.  So that's

10  certainly going into the mix here.  There has to be

11  punishment that equals a crime that's hard to imagine how

12  much worse than.

13          There's a concept also of deterrence.  We

14  have to deter further crimes, and that's both inward-facing

15  and outward-facing.  On the one hand, the punishment has to

16  be severe enough that you would never be tempted to commit

17  a similar crime again for the rest of your life.  That's

18  pretty easy, because the kind of numbers that we are

19  talking about here or the potential for life, any of those

20  things I think are going to satisfy the internal

21  deterrence, but there's also external deterrence that we

22  have to think about.  What message are we sending here to

23  other people.  What can we do to deter others from

24  committing a similar act.  And there's -- we have to take

25  into consideration what message do we send about what we do

1  with someone who, in cold blood, murders their estranged

2  husband and the father of their children.  What message are

3  we sending about what is the punishment you get if you do

4  that.  I have to think about that.

5              There's a concept of protecting the public

6  from further crimes.  That goes into the concept of

7  recidivism.  I am not convinced that there's a high

8  potential for you if you were to ever get out of prison

9  some decades from now.  Again, if you get out, I am not

10  particularly concerned about the possibility of recidivism,

11  but I have to think about it, and that's where the

12  protecting the public from other crimes comes in.  Part of

13  your sentence has to be to incapacitate you long enough

14  that we don't have to worry about you hurting anyone else.

15              There's also the rehabilitative component of

16  this.  I really don't have any control over what happens to

17  you while you are in the custody of the BOP, but they take

18  very seriously trying to provide programming and so forth

19  to make you as productive as you can be.  If, ultimately,

20  the sentence in this case contains an out date, then you

21  would be subject to what's called supervised release where

22  there is programming available to try and help you

23  acclimate to society and come back and be a productive

24  citizen.  In good conscience and confidence, I won't be the

25  person supervising you.  I'll be long gone by then, but

1    some, if you do get an out date, there will be some judge

2    and some number of probation officers who will be working

3    with you on the other end of that.

4              I have to look at the -- let's just break

5    that down a little bit differently just to, because

6    sometimes if I say it a little differently, it becomes

7    clearer, maybe sometimes less clearer.  The first thing we

8    have to look at is the nature and circumstances of the

9    offense.  In other words, what happened.  We've talked

10   about that.  We'll talk about that I'm sure at some length

11   today, but, you know, we have a premeditated, cold-blooded

12   murder here, and there is no way to sugarcoat that, and I

13   think it's Mr. Klucas who says or Mr. Bailey who says in

14   the sentencing memorandum, this is a -- this is a murder

15   case masquerading as a drug case and, frankly, he's not

16   wrong.  This case isn't as much about drug -- it's a

17   violation of the drug statutes, but it's a murder case.  It

18   just has the look and feel and everything about that, so

19   that observation struck; it resonated with me a little bit,

20   Mr. Klucas.

21             So we have to look at the "what happened"

22   part.  Then we have to look at the history and

23   characteristics of the person who committed that crime and,

24   obviously, this is a person, who, we are not talking about

25   a career criminal here.  We are talking about someone who,

1   you know, may have had some bad decisions over her lifetime

2   and maybe had some self-destructive tendencies and so

3   forth, but this is not something that was otherwise

4   consistent with her.  So it's not like we have a person who

5   has got a 20-year criminal history or something.  This is

6   kind of a one-off, as it were, but it's hard to -- it's

7   hard to say that, you know.  You picked a big one for the

8   one.

9           We have to look at all the kinds of

10  sentences that are available, and that part, it's easy.

11  This is there is no choice here but for a prison term

12  measured in decades or possibly lifetimes.  It's not like

13  we've got the possibility of probation or some alternative

14  incarceration here.  The answer here is going to be

15  imprisonment, and depending on what the imprisonment looks

16  like, some, perhaps some period of supervision on the other

17  side of that.

18          We have to look at the guideline range,

19  which is promulgated pursuant to the United States

20  Sentencing Commission Guidelines, which is a book that

21  looks something like that, okay.  And there's two

22  appendices to it, but we don't have to look at those, but

23  it's a thick book, and it basically goes through every

24  federal crime, and it assigns a value and number of points.

25  And then there are things that can enhance that, something

1    called enhancements that can make that number go up.  There

2    are other things that can make it go down.  And,

3    ultimately, we end up with a final offense level.

4                Then it goes through and it looks at your

5    criminal history, and that's pretty easy for you, and we

6    end up with a set of numbers on an X and Y coordinate, and

7    we go onto a chart and we go down with the offense level

8    and across for the criminal history, then it tells me a

9    recommended sentence in months or life.  They go up to --

10   they cut off at 43, and you are going to be at or near --

11   you are going to be at or near the bottom of this page,

12   okay, or the left side of this page because your criminal

13   history is 1, so you are going to be down there near the

14   bottom, I suspect, when we get done with this, and that's

15   going to be a recommended sentence under the guidelines.

16               Now, I don't have to follow that, but that

17   certainly is the starting point for where we are.  And then

18   I have to consider all the 3553(a) factors that we've

19   talked about and that are listed in the statute.  I have to

20   go through and consider each of those things, and I have to

21   figure out is the guideline sentence the right sentence.

22   If so, why so.  Is it too much?  If so, why so.  Is it not

23   enough?  If so, why so.  Well, it's not going to be that

24   last one, because it's -- you are at the top.  You are

25   going to be at or near the top of the range.

1           So the only question I think we are going to

2    have is is the guideline sentence -- first of all, we have

3    to figure out what the guidelines really provide, and there

4    might be a little argument among the lawyers about that.

5    Once we figure out what the guidelines ultimately provide,

6    then we have to figure out is that the right sentence or

7    not.  And I suspect I'll endeavor for the next however long

8    this takes, it's going to be largely centered around that,

9    those issues.

10          So we have to avoid unwarranted sentencing

11   discrepancies, which, typically, when we follow that

12   process, that sort of takes care of itself, but the same

13   crime committed by a similar defendant should be -- should

14   result in a similar sentence no matter what judge does it,

15   no matter where it is, it should be.  If there are

16   differences, they should be apparent as to why.

17          And we also have to provide restitution to

18   the victims of the offense here, which we can talk about

19   today.  We may enter a final restitution order or if the

20   parties -- we can move that to a different day if there's a

21   reason to, or we can enter a restitution order today as

22   well.

23          So, you know, I have to calculate, I have to

24   look at the nature of the offense, the history and

25   characteristics of the defendant, and the needs of the

 1    public and any victims of the crime.

 2              When we talk about the sentencing

 3    guidelines, we have to go through and calculate them, and

 4    Officer Truesdell has done that in the Presentence

 5    Investigation Report.  And I think that starts on about

 6    page 9.

 7              And let's just go through this, folks.  She

 8    comes up with, for a violation of 21, U.S.C., 963, she

 9    comes up with 2D1.1 with a cross reference using

10    2D1.1(d)(1).  2A1.1 is used to determine the offense level

11    because it results in a higher offense level, and the

12    instant case involved the premeditated killing of T.H.

13    The base offense level is 43, and she cites to 2A1.1(a) and

14    2D1.1(d)(1).

15              Do you concur with that, Ms. Sterling?

16              MS. STERLING:  I do, Your Honor.

17              THE COURT:  Mr. Klucas?

18              MR. KLUCAS:  We did.

19              THE COURT:  Okay.

20              So we start off with a base offense level of

21    43.  Then we have to look at adjustments.

22              The first adjustment that Officer Truesdell

23    has included is a two-point enhancement pursuant to

24    3B1.1(c) indicating that the defendant was an organizer,

25    leader, manager, or supervisor in any criminal activity

1   other than that described in (a) or (b); therefore, two

2   levels are attached.  In the instant case, Hovanec directed

3   Theodorou and Green as to the killing of T.H. and the

4   covering up of the crime.

5            Mr. Klucas has objected to that.

6            Ms. Sterling, you have not, so I guess I'll

7   let Mr. Klucas talk about that first, if you are okay,

8   or --

9            MS. STERLING:  Certainly can, Your Honor.

10  The government intends to address both of the objections as

11  well as its objection to acceptance after we present

12  additional testimony here this morning.  So whatever --

13           THE COURT:  Well, maybe we should hear the

14  evidence, Mr. Klucas.

15           MR. KLUCAS:  Yeah, I was going to say, I

16  would rather reserve my argument.

17           THE COURT:  Okay.

18           MR. KLUCAS:  Until I hear what's been

19  presented, you know, other than what we already have --

20           THE COURT:  Okay.

21           MR. KLUCAS:  -- by way of witness testimony.

22           THE COURT:  Okay.  I think that's prudent.

23           And thank you, Ms. Sterling.

24           So there are two -- let's just get all the

25  cards on the table.  There are two enhancements.  The other

one is an adjustment for obstruction of justice.  Officer

Truesdell has added two points, pursuant to 3C1.1, finding

that the defendant willfully obstructed or impeded or

attempted to obstruct or impede the administration of

justice with respect to the investigation, prosecution, or

sentencing of the instant offense of conviction, and the

obstructive conduct related to the defendant's offense of

conviction and any relevant conduct or a closely-related

offense.  Therefore, two levels are added.  In the instant

case, the defendant drove T.H.'s vehicle and abandoned it

in Dayton, Ohio, and disposed of T.H.'s property in

multiple dumpsters, disposed of the syringe and bottle of

the etorphine used to kill T.H. came in and buried T.H.'s

body.

                    I suspect there are other arguments that the

government will make there, but that's what Officer

Truesdell cited initially.

                    Mr. Klucas has objected to that, indicating

that, and I don't want to put words in your mouth, I want

to let you argue your own words, but essentially, the

conduct that we are talking about here was all part of the

big picture murder or poisoning of T.H. and, therefore,

it's not fair to -- she's already getting punished for that

with a 43 base offense level.  This stuff is just part of

that, that same transaction and, therefore, shouldn't be a

 1   separate add-on.  Is that --

 2                   MR. KLUCAS:  That's a fair characterization.

 3                   THE COURT:  -- plain speak?  Okay.

 4                   So if we add both of those, that takes us to

 5   a 47.

 6                   Then, Officer Truesdell awarded two points

 7   for acceptance and then a third point for acceptance.  I

 8   understand the government is going to object to either or

 9   both of those, particularly the one point, but perhaps

10   both, both acceptance points at this time, which takes us

11   to a final offense level of I guess it would have been 44,

12   but the max you can have is 43, so it became 43 at that

13   point.

14                   I understand we are going to argue about

15   those last three things, the two enhancements for the

16   defense, and the acceptance for the government, but are we

17   all in agreement that that's how we got there and that at

18   least the math and the -- we are all on the same page about

19   what the report did?

20                   Ms. Sterling?

21                   MS. STERLING:  Yes, Your Honor.

22                   THE COURT:  And Mr. Klucas?

23                   MR. KLUCAS:  Yes, Your Honor.

24                   THE COURT:  Okay.

25                   So if we had the 43 as the final offense

1  level, she's a -- she's a Criminal History Category I.

2  There is no dispute about that, correct?

3                  MS. STERLING:  Correct.

4                  MR. KLUCAS:  Correct.

5                  THE COURT:  Okay.

6                  So just for introductory purposes, a 43,

7  level 1 would be a guideline recommended sentence of life.

8  Not a range, it would just be flatout life.

9                  Ms. Sterling, you've indicated that you

10  intend to -- and I'm fine, I think it's probably the most

11  efficient way to do it -- put on your evidence, and then we

12  can argue perhaps about the objections both ways, and then

13  if you want to separately argue about the 3553(a) factors

14  once I rule on what the final guideline range is, I think

15  that might be the way to proceed.

16                  MS. STERLING:  I agree, Your Honor.

17                  THE COURT:  Okay.

18                  So I'll turn it over to you.

19                  MS. STERLING:  Thank you, Your Honor.

20                  The government would call case agent, FBI

21  Special Agent A.J. Eilerman.

22                  MR. KLUCAS:  We move for a separation if

23  there is more than one agent.

24                  THE COURT:  I'll grant that.

25                  Anybody who you anticipate calling, please

1  ask them to step outside.  Or there is a witness room.

2  There is a room, Ms. Sterling, right outside.

3              MS. STERLING:  We've done that, Your Honor.

4                        - - -

5         Thereupon, the Government, in order to maintain the

6  issues on their part to be maintained, called as a witness,

7                     ANDREW EILERMAN,

8  who, having been duly sworn as provided by law, testified and

9  said as follows:

10             MS. STERLING:  Thank you, Your Honor.

11                        - - -

12                  DIRECT EXAMINATION

13  BY MS. STERLING:

14  Q        Good morning, Special Agent Eilerman.  How are

15  you?

16  A        Good.

17  Q        Would you please state your full name for the

18  record, spelling your last name.

19  A        Andrew Joseph Eilerman, E-I-L --

20             THE COURT:  Hold on a second.  I'm on it,

21  Erica.

22             Okay.

23  A        E-I-L-E-R-M-A-N.

24  Q        And how are you employed, sir?

25  A        I'm a Special Agent with the Federal Bureau of

1    Investigation.

2    Q          And how long have you been involved in law

3    enforcement?

4    A          Approximately 16 and-a-half years.

5    Q          And are all of those years spent with the Bureau?

6    A          Yes.

7    Q          Where are you currently assigned?

8    A          I work out of the Cleveland Field Office, the

9    Lima Resident Agency.

10   Q          And where is Lima in relation to Auglaize county,

11   Ohio?

12   A          It's located in Allen county, just north of

13   Auglaize county.

14   Q          Are you familiar with the investigation into

15   Amanda Hovanec?

16   A          I am.

17   Q          How is that?

18   A          I'm the case agent.

19   Q          Tell us how you got involved and how this matter

20   come to your attention, please.

21   A          On April 27th of 2022, I received a call from a

22   Wapak, Wapakoneta, police officer named Cory Zwiebel.

23   Officer Zwiebel indicated that their office had been

24   contacted by the Best Western Hotel indicating that a guest

25   named Timothy Hovanec had overstayed his reservation.

1    They, ultimately, ended up collecting equipment, computer

2    equipment, electronics, clothes from the hotel room, and he

3    had contacted me as he believed Mr. Hovanec was a State

4    Department employee, and he didn't know if it was

5    government equipment or if the electronic equipment

6    contained classified information.

7    Q        Was Mr. Hovanec, to your knowledge, a State

8    Department employee?

9    A        Yeah, so after I received that call, I contacted

10   a -- the State Department detailee attached to our Joint

11   Terrorism Task Force in Cleveland, and I asked him to query

12   their global address book and he confirmed that Mr. Hovanec

13   was a State Department employee.

14   Q        So what do you do with the information after you

15   spoke to Wapak Police Department?

16   A        Well, I traveled down to Wapak and collected the

17   items, and I asked Officer Zwiebel to tell me a little bit

18   more about what was going on, and he explained to me that

19   he believed that Mr. Hovanec was in town for a custody

20   hearing.  He was supposed to check out on Monday,

21   April 25th.  He had not checked out as of the 26th when the

22   hotel staff went to clean the room, and on the 27th, they

23   then collected his items and turned them over to the police

24   department.

25                So, as a result of that, I traveled with

1  several members of our task force to the hotel, the Best

2  Western in Wapak.  I wanted to see the room and just get an

3  idea of what was going on.  I believe the room had been

4  turned over already for the next guest, but, at that point,

5  I had one of our task force officers go down and start

6  reviewing surveillance footage at the front desk.  And

7  another task force officer, I had asked him to contact the

8  credit card company for Mr. Hovanec and try to get a list

9  of his most recent transactions.

10           So I believe the credit card records stopped

11  on Sunday afternoon.  At that point, it was clearly obvious

12  that Mr. Hovanec was missing.  And given that we were in

13  Auglaize county, I had reached out to detectives from the

14  Auglaize County Sheriff's Office.  I explained to them what

15  I had known at that point and that he was a State

16  Department employee and that perhaps we should work this

17  missing persons investigation jointly.

18           The day prior, when Wapakoneta Police

19  Department had been made aware, they requested the Auglaize

20  County Sheriff's Office to send a deputy out to Anita

21  Green's house on Middle Pike Road.  This is because

22  Wapak -- where she lives is outside of Wapak's

23  jurisdiction.

24  Q       So just to be clear, Wapakoneta is the city, and

25  it sits in Auglaize county?

```
1    A         Correct.

2    Q         Okay.

3    A         So fast-forward back to Wednesday, the 27th, we

4    are all back at the Sheriff's Office where we kind of set

5    up our command center, command post, and we decided that we

6    would send out another deputy, this time outfitted with an

7    audio recorder, because I don't believe the interview the

8    day prior was recorded.

9              So Deputy Foxhoven and Detective Brian

10   Little went out and again interviewed Amanda and --

11   Q         Back up a minute.  You said someone from Wapak

12   had gone out the day before and spoke to someone.  Do you

13   have knowledge who they spoke to or what that was about?

14   A         Yeah, that would have been, again, Detective

15   Foxhoven, and he also spoke with Amanda.

16   Q         What was the purpose of that interview?

17   A         Just to try to gather some information about

18   Tim's whereabouts.

19             So on the 27th, when Detective Little and

20   Deputy Foxhoven interviewed her, again, it was just trying

21   to get a timeline, identify what they may have known about

22   Tim, when he was last seen.  Detective Little also obtained

23   phone numbers for Anthony Theodorou, Anita Green, Amanda,

24   and following the interview, they came back to the

25   Sheriff's Office.  At that point, we decided that we would
```

```
1   get exigent phone pings for Anita Green, Amanda Hovanec,

2   and Tim Hovanec.

3   Q        And before you go further, you indicated that

4   when deputies went out to the house on the 27th?

5   A        Correct.

6   Q        They did, in fact, speak to Amanda Hovanec?

7   A        They did, yes.

8   Q        And you said they obtained telephone numbers from

9   a number of people including an individual who you have

10  identified as Anthony Theodorou, correct?

11  A        That's correct.

12  Q        Who is he?

13  A        Anthony Theodorou was later identified as the

14  boyfriend of Anita Green -- I'm sorry, of Amanda Hovanec.

15  Q        And, again, just for clarification on the record,

16  who is Anita Green relative to Amanda Hovanec?

17  A        That would be her mother.

18  Q        All right.

19           All right.  Go ahead.  You indicated the

20  decision was made to obtain exigent ping information on a

21  number of folks?

22  A        Correct.  Yeah, on Amanda Hovanec, Tim Hovanec,

23  and Anita Green's cell phones.

24           So when we received the information back,

25  the data revealed that Tim's phone had been at Anita
```

1    Green's residence for just under an hour, over 50 minutes.

2    Q        When was that?

3    A        On the 27th -- I'm sorry, on April 24th.  Sunday,

4    April 24th.

5    Q        So on April 24th, the phone location records

6    showed Mr. Hovanec's phone was where?

7    A        Was at Anita Green's residence from a little

8    after 7:00 until a little before -- until right around 8:00

9    p.m.

10   Q        And was that significant to you in some way?

11   A        Yeah, it was significant because when the members

12   from the Sheriff's Office went out to interview Amanda, she

13   had made the comment that Tim had only been there long

14   enough to drop the girls off.  So this didn't -- the data

15   wasn't coinciding with what she was saying.

16   Q        With that information, what did you do next?

17   A        Well, ultimately, the last ping that we had

18   received for Tim's phone was near a park in Dayton, Ohio.

19   I contacted a friend of mine, who is an FBI agent in Dayton

20   named Bob Buzzard, and I asked Bob Buzzard to check the

21   coordinates of the last cell phone ping.  I sent him the

22   coordinates.  A little while later, he contacted me and

23   said that he was looking at a black Volkswagen Tiguan,

24   which is the vehicle that Tim had driven to Ohio for the

25   custody hearing.

1    Q        Okay.  So the vehicle, Mr. Hovanec's vehicle, was

2    located in Dayton?

3    A        Correct.

4    Q        What happens next?

5    A        He also noted that there was no license plates on

6    the vehicle.  Agent Buzzard and I determined to -- that it

7    was a good idea to have the B.C.I. Crime Scene Team come

8    out and process the vehicle.

9             So a little bit of time went by, they showed

10   up, and as they were processing the vehicle, Agent Buzzard

11   called me back and indicated that they had located a dash

12   camera in the windshield that was located right in front of

13   the rear view mirror.

14   Q        Okay.  I'm going to back you up for a second.

15   You said the vehicle had been located near a park in

16   Dayton, Ohio?

17   A        Correct.

18   Q        And it has no license plate?

19   A        Correct.

20   Q        What are you told about the neighborhood where

21   this vehicle is located?

22   A        It was kind of a rough area of Dayton.

23   Q        And is there a particular reason why you felt

24   that it was necessary to call in a crime processing team?

25   A        Well, I mean, we are conducting a missing persons

1    investigation, and we had no idea why the vehicle was down

2    there, so we were going to treat it as a crime scene.

3    Q        All right.  So you said they come in, and that's

4    B.C.I.?

5    A        Correct.

6    Q        To your knowledge, they're processing Tim's car,

7    treating it like a crime scene?

8    A        Yes.

9    Q        And I believe the last thing you said before I

10   interrupted you was they located a dash camera in that

11   vehicle?

12   A        Correct.

13   Q        What was the vantage point, if you will, of the

14   angle of that dash cam?

15   A        So from where I just mentioned, the camera was

16   located in the upper portion of the windshield, behind the

17   mirror.  It was pointing out, looking out over the hood.

18   Q        All right.  Have you had an opportunity to view

19   that dash camera?

20   A        Yes.

21   Q        All right.  Well, why don't you continue on with

22   your story.  You're told that there's a dash camera and

23   what do you see?

24   A        Well, I asked Agent Buzzard if he could get that

25   up to us in Auglaize county as soon as it was processed and

```
 1    collected as an item of evidence.  He agreed, and he
 2    traveled north and then we sent one of our task force
 3    officers to meet him halfway and pick up the dash camera.
 4    Q        And bring it back to you in Auglaize county where
 5    you were set up?
 6    A        Correct.
 7    Q        And did you have an opportunity to view the dash
 8    camera?
 9    A        I did.
10    Q        And let's specifically talk about the April 24th
11    timeframe when Mr. Hovanec dropped his children off out
12    there at Anita Green's residence in Wapakoneta, Ohio.  Did
13    you view that?
14    A        I did, yes.
15    Q        If we can't -- tell us, generally, what's
16    depicted on there.
17    A        As he arrives in the driveway, you can see the
18    camera is pointed at the garage door and then a side entry
19    door that was later identified as Anita Green's house.
20    Standing at the door was Amanda Hovanec, and followed
21    closely behind by Anita Green.  She comes out.  The
22    children are quickly scurried into the house.
23    Q        Who comes out?
24    A        I'm sorry, Amanda comes out and makes contact
25    with Tim, followed shortly by Anita, who is seen standing
```

1  in the doorway holding the door open.  Amanda makes contact

2  with Tim, they quickly get the children into the house.

3  Anita is seen at the door scurrying the kids into the

4  house.  She follows the last child into the house, closes

5  the door.  Almost immediately thereafter, you can hear a

6  scuffle break out at the vehicle, and Tim is overheard

7  saying, "Did you just assault me?"  None of this is in the

8  view of the camera, but you can hear the audio.

9           Shortly thereafter, Tim walks around the

10 rear of the vehicle and to the front along the passenger

11 side.  At this point, they come into view of the camera,

12 and you can see Tim make contact, looking at the camera,

13 and Amanda is chasing him and trying to knock his cell

14 phone out of his hand.  As they approach the garage door of

15 Anita's house, she is actively trying to wrestle him to the

16 ground.

17 Q        She, being who?

18 A        That would be Amanda Hovanec.

19          Eventually, she's able to wrestle Tim to the

20 ground and she holds him there for quite some time until

21 Tim stops moving.  She gets up and removes Tim's watch from

22 his wrist and gets into the car and turns the car off, at

23 which time, the footage stops.

24 Q        Okay.  And you've had an opportunity to view that

25 on a number of occasions, I imagine?

```
1    A        Yes.

2    Q        All right.

3             I want to go ahead and, if we can, play

4    Exhibit 1.

5             THE COURT:  Should we be publishing this to

6    the gallery, also?

7             MS. STERLING:  Judge, that's your call.  I

8    mean, this is a public courtroom, so.

9             THE COURT:  It is.

10            MS. STERLING:  We have -- I appreciate the

11   concern.  We have previously discussed the matter with the

12   victim's family.  They are aware, and they've been given

13   their options as far as that recording.

14            THE COURT:  I think you've all heard what's

15   going to be in this video.  If anybody -- I am going to

16   publish it in the room.  If anybody doesn't want to be

17   present for that, this will be a good time to step out, I

18   suppose.

19            MS. STERLING:  Let's make sure the volume is

20   up, please.  Thank you.

21            THE COURT:  Are you playing it from the

22   table there?  Yes?

23        (Whereupon, exhibit played in open court.)

24   Q        Special Agent Eilerman, just to note here on

25   Exhibit 1, I believe you can see it on your screen in front
```

```
1   of you, the date and time of this video?

2   A          Yeah, the date is listed as April 24th, 2022, at

3   7:00 p.m.  It's listed as 1900, 7:00, yeah.

4   Q          In your review, did you find the date and

5   timestamps on these videos to be generally accurate?

6   A          Yes.

7   Q          Thank you.  Go ahead.

8              (Whereupon, exhibit played in open court.)

9                   THE COURT:  Could you stop for just a

10  second?

11                  Do we need to lower the lights?  Can

12  everyone see the monitors okay?  Are we okay?  All right.

13  I just -- I'm sorry.

14                       And please continue.

15             (Whereupon, exhibit played in open court.)

16  Q          All right.  So Special Agent Eilerman, can you

17  tell the Court what was going on in the investigation at

18  the time that you saw the video that was just played?

19  A          Well, before the video had arrived back in

20  Auglaize county, we decided that it was time for us to

21  start conducting interviews, interviews of Anita Green,

22  Amanda Hovanec, and Anthony Theodorou.

23                  So, at the time, myself and Lieutenant Doug

24  Burke had traveled out to Anita's house, and our objective

25  was to interview Anthony Theodorou.  Simultaneously, FBI
```

1   Special Agent Kyle Fulmer and Mike Huber were traveling to

2   interview Anita Green, and their interview was going to

3   take place at Anita's residence.

4           We made contact with Mr. Theodorou.  He

5   agreed to travel back to the Sheriff's Office for an

6   interview, and while we were en route back to the Sheriff's

7   Office, I received a telephone call from my boss, and he

8   had informed me what the video depicted.

9           So we got back to the Sheriff's Office, we

10  initiated our interview with Mr. Theodorou.  He was

11  provided his Miranda rights and agreed to be interviewed.

12          Initially, he told us that he had known

13  Amanda since August of 2019, that he traveled into the U.S.

14  most recently on April 6th of 2022.  He spent a few days at

15  Anita Green's residence visiting with Amanda and her

16  children.  And on April 10th, he flew to the United Kingdom

17  to visit his daughter.  He returned to the U.S. on

18  April 20th of 2022, and was again staying at Anita's

19  residence visiting Amanda.

20          He said that he was aware that he had never

21  met Tim, but he was aware that Amanda and Tim were going

22  through divorce proceedings and that they were also going

23  through a custody dispute involving their children.

24          He provided information about when Tim

25  picked up the girls on April 22nd, and then he provided

1   information about the dropoff of the children on

2   April 24th.  He indicated that he wasn't outside during the

3   dropoff, that he was in the house, and he said that when

4   the girls came in, they had gathered their toys or their

5   surprises that were laid out for them, they went upstairs,

6   played with their toys, and as it was a school night, they

7   were provided baths and got ready for bed.

8                    It was still light out at this time, and

9   over the weekend, Anthony and Amanda had been working on an

10  arbor located down near the pond at Anita's residence.

11  Since it was still light, Theodorou said that he and Amanda

12  went back out to the pond and continued working on the

13  arbor.  After that, they went in the house, Amanda got the

14  girls to bed, Anthony took a shower and he went to bed.  He

15  said that that whole afternoon, evening on Sunday, Amanda

16  was never out of his sight more than only a few minutes.

17  Q        At this point, you were aware of the contents of

18  the video, correct?

19  A        Yes.

20  Q        Presumably, that seemed inconsistent with what

21  Mr. Theodorou was telling you at the time?

22  A        Yes.

23  Q        What did you do next?

24  A        I confronted him and I told Anthony that we were

25  aware that Amanda had killed Tim, that we had seen the

1  video, and that what he was telling us wasn't true.

2        Pretty quickly, he changed his story and

3  told us that Amanda had been planning to murder Tim for

4  over a year.  He said that it was all her idea and that he

5  killed her -- she killed Tim by injecting him with a

6  substance called M99.

7  Q        Did he, I'm sorry, did he tell you -- I'm sorry.

8  You just answered the question I was going to ask you,

9  which is how she killed him.  Did he offer any other

10  alternatives to the M99 in his initial statement?

11  A        Originally, I believe they planned on hiring a

12  hitman to do it and, ultimately, Amanda ended up killing

13  him with the M99.

14  Q        All right.

15  A        By injecting him.

16  Q        During your initial interview with Mr. Theodorou,

17  did you ask him if he knew where Tim's body was?

18  A        We did, yes.

19  Q        And what did he say?

20  A        He said his body was underground and then he

21  offered to take us to where his body was buried.

22  Q        Did you go with Mr. Theodorou to attempt to

23  locate the body?

24  A        Yes.

25  Q        If we can, tell us, at the end of all of this,

1  where did you go?  What was the location?

2  A          It was at the intersection of Wrestle Creek Road

3  and Blank Pike Road.  And there was a pond.  Wrestle Creek

4  runs north and south, Blank Pike runs east and west.  On

5  the south side of Blank Pike Road, there was a pond.  And

6  on the north side of the road, there was a wooded area.

7  There was a little bit of an area of grassy ditch that went

8  down and came back up, and then probably I'd estimate

9  20 yards, and then the wooded area began.

10                It was a very thick, wooded area, with a lot

11 of honeysuckle.  It wasn't easy to traverse.  And,

12 obviously, it was dark and it had been raining that night

13 as well.

14 Q          When you go out there, approximately how far is

15 this location that you are describing from the Green

16 residence?

17 A          Just a couple miles.  It's not far at all.

18 Q          And when you go out there to that location, you

19 said it was dark.  Is Mr. Theodorou able to identify to you

20 specifically where Mr. Hovanec's body is?

21 A          Yes, so he -- we had him, obviously, handcuffed

22 and shackled, and he escorted us through the woods, and it

23 was a very circuitous route, and at one point, he stopped

24 and said this is it.  And it didn't look like a grave.

25 There was no mounding dirt.  There had been I believe like

1   twigs and leaves placed over it.  In fact, myself and

2   Detective Tim Rammel weren't sure that he was correct by

3   the route we took and just how it looked.

4   Q        Did it turn out he was correct on the location?

5   A        He was correct.

6   Q        Let's go ahead, if we can, play Exhibit 2.

7            THE COURT:  No, do you have it up?  That was

8   on us.

9            (Whereupon, exhibit played in open court.)

10  Q        All right.  And if you would, Special Agent

11  Eilerman, what are we looking at here?

12  A        So this is an overhead view of the area of where

13  Tim's body was located.  The red pin is going to be pretty

14  close, if not the exact spot, of where his body was

15  located.  Wrestle Creek Road is identified by the name

16  there.  And Blank Pike, as you can see, just to the -- in

17  this picture, the top of Blank Pike, but as it would sit

18  via cardinal directions, that pawn would be south of Blank

19  Pike.

20  Q        It does not appear to be much development in this

21  particular area of the county; would you agree with that?

22  A        No, it's very rural.

23  Q        All right.

24           If we could move on and let's show

25  Exhibit 3.

1        And what are we looking at here, special

2   agent?

3   A       So this is walking in.  I think you can see in

4   the left portion of the camera, I believe that's going to

5   be the road.  That's going to be looking back at the -- I

6   believe that's maybe -- actually, no.  That's -- yeah,

7   that's going to be looking back to the south of the road.

8   This is leading into the area of the wood, wooded area.  As

9   you can see, it's very low growth.  It's hard to walk.

10  It's not like walking through normal woods.  A lot of

11  honeysuckle.  There is a path that's there now, and that

12  path was largely created by the crime scene recovery team.

13  Q       Okay.  And how about Exhibit 4?

14  A       Again, just showing the overgrowth in this area

15  and how hard it is to walk through.

16  Q       And these pictures were taken presumably the

17  morning after Mr. Theodorou took you out there?

18  A       That's correct.

19  Q       So just days after the murder?

20  A       Correct.

21  Q       You indicated previously that Mr. Theodorou was

22  correct in the location that he provided.  I'm assuming

23  that a crime team was called in to process that scene?

24  A       Yeah.  So after he identified the location on the

25  night of the 27th, we had again contacted the B.C.I.,

```
 1   requested that they come out and their Crime Scene Team

 2   conduct the -- exhume the body.  And it was obviously late

 3   at night, so the Sheriff's Office had posted marked units

 4   in the area to protect the scene, and then early the next

 5   morning is when the processing of that area began.

 6   Q       All right.

 7           Let's show Exhibit 5, please.

 8           And what are we looking at here, please?

 9   A       So this is going to be, again, the intersection

10   of Wrestle Creek and Blank Pike Road and the coordinates

11   that the B.C.I. agents had designated to where Tim's body

12   was recovered.  And it shows, essentially, a straight line

13   from the road.  It was almost -- it was 178 feet.

14   Q       What's the distance -- the length of a football

15   field?

16   A       Three hundred feet.

17   Q       Let's pull up Exhibit 6, please, and if we could

18   zoom in on what's depicted there.

19           And what are we looking at here, please?

20   A       So this is going to be a diagram drawn by,

21   created by the B.C.I., Special Agent Sarah Taylor, who was

22   present at the time Tim's body was exhumed.  And this is

23   depicting the length, width, depth of the grave where Tim's

24   body was found.

25   Q       And what was the depth of the grave?
```

```
1    A         It was two feet.

2    Q         It says width, 2.2 feet, correct?

3    A         Correct.

4    Q         Length?

5    A         6.2 feet.

6    Q         And next, I'm going to ask you to take a look at

7    what's been marked as Exhibit 7.  And what are we looking

8    at here?

9    A         This is Tim's body.

10   Q         You can go ahead and take that down, please.

11             And that was Tim's body, obviously, in the

12   grave before it was removed?

13   A         Correct.

14   Q         Okay.  Anything of note about the body or the

15   grave?

16   A         Yes.  So Tim had, when his body was recovered, it

17   was identified that he had a plastic bag over his head.

18   Also, his hands and his feet were zip-tied and there was a

19   bluish-green substance that was found in the area of his --

20   of his torso and his head.  It was collected as an item of

21   evidence.

22   Q         The substance was not something that was

23   elsewhere out there at the -- at the burial location?

24   A         No.

25   Q         And is it your testimony that it was in the grave
```

```
1   as opposed to on top of the dirt covering Tim's body?

2   A        Correct.

3   Q        As you sit here today, do you know approximately

4   how tall Tim was and how much he weighed?

5   A        So Tim was, according to the Lucas County

6   autopsy, he was 5'10.5" and he weighed 229 pounds.

7   Q        After Mr. Theodorou has taken you out to the

8   grave site but before the body has been exhumed, it's my

9   understanding that you went back to the Sheriff's

10  Department to continue your interview with him; is that

11  correct?

12  A        Correct.

13  Q        All right.  Run us through that, please.

14  A        At this point, he told us that he had obtained

15  the substance from a gentleman in South Africa.  He shipped

16  it from South Africa to Amanda at Anita Green's residence.

17  He told us that Amanda had been planning this for a year.

18  He said that after it happened, Amanda had drug his body

19  from where Tim died into Anita's garage, and he presumed

20  that she prepared the body and -- as in zip-ties and

21  plastic bag.  He went on to tell us that they drove Tim's

22  car down to Dayton, where they planned to dump it in

23  Dayton.

24  Q        When you say "they," who drove Tim's car down?

25  A        So Amanda drove Tim's Volkswagen and Anthony
```

```
 1  followed in Amanda's Honda Pilot.

 2              He also provided information that when they

 3  drove to bury Tim's body, Anita Green drove them.  They had

 4  prearranged a plan where they weren't going to use cell

 5  phones.  Anita would drop them off, and every hour on the

 6  hour, she would travel back to that area where they buried

 7  Tim's body, and if they weren't standing down near the

 8  road, she would return home and come back an hour later.

 9  Q       Did he indicate to you why they had agreed that

10  they would not use cell phones?

11  A       Because cell phones can be tracked and they

12  didn't want to leave any sort of digital footprint of their

13  actions.

14  Q       What else did he tell you about the crime in this

15  initial interview?

16  A       He told us that after it happened, he, Anita, and

17  Amanda had been talking about it.  He recalled a time after

18  law enforcement had been to the house that Amanda had sat

19  him down and talked to him and told him that she had no

20  idea that Tim still had things at the hotel and wasn't

21  planning for that.

22  Q       Did he speak to you about whose idea it was to

23  drive Tim's car to Dayton?

24  A       Yeah, Amanda was the one who came up with the

25  idea to discard Tim's vehicle down in Dayton.
```

```
1    Q        And did you, subsequently, find evidence in the

2    dash cam to support that?

3    A        Yes.

4    Q        Were there other -- presumably, there are, given

5    the answer to the question I just asked you, there were

6    other videos on the dash cam recovered from Tim's car?

7    A        Yes.

8    Q        Okay.  Just generally speaking, what timeframe is

9    on there and what do they contain?

10   A        So from March 25th of 2022 until April 24th of

11   2022, videos.  On March 25th, it shows an attempted pickup

12   at Anita Green's house.  Tim showed up and was seen

13   speaking to Amanda at the backdoor of Anita's house.  The

14   girls didn't come out.  He ended up going into the car,

15   gathering a bag of gifts, and then went into the house.

16   And then, ultimately, left alone without the children.  And

17   on April 22nd, it showed him arriving at the Auglaize

18   county courthouse.  And later that night, it showed him

19   picking up the children at Anita's house.

20   Q        Obviously, showed the video we previously played

21   at the dropoff, correct?

22   A        Correct.

23   Q        And if I recall, the dropoff was just after

24   7 p.m. on April 24th, correct?

25   A        Correct.
```

1    Q        What's the next video?

2    A        The next video shows Tim's car leaving Anita's

3    driveway.  Shortly after turning right out of the driveway,

4    you can hear Amanda make the comment, "Fuck, yeah."

5    Q        Let's go ahead, if we can, play Exhibit 11.

6             (Whereupon, exhibit played in open court.)

7    Q        Is it that video you just referenced?

8    A        Yes.

9    Q        And we'll pause it right there, please.  Pause

10   it, please.

11             The date and timestamp at the bottom,

12   please?

13   A        So this was at 7:51 p.m. on April 24th of 2022.

14   Q        All right.  Let's go ahead and play.

15            (Whereupon, exhibit played in open court.)

16   Q        Thank you.

17            Are there additional videos on the drive to

18   Dayton?

19   A        Yes.

20   Q        All right.

21   A        There is another video where Amanda stops the car

22   and someone pulls up next to her.  We've identified that as

23   Anthony Theodorou, and they have discussions regarding

24   wiping the vehicle down when they dump it in Dayton.

25   Q        Let's play Exhibit 12, please.

| | | |
|---|---|---|
| 1 | | (Whereupon, exhibit played in open court.) |
| 2 | Q | Is that the video you were just referring to? |
| 3 | A | Yes. |
| 4 | Q | All right.  And are there additional videos? |
| 5 | A | Yeah, there's other videos during the drive down |

there.  There's a video that shows Anthony Theodorou in it.
There's another video that shows her pulling over and was
planning on throwing some of the stuff into a trash can,
but she saw people outside.

Q       Okay.

        Let's play Exhibit 13, please.

        (Whereupon, exhibit played in open court.)

Q       Thank you.

        Before the decision was made to interview
these folks, specifically, Mr. Theodorou, Ms. Green and
Amanda Hovanec, fair to say that you or members of your
team had been keeping on eye on their whereabouts, correct?

A       Yes.

Q       And, specifically, I want to draw your attention
to April 27th, which was the day of the interview, and I
believe three days after the murder; is that correct?

A       Correct.

Q       All right.  Anything in particular with regard to
surveillance of Amanda Hovanec on that date?

A       So the surveillance team noted that Amanda and

1  Anthony had taken the three girls to the Neil Armstrong

2  museum in Wapak.  They conducted surveillance, they

3  watched, and they saw the family arrive in Amanda's Honda

4  Pilot.

5  Q      All right.

6           Let's pull up Exhibit 14, please.  And if we

7  can zoom in on the picture, if we could.

8           And what's depicted here, Agent Eilerman?

9  A      This photo shows Amanda and their three children.

10 Q      And, again, the date at the bottom is accurate?

11 A      This is at 4:27 p.m. on April 27th, 2022.

12 Q      All right.

13          How about Exhibit 15.

14          And, again, what's depicted here?

15 A      This is Amanda's Honda Pilot.

16 Q      At the time -- I'm sorry.  Go ahead.

17 A      Shown at the Neil Armstrong Museum.

18 Q      At the time that this photograph was taken, is

19 there anything of significance about this?

20 A      At the time, no.

21 Q      And what about now?

22 A      That Amanda took her three girls to the museum in

23 the same car that she used to transport their deceased

24 father.

25 Q      You've talked about your initial interview of

```
1   Mr. Theodorou.  And I believe you said at the outset that

2   Anita Green was also being interviewed by other agents at

3   that time, correct?

4   A        Correct.

5   Q        And was Amanda Hovanec also being interviewed?

6   A        She was.

7   Q        And by different investigators?

8   A        Correct, yes.

9   Q        Fair to say that all three of them made some

10  level of admissions in these interviews and were arrested?

11  A        Yes.

12  Q        Either late on the 27th or early in the morning

13  on April 28th, correct?

14  A        Correct, yeah.

15  Q        All right.  Where were they -- what were they

16  charged with?  Where?

17  A        So Amanda, Anita and Anthony were all arrested

18  and charged in the state in Auglaize county with aggravated

19  murder.  They were held at the Auglaize County Jail.

20  Q        All right.  At some point, obviously, they came

21  up to federal court.  Do you recall approximately when that

22  was?

23  A        On May 2nd, a federal criminal complaint was

24  filed.  They were transferred to federal custody and

25  transported to Toledo for their initial appearance.
```

1    Q        As you sit here today, do you have an

2    understanding about how these cases resolved?

3    A        Yes.

4    Q        And, in particular, Anita Green pled guilty,

5    correct?

6    A        Anita Green pled guilty on October 17th of 2023.

7    Q        And how about Amanda Hovanec?

8    A        Amanda Hovanec pled guilty on February 14th of

9    2024.

10   Q        At that time, had Mr. Theodorou entered a guilty

11   plea?

12   A        Not yet.

13   Q        All right.  Did you have an opportunity, however,

14   to talk to him again in February of 2024?

15   A        Yes.

16   Q        And what were the circumstances of that?

17   A        We conducted proffer interviews of Mr. Theodorou.

18   Q        Okay.  Was his attorney present?

19   A        Yeah.  So a proffer interview is essentially

20   where the defendant is interviewed in the presence of their

21   attorneys.  Prosecutors are there.  It's a situation --

22   it's basically an interview where they have more

23   information to provide.

24            At the onset of the interview, a letter is

25   provided to the defendant and their attorney, which

```
 1   essentially lays out the rules of the interview stating
 2   that if they are truthful in their interview, none of the
 3   information that they provide can be used against them.
 4   Q        If I heard you correctly, Mr. Theodorou made
 5   significant admissions during his initial interview
 6   inculpating himself?
 7   A        Correct.
 8   Q        However, you agreed to sit down and proffer with
 9   him?
10   A        Yeah.
11   Q        And why was that?
12   A        He had more information to tell.  We wanted to
13   hear it.
14   Q        What's the more information as it relates to
15   Amanda Hovanec?
16   A        Well, about July of 2021, Amanda contacted
17   Anthony and asked Anthony if he knew of anyone who would
18   kill someone.  It was about an hour and-a-half
19   conversation, and at some point in the interview or in the
20   phone call, Theodorou realized that that someone was Tim.
21   He told her he didn't know of anyone, but he would ask
22   around.
23   Q        Did he ask around?  Did he tell you whether he
24   asked around?
25   A        He did.
```

1    Q       All right.

2    A       He -- he queried one of his close friends, a

3    gentleman by the name of Ronny Collins.  He asked Ronny if

4    he knew of anyone who would kill someone.  Ronny appeared

5    to not want anything to do with that, told him that's

6    ridiculous, then he dropped it and never brought it up with

7    Ronny again.

8            He got ahold of another associate, a friend

9    of his, and asked him the same question if he knew of

10   anyone that would be willing to kill someone, and that

11   person said they might know someone.

12           A while later, that associate contacted

13   Anthony and said he had found someone willing to do it.

14   There was conversations, discussions between Amanda,

15   Anthony, and this we'll call him hitman 1, and at some

16   point, hitman 1 found out that Tim worked for the U.S.

17   Government and he backed out.  And that was the end of

18   hitman 1.

19           Anthony went back to his associate, and he

20   asked his associate if he could find someone else, and he

21   said that he could.  He found a second person we'll call

22   hitman 2, and hitman 2 wanted 100,000 rand South African

23   payment with 50,000 up front.  Theodorou took cash that he

24   had on hand, traveled and provided it to the associate, who

25   then gave the money to hitman 2.  At that point, they never

1    heard from hitman 2 ever again.

2              Theodorou went back to his associate, and he

3    then became hitman 3.  The associate and Theodorou -- the

4    associate told Theodorou about M99, told him it's used

5    for -- as a tranquilizer on large animals, and he told him

6    that it's devastating to humans, and he was the one who

7    secured the M99.  He was the one who gave it to Theodorou

8    and planned to fly to the U.S. with Theodorou in April of

9    2022 to kill Tim.  He was going to fly into Columbus and

10   drive from Columbus to Virginia, murder Tim, and fly back

11   to South Africa.

12             About a week before he was set to travel, he

13   backed out and didn't go.

14   Q       Is it your understanding, based upon this

15   information that Mr. Theodorou provided you in February of

16   this year, that this associate, who became hitman 3, was

17   aware of what the M99 he obtained and gave to Mr. Theodorou

18   was going to be used for?

19   A       He was absolutely aware of it.  He planned to

20   have it shipped to Amanda, and then he would collect it

21   from Amanda when he came to the U.S. to kill Tim.

22   Q       Did Mr. Theodorou indicate to you what he did

23   with the M99 once he got it?

24   A       Sure, yeah.  So he shipped it to Amanda, and

25   prior to shipping it, he met up with this associate, also

1    hitman 3, collected it, and Amanda had directed him to ship

2    it via DHL.

3              Mr. Theodorou contacted DHL, and they said

4    that he can't ship liquids internationally.  He relayed

5    this information to Amanda, who told him that she had

6    shipped -- a friend had shipped her perfume while she was

7    abroad in the past and all he had to do was conceal it

8    within something else and not list it on the manifest and

9    he would be able to get it through.

10             So, at some point, Theodorou and associate,

11   his associate gathered a spare metal part that was long and

12   cylindrical, it had a threaded top that unscrewed, and

13   there was a void inside just about the size of the vial,

14   the glass vial containing the M99.  They concealed it

15   inside, screwed the top back on, and he mailed it out on

16   February 22nd along with several other items in the package

17   to include clothing, jewelry, a hookah pipe.

18   Q        Did Mr. Theodorou ever explain to you why, first

19   of all, whose idea was it to hire a hitman, according to

20   him?

21   A        Anita -- Amanda's.

22   Q        And did he ever explain to you why, after the

23   first one dropped out, why he attempted to locate

24   additional persons?

25   A        Yeah.  All of this was he was being directed by

1    Amanda.

2    Q        And if I heard you correctly, he also told you

3    that the reason he shipped the item in DHL and concealed it

4    in the way that he did is because that's what Amanda

5    Hovanec directed him to do?

6    A        Yes.

7    Q        Did Mr. Theodorou provide more details about the

8    weekend of the murder itself in April of 2022?

9    A        He did, yeah.

10   Q        Specifically, as it relates to Amanda, what new

11   information did he provide you?

12   A        So Anthony didn't go to the hearing on April 22nd

13   when Tim was granted immediate custody of the children

14   starting that night.  He picked up the girls from school.

15   When he came back to Anita's house, he saw Samantha, Anita

16   and Amanda in the kitchen talking.

17   Q        Who is Samantha?

18   A        Samantha would be Amanda's sister.

19   Q        Okay.

20   A        Theodorou said that Amanda was visibly upset.  He

21   went and settled the girls down and he came back into the

22   kitchen and he heard Amanda say that she was going to kill

23   him.  She was going to kill Tim.  And Anthony asked her

24   what was wrong, and Amanda said it doesn't matter, I'm just

25   going to kill him.

```
 1   Q          Mr. Theodorou tell you who was present when
 2   Amanda made this statement?
 3   A          Anita Green and Samantha, her sister.
 4   Q          Did he provide you any additional information as
 5   it relates to the burial location of Mr. Hovanec?
 6   A          Yes, he did.  The following day, on Saturday, the
 7   23rd, Anita, Anthony and Amanda were having dinner, and the
 8   discussions were about where they were going to bury Tim's
 9   body.  And, actually, let me back up just a moment there.
10              So Theodorou said that on Saturday in the
11   afternoon, Anita had taken Amanda for a ride.  And about
12   45 minutes after they left, they returned.  Amanda told
13   Theodorou that Anita had shown her an area, a pond that
14   Anita knew was going to be filled in with soil.
15              And so now fast-forward to the dinner on
16   Saturday night, they are discussing this pond as a place
17   where they were going to dispose of Tim's body.  Theodorou
18   told everyone that wasn't a good idea to put him in the
19   pond.  Even if they were going to fill it with soil, you
20   would have to weigh the body down.  The pond is close to
21   the road.  If those weights break free, the body would
22   float to the surface.  So, ultimately, they decided that
23   they would bury his body in the north in the woods where,
24   ultimately, his body was buried.
25   Q          He previously told you in his initial interview
```

1    that Anita Green had driven he and Amanda to the grave site

2    after the murder when they buried Mr. Hovanec's body,

3    correct?

4    A        Correct.

5    Q        Did he provide you with any additional

6    information about Anita Green's involvement during the

7    proffer?

8    A        Yeah, he said that, after that dinner, Anita

9    drove them to dig the grave.  The same plan as far as when

10   they dropped off and buried Tim's body that no cell phones

11   would be used, that every hour, on the hour, Anita would

12   return, and if they weren't standing down by the road that

13   she would come back an hour later.

14            He also said that Anita provided them with

15   shovels, Anita provided them with bibs and rubber boots.

16            And he provided information that said Anita

17   was present on Sunday when they loaded Tim's body into

18   Amanda's Honda Pilot.

19   Q        Are you saying that Mr. Theodorou told you that

20   the grave was dug in advance of the murder?

21   A        Yes.

22   Q        Did you have an opportunity, after receiving this

23   additional information from Mr. Theodorou, to attempt to

24   corroborate any of it?

25   A        Yeah.

1    Q        All right.  What, specifically, were you able to

2    corroborate or what were you looking at to corroborate?

3    A        Well, aside from his corroboration of where he

4    took us to where the body was, we reviewed his cell phones,

5    and there was a massive amount of WhatsApp messages between

6    Anthony and Amanda dating all the way back to around 2019

7    when they met.

8    Q        All right.

9             Let's pull up, if we can, Exhibit 16.  And,

10   yeah, we are probably going to have to zoom in on each one.

11   Yes, please.  Or even a couple at a time and see what that

12   looks like.

13            Can you read those okay, Agent Eilerman?

14   A        I can.

15   Q        Okay.  Are these messages from Mr. Theodorou's

16   phone?

17   A        They are.

18   Q        Okay.  And who are these messages between?

19   A        So the top left, where you see a 419 number, that

20   is going to be Amanda.  And her name in their next threads

21   was Kitty.  And the bottom right, the green messages, are

22   going to be from Theodorou.

23   Q        Okay.  When you say Kitty, is that a pet name?

24   A        Yes.

25   Q        Okay.  And was there a similar pet name that

1    Amanda Hovanec had for Anthony Theodorou?

2    A       Yes, it was Puppy.

3    Q       All right.  Thank you.

4            So these messages, it appears to me, are

5    from July 13th of 2021; is that correct?

6    A       Yes.

7    Q       Okay.  And did you find in your review that these

8    messages appeared, similarly to the dash cam videos, to be

9    accurate with regards to the date and time?

10   A       Yes.

11   Q       Okay.  So, if you can, let's just start here with

12   this initial message from Ms. Hovanec.

13   A       Amanda says, quote, "Can you promise me that

14   you'll still go the hunting farm this weekend even if I'm

15   not there?"  End quote.

16           Which Anthony responds, quote, "Can't make

17   that promise."  End quote.

18   Q       Okay.  Give us a little context here.  What's the

19   hunting farm?  What's she asking here?

20   A       Hunting farm is where his associate and hitman 3

21   live.

22   Q       Okay.

23           Go to the next set of messages.

24   A       So continuing the conversation, Amanda says,

25   quote-unquote, "Why."

1        And Theodorou responds, quote, "Because I
2   don't want to go if you not here."  End quote.
3   Q       All right.
4              Next page, please.
5   A       Continuing.  Amanda says, quote, "Yeah but I want
6   to know if plan b is possible."  End quote.
7   Q       And according to Mr. Theodorou and your
8   conversation with him, what was plan b, generally speaking?
9   A       Plan b would be the hitmen, to hire hitmen.
10  Q       And who is asking if they want to know if that's
11  an option?
12  A       Amanda.
13  Q       Okay.  And what does Mr. Theodorou respond?
14  A       He says, quote, "I'll follow up with him."  End
15  quote.
16             To which Amanda replies, "Ok."
17  Q       Okay.  And what does Mr. Theodorou say?
18  A       Theodorou says:  But no point going up there if
19  you're not here.
20  Q       Okay.  Next page, please.
21  A       Amanda says, "Well there is if you're able to
22  talk to him and get more information then you would by
23  phone."
24             To which Theodorou replies, "Yea I guess
25  so..I'll see how things go."

```
1                    Amanda replies:  "Ok."

2                    Followed by another message from Amanda that

3         says, "Sorry puppy.  I just want this to all be different

4         for all of us and that's the only way I know how.  And I

5         want to change it now.  Not wait while the girls keep

6         getting fucked over."

7    Q        Okay.

8                    Next page.

9    A        Theodorou responds in the same text string, "I

10        know..thats why it would be best for you to be here to

11        speak to him directly..even if you here for a few days."

12                   Amanda replies, "What am I supposed to do

13        about the girls?"

14                   Theodorou responds and says, "Wait and see

15        what your attorney says" tomorrow.  He abbreviates

16        tomorrow.

17                   Amanda responds, "And if he says I can go

18        pick them up?"

19                   Theodorou says, "Then you go pick them up."

20                   Amanda says, "So then would you talk to the

21        guy for me?"

22                   Theodorou says, "Ya I will."

23                   Theodorou says, "But you the one that has

24        all the details and questions."

25                   To which Amanda responds, "Ok.  You can
```

```
 1   always video call me so I can be apart of it too."
 2                 Theodorou responds, "K."
 3   Q          And then this message appears to be from a
 4   different date, on July 22nd, about a week later, correct?
 5   A          Correct.
 6   Q          And this is a message from who to whom?
 7   A          This is a message from Theodorou to his
 8   associate, hitman 3.
 9   Q          All right.  And what does it say?
10   A          It says, "I know you lost signal your end..but we
11   can come up whenever you not busy with things.  Oom.
12   Amanda also wants to check out" -- I can't read that --
13   "Mooivalei and see your" -- "and see your set up there and
14   then we can speak properly about all the other things."
15   Q          Did you have the opportunity to ask Mr. Theodorou
16   about these messages?
17   A          Yes.  He said --
18   Q          And go ahead.
19   A          That was in reference to discussions with his
20   associate regarding Amanda's desire to hire a hitman and
21   kill Tim.
22   Q          Okay.
23                 And Exhibit 17, please.
24                 Did you find additional messages in support
25   of that plan?
```

```
1   A        Yes.

2   Q        All right.  These messages appear to be from

3   August 11th of 2021; is that correct?

4   A        Correct.

5   Q        And, again, blue is Ms. Hovanec, green is

6   Mr. Theodorou; is that accurate?

7   A        I don't believe this is Ms. Hovanec.

8   Q        I'm sorry.  Tell me who it is then?

9   A        This is going to be hitman 3, also, the associate

10  of Theodorou.  And he says, "Where in the states is he?"

11           Theodorou responds, "He's residence is in

12  Virginia but he has to go to Ohio to pick up the girls."

13  Q        And what are we looking at here?

14  A        It's going to be another conversation between the

15  same two, Theodorou and his associate, also hitman 3.

16  Theodorou states, "Hey Oom.  Sorry if you are busy.  Just

17  wanted to find out if you've heard back from him yet?"

18           "Him," Theodorou said, would have been the

19  hitman, one of the proposed hitmen.

20           To which associate 3 forwards a text I

21  believe to Theodorou, and it says, "Hi Craig.  Don't you

22  mind calling Anthony."

23  Q        Okay.  And next page, please?

24  A        To which it's also a forwarded text sent from

25  associate, slash, hitman 3 to Theodorou said, "Not today.
```

1  Still pondering."

2  Q        And then what is this at the bottom?

3  A        That's a representation of a monetary, the

4  South African form of currency is called the rand, so that

5  says 7,500 rand.

6  Q        Okay.  And the date of these messages is now in

7  January, correct?

8  A        January 26th of 2022.

9  Q        And who were these messages from?

10 A        This is a message from the associate, slash,

11 hitman 3 when he says, "About a quarter of a full bottle."

12 Q        Similarly, did you ask Mr. Theodorou about these

13 messages in the subsequent interview?

14 A        Yes.

15 Q        And what did he tell you they represent?

16 A        These were referencing the M99 and how his

17 associate was able to get a vial containing about a quarter

18 of the liquid of the M99, and then the 7,500 rand was the

19 cost for the M99.

20 Q        Were you able to obtain any corroboration from

21 Mr. Theodorou's statements that he shipped the M99 after

22 receiving it from South Africa or in South Africa to

23 Ms. Hovanec?

24 A        Yes, we reached out.  I reached out to a United

25 States Postal Inspector who works closely with Customs and

1   Border Protection Agent who was able to monitor inbound

2   shipments into the U.S.  And he located a DHL package that

3   was delivered to 19423 Middle Pike Road on March 1st of

4   2022.

5   Q       All right.

6           Let's pull up Exhibit I guess it's 18,

7   please.  And what are we looking at here?

8   A       So this is going to be the waybill for the

9   package that was shipped by Anthony Theodorou to Amanda

10  Hovanec, which contained the M99.

11  Q       And what's the date, please, that this was

12  shipped?

13  A       The date this was shipped was on February 22nd of

14  2022.

15  Q       Okay.  And the next page.

16          Then what is this?

17  A       This is going to be the manifest of what was

18  claimed to be inside.  And what was claimed was clothes,

19  four items, a metal bookmarker, a Shinelife hookah nozzle

20  bead.

21  Q       Next page, please.

22  A       A galvanized metal African decorative paper,

23  necklaces, Lovisa jewelry times four, and E-Z Lock bag

24  sealers.

25  Q       Okay.

```
 1                    Next page.

 2                    And what is this?

 3    A         This is the identification that was shown when

 4    the package was shipped at DHL.

 5    Q         And --

 6    A         That's Anthony Theodorou's ID.

 7    Q         Thank you.

 8                    Next page.

 9                    What is this?

10    A         This is going to be the custom's clearing.  Since

11    it's leaving one country and coming into another, this

12    paperwork had to be filled out.  And it shows the shipper's

13    name is Anthony Angelo Theodorou, and it provides his

14    address, contact phone number, and then email, and then

15    consignee, or recipient's name, as Amanda Leigh Hovanec,

16    19423 Middle Pike Road, Wapak, Ohio, provides her phone and

17    an email.

18    Q         And any corroboration that the package was

19    actually received by Amanda Hovanec in Wapakoneta, Ohio?

20    A         Yes.

21    Q         Next page, please.  You have to go up.  Thank

22    you.

23    A         It shows that the package was delivered on

24    March 1st of 2022 and was received by Amanda Hovanec.

25    Q         You are familiar, as the case agent, no doubt,
```

```
 1   with the content of the interviews and the evidence,

 2   generally, of the entire investigation, correct?

 3   A        Yes.

 4   Q        Okay.  Based upon that knowledge, can you tell

 5   the Court who injected Tim Hovanec with M99 on April 24th

 6   of 2022?

 7   A        Amanda Hovanec.

 8   Q        Who rolled his body into the garage after he was

 9   dead?

10   A        Amanda Hovanec.

11   Q        Who wrapped his body in plastic before getting

12   help to load it into her car?

13   A        Amanda Hovanec.

14   Q        Who asked Anita Green to drive Tim's body to the

15   grave site?

16   A        Amanda Hovanec.

17   Q        Who disposed of Tim's car after the murder?

18   A        Amanda Hovanec.

19   Q        Who disposed of Tim's phone and his personal

20   property after the murder?

21   A        Amanda Hovanec.

22   Q        For the record, was Amanda Hovanec still lawfully

23   married to Tim Hovanec at the time of the murder?

24   A        Yes.

25   Q        You are aware, as the case agent, that Amanda
```

1  made a claim during the investigation that Tim was abusive

2  to his children, correct?

3  A        Correct.

4  Q        What, specifically, was the claim, to your

5  knowledge?

6  A        The claim was on November 7th of 2021, Tim had --

7  was returning the girls from a weekend visitation.  After

8  he returned the girls, Amanda was giving their oldest

9  daughter a bath, and she noticed bruising on the daughter's

10  torso and she also noticed bruising on her elbow and the

11  back of her leg.  Amanda contacted law enforcement later

12  that night to file a report.

13  Q        And what is the date and time of the report?

14  A        That was 11:51 p.m. on November 7th, 2021.

15  Q        Did you have an opportunity to look into the

16  allegation and, specifically, the report that was made?

17  A        I did, yes.

18  Q        All right.  Tell us what you did.

19  A        Auglaize County Sheriff's Deputy Mickie Grothause

20  responded, and he interviewed, he conducted an

21  investigation to include interviewing the daughter.  He

22  took photographs and he asked the daughter what had

23  happened, and the daughter told him that her and one of her

24  sisters were like jumping on a bed making a commotion and

25  it upset Tim and he yelled at them and picked up the oldest

1    daughter by the torso and set her down in a chair.

2    Q        Now do you know that because you read that in a

3    report?

4    A        Yes.

5    Q        Any other reason that you know that?

6    A        We interviewed the Sheriff's -- the Deputy,

7    Mickie Grothause.

8    Q        And did you ask him, specifically, about that

9    statement that the daughter made?

10   A        Yes.

11   Q        And did he stand by that?

12   A        Yeah, absolutely.

13   Q        In fact, the report indicates that he

14   specifically asks the child if she was thrown into the

15   chair or sat on the chair, correct?

16   A        Correct.

17   Q        And he confirmed that she said that she was sat

18   in the chair?

19   A        Correct.

20   Q        Okay.

21            Did you have an opportunity to review the

22   photographs with the alleged injuries?

23   A        Yes.

24   Q        Okay.

25            Pull up Exhibit 20, please.

```
 1                     All right.  What are we looking at here on

 2    page 1?

 3    A         This is a photograph depicting what appears to be

 4    some mild bruising on their oldest daughter.

 5    Q         Okay.

 6                     Page 2, please.

 7                     What are we looking at here?

 8    A         This is -- it's going to be their oldest

 9    daughter's torso, and you can see some bruising on the

10    torso.

11    Q         Okay.

12                     Page 3?

13    A         This has -- this would be a bruise on the elbow

14    of the same child.

15    Q         Okay.

16                     And page 4?

17    A         This is the child where those photos were taken.

18    Q         So that photo of the child at the time the photos

19    were taken?

20    A         Yeah.

21    Q         All right.

22                     Thank you, you can take that down.

23                     After taking the report and these

24    photographs, what did Deputy Grothause do?

25    A         Well, as a sheriff's deputy, they are a mandatory
```

1   reporter, so he referred the incident to the Auglaize

2   County Children Services and they took all the information

3   and they decided not to screen the case in.

4   Q       Now do you know that from reviewing reports or do

5   you know that for another reason?

6   A       Well, reviewing reports and interviewing Seth

7   Bowersock, who was the supervisor at Auglaize County

8   Children Services.

9   Q       Was he the supervisor on call on the evening this

10  report came in?

11  A       Yes.

12  Q       All right.

13          What did Mr. Bowersock tell you about the

14  report and Children Services' position with regard to it?

15  A       He indicated that he reviewed all the information

16  and they decided not to screen it in based on the fact

17  that, to them, it didn't appear to be abuse.  There was no

18  history of abuse.  The child, in fact, claimed that it

19  wasn't abuse, and the fact that Tim and Amanda were going

20  through a divorce.

21  Q       Now this report came in in November I believe you

22  said 7th of 2021?

23  A       Yes.

24  Q       What was going on with the divorce and custody

25  case at that time?

```
1   A         They had -- in September of that same year, they
2   had agreed on a shared parenting plan.
3   Q         They had agreed on a shared parenting plan to
4   share visitation or custody of their children?
5   A         Yeah.  Essentially, the shared parenting plan,
6   both Tim and Amanda had agreed on a certain schedule on
7   which parent would have custody of the children and when.
8   Q         Okay.
9             Let's pull up Exhibit 21, please.
10            And is this a copy of that court notice?
11  A         It is.
12  Q         Okay.  And what's the date there, please?  Top
13  right?
14  A         Filed on September 13th of 2021.
15  Q         Okay.  And read the last sentence on this page,
16  please.
17  A         At the time of the agreement of the parties was
18  read into the record, both parties were advised of their
19  rights, and both parties acknowledged the agreement and
20  wished for --
21  Q         Next page, please.
22  A         -- the Court to approve the shared parenting plan
23  as the same being in the best interest of the minor
24  children.  As a result, the parties have agreed that the
25  guardian ad litem investigation be suspended, and his
```

```
 1   obligation to complete a written report also suspended
 2   until further order of the Court.
 3   Q        The document appears to be signed by Ms. Hovanec,
 4   Mr. Hovanec, and the guardian ad litem?
 5   A        Correct.
 6   Q        So then September of '21, it appears that they
 7   had resolved at least the custody issues with regard to the
 8   children?
 9   A        Yes.
10   Q        Okay.
11            In going through the cell phone
12   communications, did you find other messages, post shared
13   parenting plan, about the terms of that agreement?
14   A        Yes.
15   Q        All right.
16            Let's pull up Exhibit 22, please.
17            And what are we looking at here, Special
18   Agent Eilerman?
19   A        It's a WhatsApp text conversation between Amanda
20   and Anthony.  Again, blue will be representing Amanda.
21   Green will be representing Anthony.  This is dated
22   November 2nd, 2021, and reads as follows:
23            This is from Amanda:  And the best part of
24   the conversation with him was that he had said that because
25   Tim had failed to put any relocation clause into the plan
```

1   that there was nothing stopping me from moving the girls --

2   moving with the girls.  I only have to submit an intent to

3   relocate with the courts and they send him a notification,

4   parentheses, which he can try to file a motion to if he

5   really wanted to, end parentheses, but as long as I show

6   that his visitation rights won't be hindered, then they

7   won't reopen the case.

8   Q       Okay.  And a subsequent message a few minutes

9   later?

10  A       So it says:  We believe that it only pertains to

11  relocation inside the country as of now, but may be able to

12  file for outside the country as well.  He was going to look

13  into more.

14  Q       Okay.  And Mr. Theodorou's response?

15  A       That would be amazing.  Definitely let me know

16  what he finds out about it, and if relocation abroad will

17  be possible under the parenting plan that he submitted.

18  Q       Okay.

19                  Next page, please.

20  A       We are now on November 4th of 2021.  This message

21  is again from Amanda.  It says:

22                  Also, the house appraisal came in this

23  morning for the joint property in Maryland as it was valued

24  at 100,000 more than what we purchased it for.  Tim is

25  honestly going to shit himself with how much he'll have to

```
 1   pay me.  It will definitely pressure him more to settle for

 2   us to relocate and he keep finances.

 3   Q       All right.

 4           After the report came in of alleged abuse on

 5   November 7th of 2021, presumably, the Court was notified?

 6   A       Yes.

 7   Q       All right.  Guardian ad litem reappointed, to

 8   your knowledge?

 9   A       Yes.

10   Q       Okay.

11           Was there anything else that you did as part

12   of your investigation to try and run aground and determine

13   whether there was any truth to Amanda Hovanec's allegations

14   that Tim was abusive to the children?

15   A       Yes.  So Amanda and Tim lived and worked in

16   Victoria, South Africa, and prior to that, in Frankfurt,

17   Germany.  So myself, two State Department agents and a

18   deputy from Auglaize county traveled to Victoria and then

19   Frankfurt, and we conducted numerous interviews of

20   associates, friends, co-workers.  And there was absolutely

21   no discussions about abuse of the children.

22   Q       At any time during your investigation, were you

23   able to locate any reports filed by Ms. Hovanec alleging

24   abuse against either her or the children from their father?

25   A       Aside from the one we discussed, no.
```

```
1    Q        During any of your interviews there in Germany

2    and in South Africa, were you able to identify anyone who

3    gave you even cause for concern to think that there might

4    be some truth to the allegation of abuse?

5    A        No.

6    Q        Okay.  With no credible finding to the

7    allegations, what, in your opinion, as you sit here today,

8    was a motive for Ms. Hovanec to commit this crime?

9    A        The motive to kill Tim was so Amanda could move

10   with her children unimpeded to South Africa and live a life

11   with Anthony Theodorou.

12   Q        What do you base that on, agent?

13   A        My investigation, what we reviewed in text

14   messages, discussions with, interviews with Theodorou.

15   Q        Let's take a look at Exhibit 23, please.

16            And what are we looking at here?

17   A        So this is -- these are text messages from Amanda

18   Hovanec in late 2019, December 12th to be exact, where

19   Amanda's responding to someone, and she says:  I don't want

20   to settle down in the states.  I have no idea where I want

21   to settle down, but I know that the states have never felt

22   like home for me.

23            The second text message is going to be dated

24   April 13th of 2021.  It's titled:  Kitty.  We know that's

25   Amanda.  There's a subtext in there that she's responding
```

```
1   to that says:  I'm still missing you a fuck load more.
2   Sometimes it gets a point where I start to feel sick.
3   That's presumably from Anthony Theodorou.
4                   To where her response is:  Same.  I can't
5   wait for this to all be over and we just focus on our life
6   together.
7   Q       What about this one from May 11th of 2021?
8   A       It's from Amanda.  It says:  Random times.  But
9   it happens often enough.  They always ask about our future
10  wedding.  If we'll ever live -- if we'll ever live with
11  you.  When you'll come visit.  If they can come visit you.
12  When will we have a baby so they can help take care of it.
13  And whenever we talk about family, they always say that,
14  one day, you'll be a part of ours, too.
15  Q       All right.
16                  Next, page.
17  A       June 3rd, 2021, from Amanda.  It says:  Truth.
18  Would you still want to have a baby together even if the
19  girls and I couldn't live in South -- S.A., referring to
20  South Africa -- with you.
21  Q       Okay.
22                  Next page.  You can highlight all of these,
23  please.  Yep.
24                  What are we looking at here?
25  A       Dated June 7th of 2021.  The photo was basically
```

1   a notice of rescheduling of pretrial hearing to

2   September 20th of -- actually, to July 12th of 2021.

3   Q        So their custody hearing as been kicked?

4   A        Pushed, yes.

5   Q        Okay.  And what does Ms. Hovanec say about that?

6   I believe it's in the title of the text message?

7            If you need her to make that bigger, just

8   let us know.

9   A        I'm not seeing.

10  Q        Go ahead and just --

11  A        Okay.  Yes, can you zoom that in a little bit?

12  Okay.  I think I got it.

13           It says:  Seriously, the shit will never

14  end.

15           To which Mr. Theodorou responds:  What was

16  the reason now for them to change it to September?

17  Q        Okay.

18           Next page, please.

19  A        Amanda responds and says:  No idea.

20           And Mr. Theodorou says:  I'm sorry, my baby.

21  I want this all to end as much as you do.

22  Q        And just to be clear, the timing of these

23  messages is in June of 2021, correct?

24  A        Yes.

25  Q        Which you now know was approximately a month

1    before you found corroboration on the phone that she wanted

2    to hire a hitman?

3    A        Correct.

4    Q        Thank you.

5                    Next page.

6    A        So in response to the last text that I read from

7    Theodorou, Amanda says:  Thanks, Puppy.  I know you do.

8                    To which Theodorou responds:  I really wish

9    I could be there for you.  It kills me to know that I'm not

10   next to you right now.

11                   Amanda responds and says:  How am I supposed

12   to last another fucking year doing this?  I seriously want

13   to scream.

14   Q        Next page, please.

15   A        Text from Amanda dated June 9th of 2021:  I'm

16   sorry I disappoint you, and if me being stuck here is my

17   life moving forward, then I honestly don't know what I have

18   to offer you.  I feel like I'm in one of those moments

19   where you know you have to let someone go in order for them

20   to live a happy life and not a miserable one.  Sent to

21   Anthony Theodorou.

22                   And the next text, immediately following,

23   says:  But I'm not brave enough to let you go.

24                   On September 10th of 2021, Amanda says:  No,

25   I promise I'm not.  The girls and I pass on it -- pass it

1   on the way to school and I was curious to see what it

2   looked like inside, so I took the pictures to Google -- to

3   Google it and check out the photos online.  It's cute, but

4   I'm definitely not for real looking for any houses until

5   after the final verdict regarding divorce, slash, custody

6   and having your input on the matter as well.

7   Q       Next page.

8               And what is his response to her -- I'm

9   sorry -- yeah, his response is?

10  A       Theodorou responds and says:  Okay, I was just

11  checking, L-O-L, but yeah, let's wait to see how the court

12  case goes.  I'd rather we look for a house here for all of

13  us.

14              To which Amanda replies:  Of course.

15  Q       Next page.

16              Now these messages appear to be in April of

17  2022, correct?  Just a few weeks before the murder?

18  A       This -- this, yes, April 8th of 2022.

19  Q       Okay.

20  A       This is from Theodorou to Amanda and it says:

21  Please ignore me tonight.  I'm just in a bit of a mood

22  because I'm honestly really missing you.  I get to a point

23  where I don't know what to do with myself because I just

24  want to be next to you.  And then after the comment you

25  made about South American food and me going there to see

1    you, it just put such a damper on the whole situation.  I

2    don't want to be far away from you.  I want you every day,

3    forever, and if I can't get that, it will honestly kill me.

4              Amanda's response is:  I'm really missing

5    you, too, Anthony.  Way too much.  I don't want to be away

6    from you, either, and I hate it.  I hate that we can't

7    experience everything together and live every moment

8    together, and I hate it even more fighting with you when

9    you are so far away.  It was much easier arguing with you

10   in person and still being able to hold your hand and kiss

11   your lips, then do naughty things with you afterwards.

12             Followed by, from Amanda:  I wish I were

13   there to put your mind at ease and remind you of how much I

14   love you and that you are stuck with me for eternity.

15             Theodorou responds:  I just don't want it

16   like this.

17   Q       Next page?

18             THE COURT:  Could we maybe do that half at a

19   time?  It's too hard --

20             MS. STERLING:  Too hard to read?  Sure.

21             THE COURT:  It's a vision test for

22   everybody.

23   A       So Amanda is responding to a text from Anthony,

24   and Anthony subtexts within her text, says:  No, not

25   really.  Every conversation, everything I think about just

```
 1   makes me miss you so much more.  I know I haven't seen you
 2   for a day, but it's really killing me inside.
 3                   To which Amanda responds:  I hate it more
 4   than you do.
 5                   And then in response to Theodorou's text,
 6   where it says I just don't want it like this, Amanda says:
 7   What do you want me to do?  I'm trying everything I can to
 8   change it.
 9   Q        And the next page, please, last page.
10                   Just one at a time.
11   A        On April 9th of 2022, Amanda says to Theodorou:
12   I miss having the conversations in person and being able to
13   touch and feel you whenever I want just as much, if not
14   more, than you do.  I can't wait until our life is
15   different and we finally get to live it the way we want.
16                   April 9th, Theodorou responds:  I hope you
17   enjoy your dinner tonight and that the girls make their way
18   outside to burn a bit of energy off.  But you can also tell
19   the girls that they all have to finish their dinner tonight
20   if they want me to come and give them all hugs.  I can't
21   explain to you how much I miss you, Amanda.  Just typing
22   this message out is bringing literal tears to my eyes.  I
23   hate feeling like this where I know everything I want in my
24   life is halfway across the world.  Just know that I'm
25   always longing to have you next to me where I feel like I'm
```

```
1    the luckiest person alive and that I'm on top of the world.

2    Everything just seems so perfect when we together.  I love

3    you more than words could ever explain, or more than I

4    could ever show you.  You are my everything and always will

5    be.

6              And response from Amanda:  I both hate and

7    love when you're like this.  I love everything you say as

8    far as wanting to be next to me more than anything and

9    missing me like crazy, but I hate that you're so sad and

10   upset over it, and I wish I could change it.  I hate being

11   away from you just as much as I cannot wait for the day

12   that we get to spend our life together and never have to

13   say goodbye or be apart longer than we want to.  I love you

14   with all my heart, Anthony.  Always and forever.  I hope

15   you sleep well -- I hope you sleep well, handsome man.

16   Q         Fair to say they were in love?

17   A         Yes.

18   Q         Thank you.

19              MS. STERLING:  If I could just have a

20   moment, Your Honor.

21                   (Pause in the proceedings.)

22              No further questions of this witness.  Thank

23   you.

24              THE COURT:  I think this would be a really

25   good time to take about a ten-minute break.
```

1          MR. KLUCAS:  That's a-okay with us.

2          THE COURT:  And I would say five, but there

3    is so many people here and for the bathrooms.

4          Folks, there's bathrooms on this floor and

5    down -- the floor below us is a mirror image of this floor,

6    so there's restrooms out this door and to your left and

7    also down the stairway in the same location by the

8    elevators if you use those.

9          So we'll be in recess until --

10         MR. KLUCAS:  Judge?

11         THE COURT:  Yes?  11:30?

12         MR. KLUCAS:  It's already 11:30.  Could I

13   just maybe get a few more minutes than ten?  I'm going to

14   have to move some things.  I don't know when we are going

15   to be done here.  I'm running into a conflict.

16         THE COURT:  So how long do you need,

17   Mr. Klucas?

18         MR. KLUCAS:  Like 15 is fine.

19         THE COURT:  So 11:35?

20         MR. KLUCAS:  That's fine.

21         THE COURT:  Okay.  I would ask, please don't

22   have any conversations with the agent while we are on break

23   about anything about the case.  I mean, you can ask him

24   where he got his tie or something, but don't talk to him

25   about the case, please.

```
 1                    MS. STERLING:  Understood.

 2                    THE COURT:  Okay.

 3                    We'll be in recess.

 4                    MS. STERLING:  Thank you.

 5                    (Whereupon, a break is taken.)

 6                           - - -

 7              (Proceedings resumed in open court.)

 8                    THE COURT:  Okay.

 9                    Mr. Klucas?

10                    MR. KLUCAS:  Yes.

11                    THE COURT:  Proceed.

12                    MR. KLUCAS:  Thank you, Judge.

13                    THE COURT:  And that stand will rotate

14    45 degrees if you want to turn a little bit towards him.

15                    MR. KLUCAS:  We'll see how it goes.

16                    THE COURT:  Okay.

17                    MR. KLUCAS:  It's my first go round with the

18    new podium, so.

19                    THE COURT:  It will go up and down and it

20    will rotate 45 degrees towards him if you get tired of

21    whipping your neck around, so.

22                    MR. KLUCAS:  All right.

23                    THE COURT:  And if you want to move around,

24    I got to put a wireless mic on you.

25                    MR. KLUCAS:  No, I'm going to stay put.
```

```
1                            - - -

2                      CROSS EXAMINATION

3   BY MR. KLUCAS:

4   Q        I think it's still morning.  Good morning.

5   A        Good morning, sir.

6   Q        It's Eilerman?

7   A        Yes.

8   Q        Okay.  Agent Eilerman, you started your direct

9   testimony for Ms. Sterling by indicating you had been with

10  the FBI for 16 years?

11  A        Yes.

12  Q        Okay.  In April of 2022, what were your duties

13  with the FBI?

14  A        I was the coordinator and still am the

15  coordinator of the Northwest Ohio Safe Streets Task Force,

16  which is a drug and violent crime task force in Lima.

17  Q        All right.  And in the context of those duties,

18  do you have the opportunity to investigate a lot of murder

19  cases?

20  A        I would say no.

21  Q        Okay.  And you would agree with me that this is a

22  homicide case, right?

23  A        It is, but, at the time, we weren't aware that it

24  was a homicide when we initially got involved.

25  Q        Okay.  I'm with you.  I didn't ask you that,
```

```
 1   though, right?  You would agree with me today that this is

 2   a homicide case?

 3   A        Yes.

 4   Q        All right.

 5            I want to ask you some questions about the

 6   course of the investigation, all right?

 7   A        Okay.

 8   Q        I think you testified that on April 25th, in the

 9   afternoon, that the hotel had contacted local law

10   enforcement about a guest who had overstayed?

11   A        Correct.

12   Q        All right.  And that guest was Mr. Hovanec?

13   A        Yes.

14   Q        And that would have been at shortly before 2 p.m.

15   that day?

16   A        I don't recall the specific time when they

17   contacted Wapak Police Department.

18   Q        Okay.  But you would agree with me that it was on

19   the 25th?

20   A        Yes.

21   Q        All right.  And I think you indicated that after

22   the hotel had contacted local law enforcement, that they

23   had asked the sheriff's deputies to go out to where

24   Ms. Green and Amanda lived?

25   A        Correct.
```

```
 1   Q        And they did that?

 2   A        Yes.

 3   Q        All right.

 4            And then as the investigation developed, you

 5   indicated you had submitted exigent requests to Verizon?

 6   A        I think it was T-Mobile.

 7   Q        If your probable cause affidavit says Verizon,

 8   would you agree with that?

 9   A        If that's what it says, yeah.

10   Q        Okay.  Let me, because I'm not trying to trip you

11   up here, let's phrase the question like this.  You had

12   submitted exigent requests to Mr. Hovanec's cellular

13   provider?

14   A        Correct.

15   Q        Whoever it may have been?

16   A        Yeah.

17   Q        All right.  And when you asked for that sort of

18   information, that's not information indicating what tower

19   the phone's hitting off of, right?

20   A        Correct.

21   Q        That's location data that is kept by the provider

22   themselves?

23   A        Yes.

24   Q        And that location data I believe is expressed in

25   longitude and latitude?
```

```
1   A          Yeah.  I'm not an expert on that, but yes, that's
2   how the numbers are given to us.
3   Q          Okay.  And so this is going to be a far more
4   precise exercise than just what tower they are hitting off
5   of?
6   A          Yes.
7   Q          And, again, that information is maintained by the
8   provider?
9   A          Correct.
10  Q          Only the provider can get rid of that
11  information?
12  A          Yes.
13  Q          Okay.  Ms. Hovanec can't get rid of that
14  information?
15  A          Correct.
16  Q          Mr. Theodorou can't get rid of that information?
17  A          Correct.
18  Q          Okay.  That information is going to be with the
19  provider?
20  A          Right.
21  Q          And were you the one that reviewed the
22  information that came from the provider?
23  A          No.
24  Q          Okay.  That information was shared with you?
25  A          The results were shared with me, yes.
```

```
1    Q          Right.  It's your case?

2    A          Yes.

3    Q          All right.  And from that information, you

4    learned that the last location provided was in the Dayton

5    area?

6    A          Correct.

7    Q          I think you said Highland Park neighborhood; is

8    that what you said?

9    A          I believe so, yes.

10   Q          All right.  And this was still on April the 25th?

11   A          No, this would have been on April the 27th.

12   Q          On the 27th?

13   A          Yes.

14   Q          You got your information from Verizon on the

15   27th?

16   A          Correct.

17   Q          Okay.  And with that information from Verizon,

18   found Mr. Hovanec's car?

19   A          Agents in Dayton found it, yes.

20   Q          When I say "you," unless -- it's law enforcement?

21   A          Okay, yeah.

22   Q          Okay.  I'll let you know if I'm asking just about

23   you, all right?

24   A          All right.

25   Q          So now with a day or so, you've located the car?
```

```
 1   A         The same day that we initially got involved in

 2   the investigation on the 27th, yes.

 3   Q         Okay.  So you, the FBI, got involved in the

 4   investigation on the 27th?

 5   A         Correct.

 6   Q         All right.  Local law enforcement had been doing

 7   some investigative work the day before?

 8   A         Yes.

 9   Q         All right.  So on the 27th, you've located the

10   car?

11   A         Correct.

12   Q         And then I think you said you called B.C.I.?

13   A         Yes.

14   Q         They came and processed the car?

15   A         Correct.

16   Q         Found the video?

17   A         Right.

18   Q         All right.  And after reviewing the video, still

19   on April 27th, law enforcement goes back out to Ms. Green's

20   house?

21   A         It was -- we were on our way out to Ms. Green's

22   house while they were reviewing the video.

23   Q         Okay.  So you were going to go there anyways?

24   A         Yes.

25   Q         But now you are really going to go there?
```

```
1    A         Correct.

2    Q         After you know what's on the video?

3    A         We were already on our way back when we found out

4    what was on the video.

5    Q         Okay.  So this is now one day after you've

6    started your investigation?

7    A         Same day.

8    Q         Same day.  Okay.  And on April the 27th, when

9    people went back out there to Ms. Green's house,

10   Ms. Hovanec was taken down to the Wapakoneta -- was it to

11   the Sheriff's Department?

12   A         It was, which Amanda was not taken to the

13   Sheriff's Office.  She drove her children to the Sheriff's

14   Office prior to us arriving at Ms. Green's house.

15   Q         Okay.  So she's there.  She's at the Sheriff's

16   Office?

17   A         Yes.

18   Q         On April 27th?

19   A         Yes.

20   Q         All right.  Same day that you got involved?

21   A         Yes.

22   Q         All right.  And while she's at the Sheriff's

23   Office, she is questioned?

24   A         Yes.

25   Q         And Mr. Theodorou is also at the Sheriff's
```

1    Office?

2    A        He ended up there.

3    Q        Yeah.  Maybe -- I'm not suggesting they arrived

4    contemporaneously, but they were both there on the 27th?

5    A        Correct.

6    Q        All right.  And Mr. Theodorou is also being

7    questioned on the 27th?

8    A        Yes.

9    Q        And after some initial denials by Ms. Hovanec,

10   there was an admission as to what happened?

11   A        Yes.

12   Q        And after some initial denials by Mr. Theodorou,

13   there was an admission as to what happened?

14   A        Correct.

15   Q        All right.  And those admissions were sufficient

16   enough for local law enforcement to charge?

17   A        Correct.

18   Q        Okay.  I think we said there was criminal

19   complaints for aggravated murder?

20   A        Yes.

21   Q        So within a day of your getting involved in this

22   investigation, you have people under arrest?

23   A        Correct.

24   Q        All right.  Charged with a crime?

25   A        Yeah.

```
1    Q         And what really turned it or what really got the

2    investigation started was the exigent records from the

3    provider, right?

4    A         Yes.

5    Q         I mean, the direction really came together once

6    you found the car and the video?

7    A         Correct.

8    Q         All right.  And that happened the day that you

9    started?

10   A         Yes.

11   Q         And during his questioning on April the 27th, and

12   forgive me, it might have spilled into the early morning of

13   the 28th, Mr. Theodorou indicated he would show you where

14   the body was?

15   A         Correct.

16   Q         Okay.  And he did that?

17   A         Yes.

18   Q         And do you recall, was that still on the 27th or

19   had the clock flipped and it was in the morning of the

20   28th?

21   A         I believe it was still the late night hours of

22   the 27th.

23   Q         Okay.  So within a day of your getting into this,

24   starting your investigation, you have suspects in custody?

25   A         Correct.
```

```
 1   Q        Correct?

 2   A        Correct.

 3   Q        Ready to be charged, if not charged already?

 4   A        Correct.

 5   Q        And you have been shown where the body is?

 6   A        Correct.

 7   Q        And if I understood your testimony earlier this

 8   morning, the only reason that there was no exhumation of

 9   the body right then and there was because it was dark,

10   right?

11   A        And late.

12   Q        And late, right?

13   A        Yes.

14   Q        All right.  And so as soon as practicable, B.C.I.

15   came and dug up the body?

16   A        Correct.

17   Q        And that occurred on the 28th?

18   A        Yes.

19   Q        So maybe 36 hours from the time you got involved,

20   the body's recovered, right?

21   A        Correct.

22   Q        Amanda is under arrest?

23   A        Yes.

24   Q        Mr. Theodorou is under arrest?

25   A        Yes.
```

```
1   Q        Is Ms. Green under arrest?

2   A        Yeah.

3   Q        Okay.  So all three suspects in custody and

4   charged?

5   A        Correct.

6   Q        Body recovered, little over a day?

7   A        Yes.

8   Q        You indicated that there was additional

9   interviews with Mr. Theodorou in February of this year?

10  A        Correct.

11  Q        And that was a proffer?

12  A        Yes.

13  Q        And that proffer was undertaken to explore the

14  possibility of Mr. Theodorou cooperating with law

15  enforcement?

16  A        It was just undertaken to find out what more

17  information he had to provide.

18  Q        All right.  And so you did talk to him, right?

19  A        Yes.

20  Q        And during these conversations, he indicated to

21  you that he -- he asked around in South Africa to try to

22  find somebody to kill Mr. Hovanec?

23  A        Yes.

24  Q        And that he found who you characterize as hitman

25  number 1?
```

```
 1   A         Yes.

 2   Q         And that hitman number 1 said not interested when

 3   he or she found out that it was a State Department

 4   employee?

 5   A         Yes.

 6   Q         And so Mr. Theodorou then undertook to find

 7   another candidate?

 8   A         Yes.

 9   Q         And he found another candidate?

10   A         Correct.

11   Q         And that candidate that you called hitman

12   number 2, he or she wasn't discouraged by Mr. Hovanec being

13   a State Department employee?

14   A         Yeah, as far as I know, that didn't seem to

15   bother hitman number 2.

16   Q         Okay.  And then Mr. Theodorou went so far as to

17   not only secure hitman number 2, but he paid hitman

18   number 2?

19   A         Correct.

20   Q         And he paid with his own money as far as you

21   know, right?

22   A         No.

23   Q         Nobody sent him any money to give to the hitman?

24   A         Correct.

25   Q         And so after Mr. Theodorou had paid hitman
```

```
 1    number 2, nobody ever heard from hitman number 2 again?

 2    A        Correct.

 3    Q        Okay.  So Mr. Theodorou went and found hitman

 4    number 3, right?

 5    A        He had already been in contact with hitman

 6    number 3.  Hitman number 3 arranged, facilitated contact

 7    with hitman number 1 and hitman number 2.

 8    Q        Okay.  So when hitmen 1 and 2 didn't materialize,

 9    this gentleman said I'll be hitman number 3?

10    A        Correct.

11    Q        Okay.  And that's the guy that Mr. Theodorou

12    found?

13    A        Yes.

14    Q        All right.  Somebody that he knew?

15    A        Yes.

16    Q        All right.  And it was Mr. Theodorou's

17    conversations with hitman number 3 that raised the

18    possibility of using a drug?

19    A        Correct.

20    Q        All right.  And once that decision had been made,

21    Mr. Theodorou took the steps to build the container for

22    shipping?

23    A        Yes.

24    Q        And build the container so that it would avoid

25    liquid detection for customs?
```

```
 1    A          Correct.

 2    Q          Did the shipping?

 3    A          Yes.

 4    Q          Paid for the shipping?

 5    A          Yeah.

 6    Q          During Mr. Theodorou's proffer, do you recall

 7    whether anybody told him that this was an opportunity for

 8    him to help himself?

 9    A          During the proffer?

10    Q          Yeah, or before?

11    A          Maybe in his initial interview when we were

12    trying to get the truth, but I don't specifically recall.

13    Are you referring to law enforcement asking him if he could

14    help himself?

15    Q          Either law enforcement or if there was a

16    prosecutorial representative there?

17    A          No, I don't.

18    Q          Okay.  Now you've been in law enforcement for

19    16 years?

20    A          Yes.

21    Q          It is not unusual, when interviewing a suspect,

22    that the initial statement is not truthful?

23    A          Correct.

24    Q          Right?

25    A          Yeah.
```

```
 1   Q        Okay.  It takes a while for people to come around
 2   sometimes, right?
 3   A        Absolutely.
 4   Q        Also, in your experience with law enforcement, if
 5   there are multiple suspects, okay, it's not unusual for one
 6   of those suspects to start pointing the finger at somebody
 7   else?
 8   A        Sometimes, yes.
 9   Q        Okay.  Well, that happens frequently, doesn't it?
10   A        Yeah.  I mean, I wouldn't say all the time, but
11   sometimes, yeah, it would happen.
12   Q        And so once in on April 27th, when you had three
13   suspects in custody, okay, and you were interviewing, law
14   enforcement was interviewing three separate suspects, all
15   right, it's not surprising that somebody pointed the finger
16   at somebody else?
17   A        Correct.
18   Q        All right.  When Mr. Theodorou was looking for
19   hitman number 1, he was in South Africa?
20   A        Yes.
21   Q        Ms. Hovanec was in Ohio?
22   A        Correct.
23   Q        All right.  When Mr. Theodorou was looking for
24   hitman number 2, he was in South Africa?
25   A        Yes.
```

```
1   Q          She was in Ohio?

2   A          Yes.

3   Q          When hitman number 3 materialized and

4   Mr. Theodorou was talking to him, Mr. Theodorou was in

5   South Africa?

6   A          Yes.

7   Q          Ms. Hovanec was in Ohio?

8   A          Correct.

9   Q          Okay.  When he shipped the drug, he was in South

10  Africa?

11  A          Yes.

12  Q          When he built the container to avoid customs, he

13  was in South Africa?

14  A          Correct.

15  Q          He didn't have to do any of that, did he?

16  A          No.

17  Q          He could have said, I'm in South Africa, this

18  crazy lady is in Ohio, I'm not doing any of this?

19  A          Absolutely.

20  Q          But he didn't?

21  A          No.

22  Q          He did it all?

23  A          Correct.

24  Q          Because he wanted to, right?

25  A          I'd say, yeah, if we are going to look into it, I
```

1 would say he wanted to be with Amanda, so he was doing

2 whatever he needed to do to facilitate that end result.

3 Q       Because it's clear that he had every opportunity

4 to abandon this, right?

5 A       He could have walked away.

6 Q       Right.  He didn't even have to come back to Ohio

7 from South Africa if he didn't want to?

8 A       Correct.

9 Q       But he chose to?

10 A       Yes.

11 Q       And he chose to do all of these things on his own

12 that we just discussed in South Africa?

13 A       Yes.

14               MR. KLUCAS:  Let me have one second, please?

15               THE COURT:  Sure.

16               (Pause in the proceedings.)

17 Q   (By Mr. Klucas) So when I was going through all the

18 things that Mr. Theodorou did in South Africa, I forgot one

19 thing.  He paid for the drug, also, didn't he?

20 A       He did.

21 Q       Okay.  And I think I asked you, for the shipping,

22 too?

23 A       Yes.

24 Q       All right.

25               One second.

```
 1                    (Pause in the proceedings.)

 2                    MR. KLUCAS:  All right.  Thanks so much.  We

 3      don't have any other questions.

 4                    THE COURT:  Any redirect, briefly,

 5      Ms. Sterling?

 6                    MS. STERLING:  Just a few questions, Judge.

 7                              -  -  -

 8                      REDIRECT EXAMINATION

 9      BY MS. STERLING:

10      Q        Everything Mr. Klucas just asked you, hiring the

11      hitman, shipping the M99 from South Africa to the United

12      States, paying for the M99, Mr. Theodorou ever tell you why

13      he did those things?

14      A        He did.

15      Q        What did he tell you?

16      A        Amanda told him to do it.  In fact, as far as

17      paying for the M99, he said if he didn't pay for it, Amanda

18      threatened that she would come to South Africa to bring it

19      back herself, and he knew that he would have to pay for her

20      travel if that happened.

21      Q        Mr. Klucas just asked you about Mr. Theodorou's

22      location in South Africa when he was doing all of these

23      things, correct?

24      A        Yes.

25      Q        During your investigation, are you aware of
```

```
 1   whether or not Amanda Hovanec traveled to South Africa late
 2   summer of 2021?
 3   A        Yes.
 4   Q        Did she?
 5   A        Yeah, she did.
 6   Q        To your knowledge, do you have any information
 7   that she, in fact, met with Mr. Theodorou's associate also
 8   identified as hitman number 3 herself?
 9   A        Yeah, she did.
10   Q        Mr. Theodorou tell you that?
11   A        He did, and it was also confirmed through text
12   messages.
13   Q        You testified it's not -- sometimes, it happens
14   when you are interviewing people that they don't initially
15   tell the truth, correct?
16   A        Correct.
17   Q        Sometimes they point the finger at other people,
18   correct?
19   A        Yep.
20   Q        In this case, Mr. Theodorou, you testified on
21   direct, said this whole thing was her idea, right?
22   A        Yes.
23   Q        Did that turn out to be true based upon the video
24   evidence that you reviewed?
25   A        Absolutely.
```

```
 1   Q        You testified that Mr. Hovanec -- Mr. Theodorou

 2   and Ms. Hovanec, they lied and then told the truth in their

 3   interviews in April of 2022, correct?

 4   A        That's correct.

 5   Q        At what point did they tell the truth?

 6   A        When confronted with the fact that we had

 7   recovered video.

 8   Q        To your knowledge, was Ms. Hovanec aware that

 9   there was a dash cam on Mr. Hovanec's car?

10   A        Not at all.

11   Q        Thank you.

12            MS. STERLING:  If I could just have a

13   moment.

14            No further questions, Your Honor.

15            THE COURT:  All right.

16            MR. KLUCAS:  Nothing more.

17            THE COURT:  Special agent, you can step

18   down.

19            Do you have another witness, Ms. Sterling?

20            MS. BAEPPLER:  Your Honor, the United States

21   calls --

22            THE COURT:  Your mic's not on.

23            MS. BAEPPLER:  Thank you.

24            The United States calls Detective Brian

25   Little.
```

```
 1                   THE COURT:  Ms. Baeppler, would you pull
 2   that mic.  These guys point the microphone up towards the
 3   ceiling.  Point it towards you.  There you go.
 4                            - - -
 5              Thereupon, the Government, in order to maintain the
 6   issues on their part to be maintained, called as a witness,
 7                       BRIAN LITTLE,
 8   who, having been duly sworn as provided by law, testified and
 9   said as follows:
10                            - - -
11                   THE COURT:  And same offer, I should have
12   made it to Ms. Sterling, but if you guys, that podium
13   rotates 45 degrees if you want, or you can leave it where
14   it is.  See, isn't that cool?
15                   MS. BAEPPLER:  Very nice.  Thank you.
16                            - - -
17                       DIRECT EXAMINATION
18   BY MS. BAEPPLER:
19   Q        Good afternoon, sir.  Can you please identify
20   yourself for the record.
21   A        Detective Brian A. Little, spelled L-I-T-T-L-E,
22   and I work for the Auglaize County Sheriff's Office.
23   Q        And how long have you been with the Auglaize
24   County Sheriff's Office?
25   A        I've been in law enforcement for 32 years, the
```

1    last 21 have been with the Auglaize County Sheriff's

2    Office.

3    Q        All right.  And what is your current rank or

4    title at the Sheriff's Office?

5    A        Detective, and I'm assigned to the Detective

6    Bureau.

7    Q        All right.  And did you become involved in an

8    investigation regarding a missing person back in April of

9    2022?

10   A        Yes, I did.

11   Q        And can you explain for the Court, please, how it

12   was that you became involved in that investigation?

13   A        FBI Agent Eilerman called me on the morning of

14   the 27th and advised me that he had an investigation

15   involving a missing person.  He had multiple FBI agents

16   enroute to Auglaize county, wanted to know if we could

17   assist him and if we could use the Sheriff's Office as a

18   base of operations.

19   Q        All right.  And did you agree to allow Agent

20   Eilerman to use the Auglaize county S.O. as a base?

21   A        I did, and I notified all of our other detectives

22   including our Drug Task Force detectives and notified the

23   Sheriff.

24   Q        All right.  And did you learn that the person

25   that was missing at that time on April 27th was a gentleman

1  by the name of Tim Hovanec?

2  A        Yes, I did.

3  Q        All right.  And for purposes of just sort of

4  getting our bearing, April 21st was a Wednesday; is that

5  correct?

6  A        That's correct.

7  Q        All right.  So in response to Agent Eilerman's

8  call, what did you do?

9  A        The first thing that I did, like I said, I

10  notified the other detectives, waited for everyone to get

11  there to arrive, Agent Eilerman, everyone else.  And the

12  first thing that I wanted to do was go back and essentially

13  start over.  We'd had a deputy go out to speak with Amanda

14  Hovanec the day before on Tuesday at the request of the

15  local police department, and I wanted to go back out and

16  reinterview her.

17  Q        And what was your purpose or your thought in

18  going back out to reinterview Amanda Hovanec?

19  A        I wanted to get a timeline of everything that Tim

20  had done since he had been in Auglaize county and just try

21  to find out where he might have gone or get any kind of

22  information that would help us find him.

23  Q        All right.  And did you, in fact, go out to her

24  residence?

25  A        I did.

1  Q        And, at that point in time, she was living with

2  her mother, Anita Green; is that correct?

3  A        That's correct.

4  Q        And do you recall, sir, approximately what time

5  of day it was that you went out to Anita Green's residence?

6  A        It was earlier in the day.  The kids weren't home

7  from school yet.  I know they get home at 2:30, so it was

8  before 2:30 in the afternoon at some point.

9  Q        All right.  And did you travel to the Green

10  residence alone or was somebody with you?

11  A        Deputy Foxhoven, the same deputy that had went

12  there the day before.

13  Q        Now when you arrived at the Green residence, who

14  did you find there?

15  A        I talked to Amanda at the front door and I know

16  her boyfriend, Anthony, Anthony Theodorou was also inside

17  the residence.

18  Q        All right.  And that conversation that you had

19  with Amanda Hovanec that day on the 27th, was that

20  conversation recorded?

21  A        It was.

22  Q        And is that part of your standard procedure that

23  you record conversations?

24  A        Yes, I did.

25  Q        All right.  And prior to coming here today, have

1  you had occasion to review that recording?

2  A       I did.

3  Q       All right.  And is that recording a fair and

4  accurate representation of the conversation with

5  Ms. Hovanec as you recalled it on that day?

6  A       Yes.

7  Q       All right.  Can you share with the Court what you

8  talked with Ms. Hovanec about that morning or afternoon?

9  A       The main thing that we talked about was just

10 everything that had happened the weekend before.  We

11 discussed what had happened to lead up to Tim being here.

12 She explained that they had had a court appearance for

13 something with custody that Friday, and then Tim came at

14 about 7:00 Friday night and picked up the kids for a

15 weekend visitation that was court-ordered.

16         She said that -- we discussed the car that

17 he was driving.  She confirmed that it was a black

18 Volkswagen SUV and that it had Virginia license plates.

19         She said that she had seen Tim several times

20 through the weekend through a video call that she was

21 having with her daughters.  And then he came on Sunday

22 night to return the girls, also, at about 7:00, and that

23 she hadn't seen him since or and wouldn't have any idea

24 where he was at.

25 Q       And I think you indicated earlier whether or not

1   you questioned her about other people being in the home at

2   the time of pick up; is that correct?

3   A        Correct.  We did discuss, when Tim came on Friday

4   to pick up the girls, I had asked her who all was present

5   during that, and she said herself, her mother, Anita Green,

6   and her boyfriend, Anthony Theodorou.

7   Q        Now at some point in time during the interview,

8   after you got the basics of the pickup and why Tim was in

9   town, did the topic of physical violence come up at all?

10  A        It did.  She discussed a complaint that she had

11  made involving Tim.  She believes that he had abused their

12  daughter, Emma.  At one point, Emma had some bruising on

13  her side.  It was reported to the Sheriff's Office, and I

14  had knowledge of that before I went.  I had reviewed the

15  report.  That report indicated that Emma was in trouble and

16  Tim had picked her up and set her in a chair and that left

17  some bruising on her side and so that the investigation

18  involving abuse was unfounded.

19  Q        And aside from telling you about this one

20  incident with Emma and the bruising, did Ms. Hovanec make

21  any comments during that conversation about Tim abusing the

22  girls physically at any other point in time?

23  A        Deputy Foxhoven had asked her if there was any

24  other times that Tim had abused the girls, and she said

25  that he had not, that he had abused her and a prior

1  girlfriend she believed.  Or she said that she was hit in

2  the face and she believed this girlfriend prior to them

3  being married was also hit in the face and possibly had a

4  broken nose.

5  Q        All right.  And you indicated earlier that you,

6  prior to testifying today, have listened to this recording;

7  is that correct?

8  A        That's correct.

9  Q        All right.

10          Could you play, Ms. Niezgoda, Exhibit 24,

11  please.

12          (Whereupon, exhibit played in open court.)

13  Q        Now you've been fairly involved in this

14  investigation; is that correct?

15  A        Correct.

16  Q        All right.  And are you aware of whether or not

17  there have been -- if there was ever any substantiation of

18  Ms. Hovanec's claim that Tim Hovanec was physically abusive

19  towards her?

20  A        We have no -- other than that allegation that she

21  made, there's nothing else that we have to indicate that he

22  was.

23  Q        No police reports?

24  A        None.

25  Q        All right.  And this reference to Marnie

1    Dabroski, were any efforts made by law enforcement, to your

2    knowledge, to either locate police reports regarding a

3    physical violence, a physical attack by Tim Hovanec on

4    Marnie or reference made to interview Marnie?

5    A        Yes.  We had a detective that was able to contact

6    her.  He interviewed her and found that there was no --

7    there was never any abuse from Tim of her.

8    Q        So Marnie Dabroski denied that Tim Hovanec had

9    assaulted her?

10   A        That's correct.

11   Q        All right.  Now when you were speaking with

12   Ms. Hovanec, did you ask her if she knew where Tim had gone

13   after he dropped off the children?

14   A        She said that she didn't have any idea, but she

15   thought possibly to Columbus or Dayton.

16   Q        And did she give you any indication of why she

17   thought he might be in Columbus or Dayton?

18   A        She said that he had friends there that he liked

19   to skydive with, that he had a history of, when he comes to

20   the area, of skydiving with in either city with friends.

21   Q        All right.  Now, at some point during that

22   initial conversation with Ms. Hovanec, did the topic of

23   suicide come up?

24   A        Yes.  I asked her if -- if there was any

25   knowledge of that he might be suicidal.

1 Q        And what did she say?

2 A        She said that that was a tough concept.  She

3 began to talk about Tim's mental state as if she hadn't

4 thought of it that way in the past, but was believed that

5 he -- she described it as saying that she thought he was

6 detached from reality.  She said that he was narcissistic,

7 that he was spiteful, vengeful.  She said that, in regards

8 to their custody, she thought that Tim was just targeting

9 her and that the girls really didn't -- weren't the actual

10 issue.

11 Q        So fair to say she was not particularly found of

12 him?

13 A        Correct.

14 Q        All right.

15          I want to turn your attention to later that

16 day in the evening hours.  Did you have occasion to speak

17 with Amanda Hovanec, again?

18 A        I did.

19 Q        And can you share with the Court what the

20 circumstances surrounding that were?

21 A        We wanted to talk to her again.  There had been a

22 red flag that had arisen and we wanted to talk to her about

23 that and tried to determine what, exactly, had actually

24 happened in regards to that.

25 Q        And what was this red flag that you were

1  referring to?

2  A       When I talked to her earlier in the day, she had

3  said that Tim had been there, the girls got out, the girls

4  ran inside and that Tim left and she didn't know in what

5  direction.  The FBI, in going through and searching Tim's

6  phone information, found that his phone had actually been

7  there for I believe it was 55 minutes, which, so that

8  wasn't exactly consistent with him dropping the girls off

9  and then turning around and leaving.

10 Q       And at that point in time, did you have any idea

11 that Amanda Hovanec had killed her husband?

12 A       I did not.

13 Q       All right.  So this dash cam video had not

14 materialized --

15 A       No, it had not.

16 Q       -- at the time she came back in for the

17 interview?

18 A       Correct.

19 Q       All right.  Now how did she get to the Sheriff's

20 Department?

21 A       She came voluntarily.  I talked to her on the

22 phone and requested that she bring the daughters in so that

23 we could question the daughters, and she brought them and

24 they all came.

25 Q       Okay.  And when they arrive at the Sheriff's

```
1    Department, are she and her daughters separated?

2    A         They are.

3    Q         All right.  And she is interviewed by whom?

4    A         She is interviewed by myself and another FBI

5    agent.

6    Q         Okay.  And the girls are taken somewhere else

7    with other law enforcement personnel?

8    A         That's correct.

9    Q         And were they forensically interviewed?

10   A         They were.

11   Q         All right.  And who was present during that

12   interview, you and who else did you say?

13   A         I believe Special Agent Caleb Williams, I

14   believe.

15   Q         All right.  And was that interview recorded?

16   A         Yes, it was.

17   Q         And prior to coming here today, did you have

18   occasion to review the recording of that interview?

19   A         I have.

20   Q         And is it a fair and accurate representation of

21   what occurred on that day?

22   A         It is.

23   Q         All right.  Can you describe the initial part of

24   the interview in just general terms?  What did you talk

25   about with her?
```

```
1    A          I was trying to develop a timeline and get kind
2    of a pattern of life on Tim, what he does, where he goes,
3    what he likes to do.  If -- is there a drug problem, is
4    there any of that kind of thing that would help us lead to
5    finding him.
6    Q          All right.  So you are trying to figure out where
7    this guy is?
8    A          Exactly.
9    Q          Basically.
10   A          Yes.
11   Q          Okay.  And at some point in time, did you discuss
12   the dropoff with Ms. Hovanec on Sunday evening?
13   A          Yes.
14   Q          And what did she say initially regarding the
15   dropoff?
16   A          That after the girls were dropped off, she went
17   inside with the girls, gave the kids baths, and then went
18   to bed with the kids.
19   Q          And did you find out later that wasn't true?
20   A          I did.
21   Q          All right.  Did you ask Ms. Hovanec during the
22   interview, the first part of it, the initial part before
23   she was confronted with the dash cam, did you ask her if
24   she had made efforts to reach out to Tim to see where he
25   was and let him know that people were looking for him?
```

```
1    A          I did.  She said that she had sent a text from
2    her -- from her phone.  They used the Family Wizard, which
3    is an app that they were using for custody issues, and said
4    that he had left all his personal belongings at the hotel,
5    the hotel had turned those belongings over to the police
6    and that people were concerned about his whereabouts and he
7    needed to call as soon as possible.
8    Q          All right.
9               Can you play Exhibit 25, please.
10              (Whereupon, exhibit played in open court.)
11   Q          Do you know what this Family Wizard app is?
12   A          If -- not exactly sure, but I believe just from
13   past, that it's an app that the courts use, juvenile court,
14   family court uses so that members can discuss things, and I
15   believe it's all recorded so that nothing is said that
16   shouldn't be said to each other.
17   Q          And she sent this message.  You learned at that
18   point that she sent this message to her husband, and at
19   some point, you learned he's dead.  She sent it knowing
20   full well he's dead; is that correct?
21   A          That's correct.
22   Q          Now you mentioned earlier that while you were on
23   scene at the Green residence, you had had some initial
24   conversation about Tim's connections to Columbus and
25   Dayton; do you recall that?
```

```
 1   A          Yes.

 2   Q          Did that -- did you develop that information in

 3   the interview with Ms. Hovanec later in the day?

 4   A          We did talk about Dayton, I believe, yes.

 5   Q          And what sort of conversation did you have about

 6   Dayton and people in Dayton?

 7   A          That he had friends there.  I believe he had

 8   either worked there, worked with other places in Columbus,

 9   but he was an avid skydiver and that he may be there with

10   friends.

11   Q          And did you go through names of friends in

12   Dayton?

13   A          I can't recall whether we had actually discussed

14   names or not, but I know that we had talked about names of

15   people, whether she knew what these friends' names were.

16   Q          Did you speak with Ms. Hovanec about whether or

17   not Tim had a smart watch?

18   A          I did.

19   Q          Did she know the answer to that question?

20   A          She said that he did.

21   Q          Now at some point in time during this interview,

22   you learned that Ms. Hovanec knows where her husband is; is

23   that correct?

24   A          Correct.

25   Q          And how did you learn that?
```

```
 1   A          After the initial interview, I stepped out and I
 2   was approached by the Sheriff, who advised me that they had
 3   discovered the dash cam video on Tim's car and it actually
 4   showed that Amanda had killed him.
 5   Q          And I'm assuming you stepped out of the room to
 6   receive that information?
 7   A          That's correct, I did.
 8   Q          And once you had that information, what did you
 9   do with it?
10   A          I went back in and I continued the interview and
11   eventually I informed her that I knew what she had done and
12   that there was a video showing what she had done.
13   Q          And what did she do or say?
14   A          She admitted that she had killed him.
15   Q          Did she tell you how she killed him?
16   A          We did discuss that.  I had mentioned that there
17   was a syringe.  I don't remember asking if she had injected
18   him in the neck or the arm and she -- she confessed that
19   she had injected him in the arm.
20   Q          Did she -- did you ask her where she got the drug
21   that she used to kill her husband?
22   A          I did.
23   Q          And what did she say?
24   A          We went through a long portion of the interview
25   where she describes going to Dayton, that it was people
```

1  from Dayton or, I'm sorry, Columbus, that she had been in

2  Columbus and it was a friend of a friend of a friend.  They

3  had told her that -- she didn't know what the drug was, but

4  they had told her that it would stop Tim's heart within --

5  within two minutes and that it will kill him.  And she also

6  then said that, eventually said that the person that she

7  had got it from was an Andre, someone that she had met in

8  her jujitsu class.

9  Q        Did you learn that the story about multiple

10  people supplying the drug from Columbus was a lie?

11  A        Yes, I did.

12  Q        Did you learn that the claim that she received

13  the drug from Andre from jujitsu was a lie?

14  A        Yes, I did.

15  Q        How did you learn that?

16  A        We had a discussion.  She eventually told us that

17  the drug had been mailed to her house from overseas and she

18  eventually confessed that she had received it from her

19  boyfriend, Anthony Theodorou.  That was only after I

20  learned that Anthony Theodorou had confessed that he had

21  done that.  And once I told her that he had confessed, then

22  she finally came clean that that's where the drug came

23  from.

24  Q        So you had to confront her with the lies?

25  A        Correct.

1   Q        And the truth in order for her to finally admit

2   the truth?

3   A        That's correct.

4   Q        All right.  Did you have any discussion with

5   Ms. Hovanec about her taking her husband's car to Dayton

6   and disposing of his belongings?

7   A        I did.

8   Q        And what did she say?

9   A        She admitted that she drove his car to Dayton.

10  She ditched it in a bad neighborhood.  She then wiped down

11  the steering wheel, and she took his -- his phone, the

12  license plate from the car and the other personal

13  belongings of Tim's and she threw those away in dumpsters

14  and I believe a garbage can in the area.

15  Q        Did you ask her where her husband's body was?

16  A        I did.

17  Q        What did she tell you?

18  A        She said that she got rid of it.

19  Q        She got rid of it?

20  A        That's correct.

21  Q        Did she tell you where she got rid of it?

22  A        Again, we went through a process of where she

23  claimed that someone from Columbus had come.  Eventually,

24  she said that it was this Andre that she had gotten the

25  drug from, that he came and he took the body, hauled it

```
 1    away.

 2    Q         So she eventually admitted that she disposed of

 3    the body?

 4    A         Eventually.  After a lot of discussion, she

 5    eventually confessed that she had taken the body.  We

 6    discussed where he was at.  She explained.  I showed her a

 7    map on my phone and she pointed out it was a wooded area

 8    off of Blank Pike Road at the intersection of Wrestle Creek

 9    Road.  It's a heavily wooded area that she admitted her

10    grandfather used to own, and she said that she had put a

11    bag over his head and a bag over his body so that no fluids

12    would leak out, and then she took him and put him in a hole

13    that she had dug that was filled with water.

14    Q         And she only admitted all of this after you

15    confronted her with the truth?

16    A         That's correct.

17    Q         All right.  Did she indicate to you whether or

18    not she dug the grave?

19    A         She did.

20    Q         Did she tell you who assisted her?

21    A         She said that her boyfriend, Anthony Theodorou,

22    had helped her.  She said she made him and but that he

23    didn't want to.

24    Q         Did she share any information about any

25    assistance that her mother, Anita Green, may have lent?
```

```
 1   A          We did discuss that and she -- she talked about
 2   talking with her mother about it and that her mother had
 3   taken her or taken them there to drop the body off.
 4   Q          There, being the burial site?
 5   A          Correct, yes.
 6   Q          How long did your interview with her last?
 7   A          It was over three hours.
 8   Q          And, in your opinion, did she express remorse for
 9   killing her husband?
10   A          Absolutely not.  She blamed him the whole time.
11   Q          And when you say she blamed him the whole time,
12   what do you mean?
13   A          She said that, you know, Tim was abusive and that
14   Tim had done this and Tim had done that and it was all that
15   it was Tim's fault.
16              At one point, she admitted that she knew
17   that it was wrong to kill him, and then she said that she
18   has no idea why she's even apologizing.
19   Q          I want to turn your attention to a topic that's a
20   little bit different, but, at some point in time in the
21   recent past, were you asked to query Auglaize county
22   records, Sheriff's Department records, for instances of
23   domestic violence at the Green residence?
24   A          Yes.
25   Q          And you did that at my request; is that correct?
```

```
1    A        That's correct.

2    Q        And how far back do the digitized records for

3    Auglaize county go?

4    A        I know that I've seen some that are all the way

5    back from in the 80s.

6    Q        All right.  And in terms of any reports of

7    domestic violence coming from the Green residence, back as

8    far as you checked, presumably into the 80s --

9    A        Yes.

10   Q        -- what did you find?

11   A        I found that there was one in January of 2001.

12   It was involving Amanda's father and her sister, Holly.

13   Q        And did you pull that police report?

14   A        I did.

15   Q        And did you review it?

16   A        Yes, I did.

17   Q        And can you share with the Court what that report

18   documents?

19   A        Her father, Samuel, and Holly had gotten into a

20   verbal altercation about her playing the radio too loud I

21   believe in the car.  At some point, Holly had called him a

22   mother fucker and he had slapped her across the mouth.

23   Q        And aside from that one documented incident in

24   2001, were there any other reports whatsoever documenting

25   that the police came to the Green residence for any sort of
```

```
 1    domestic violence or domestic dispute?

 2    A        I found none.

 3    Q        All right.

 4             Okay.  Let's go back to April 27th of 2022,

 5    which, again, is a Wednesday.  At some point in time,

 6    either Wednesday or Thursday, the 28th, did you make any

 7    efforts to secure a search warrant for Anita Green's

 8    residence?

 9    A        I did on the morning of the 28th.

10    Q        All right.  And what was your role aside from you

11    secured the search warrant?

12    A        Correct.

13    Q        Did you show up at the search scene at the Green

14    residence?

15    A        I did.  We had the Ohio Bureau, B.C.I., we had --

16    we had them process the scene and do everything there.  I

17    showed up with several other detectives and we assisted in

18    anything that B.C.I. needed of us.

19    Q        All right.  And there was evidence collected from

20    the home on that day; is that correct?

21    A        There was.

22    Q        And did one of those items of evidence include a

23    drawing by one of the children?

24    A        Yes.

25    Q        All right.
```

```
 1                    Can you please pull up Exhibit 29, please.

 2                    Detective Little, do you recognize

 3   Exhibit 29?

 4   A        I do.

 5   Q        Ms. Niezgoda, can you zoom in on that for me,

 6   please.

 7                    All right.  And for purposes of our record,

 8   can you identify what that is?

 9   A        It was something that we did find in the kids'

10   bedrooms or where the kids had been sleeping at the

11   residence and appears to be a drawing possibly from Emma.

12   Q        Okay.  But we don't know for certain --

13   A        We do not.

14   Q        -- which one of the children?

15   A        No, we do not.

16   Q        But, clearly, this appears to be one of the

17   children's drawing?

18   A        Correct.

19   Q        And explain for the record and the Court what's

20   the text here and what's depicted in this child's drawing?

21   A        The figure in the middle of the page with the

22   circle around it has something more of a purple color

23   coming out of the eyes, coming out of the mouth, and coming

24   out of the stomach.  Above that circle, there appears to be

25   a tombstone that has RIP.  To the right of that, it says,
```

1    stupid daddy, with an arrow pointing to the figure.  To the

2    right of that, it says, I hate daddy.  And the A, in daddy,

3    appears to have a ghost coming out of it.

4              Below that, appears to be a female figure,

5    and to the right of that, there's an arrow.  It says -- it

6    appears to say, amazing mommy, with an arrow pointing to

7    that figure.  Below that figure it says, hate stupid daddy.

8    And to the left of that and below the center figure, there

9    appears to be another figure that I would consider is

10   deceased because there's X's over the eyes.  And to the

11   left of that, it says, die, daddy, with another smaller

12   figure.  It appears to be holding something and something's

13   coming out of that, and then the figure is all covered in a

14   different colored marker.

15             Above that, there's something red appears to

16   be coming out of that center figure, and above that, there

17   is the words demon soul with an arrow pointing to that.

18   Directly above that, there is another figure.  To the left

19   of that appears to say, angel's spirit, and there appears

20   to be another ghost coming out of the top of the head of

21   that figure with maybe a halo above it.  And to the left of

22   that, it appears to say, me and Emma, with an arrow

23   pointing down to that figure.

24   Q        Thank you.

25             MS. BAEPPLER:  If I may have a moment,

```
 1    please.

 2                    (Pause in the proceedings.)

 3                    I have nothing further.  Thank you.

 4                    THE COURT:  Mr. Klucas?

 5                    MR. KLUCAS:  Mr. Bailey.

 6                    THE COURT:  Okay, let me try that again.

 7                    Mr. Bailey?

 8                    MR. BAILEY:  Thank you, Your Honor.

 9                    THE COURT:  You can raise that up a little

10    bit, buddy.

11                          - - -

12                    CROSS EXAMINATION

13    BY MR. BAILEY:

14    Q        Good afternoon.

15    A        Good afternoon.

16    Q        You had an interview of Ms. Hovanec?

17    A        Yes, I did.

18    Q        And in that interview, she indicated that Anthony

19    was not involved at all?

20    A        At some point, yes.

21    Q        And that proved to be untrue?

22    A        It did.

23    Q        Ms. Hovanec told you that she had obtained the

24    drug at no cost?

25    A        I don't recall whether she said there was a cost
```

```
 1   or not.  Eventually, when it came out that she had received

 2   it from overseas, I don't -- I don't recall ever asking her

 3   how much it cost.

 4   Q        She admitted to having injected Tim Hovanec?

 5   A        She did.

 6   Q        She admitted to having rolled his body into the

 7   garage?

 8   A        She did.

 9   Q        She admitted to transporting his vehicle to

10   Dayton?

11   A        She did.

12   Q        She also complained of ten years of abuse, right?

13   A        She did.

14   Q        And domestic violence abusers often control their

15   victims; isn't that true?

16   A        I'm sure it could be, yes.

17   Q        Okay.  You've been in law enforcement how many

18   years?

19   A        Thirty-two.

20   Q        You've had domestic violence cases as part of

21   your career, correct?

22   A        Yes, I have.

23   Q        And you've seen the victims of abuse?

24   A        Yes.

25   Q        And you've seen how they sometimes respond to
```

```
 1   protect their abuser?

 2   A         Correct.

 3   Q         And so victims of abuse don't often report the

 4   abuse that they suffer?

 5   A         I don't know if I would say often, but yes.

 6   Q         Sometimes?

 7   A         Sometimes, definitely.

 8   Q         And that's often because they are acting on fear,

 9   correct?

10   A         Usually, I would believe.

11   Q         Were you also involved in the interview of

12   Anthony Theodorou?

13   A         No, I was not.

14                 MR. BAILEY:  Okay.  Just one moment.

15                   (Pause in the proceedings.)

16                 MR. BAILEY:  No further questions, Your

17   Honor.  Thank you.

18                 THE COURT:  Any redirect, Ms. Baeppler?

19                 MS. BAEPPLER:  No redirect.  Thank you, Your

20   Honor.

21                 THE COURT:  Detective, you can step down.

22                 THE WITNESS:  Thank you, Your Honor.

23                 THE COURT:  Anything further, ladies?

24                 MS. STERLING:  No further testimony to

25   present.
```

1               We would, at this time, move for the

2      admission of the exhibits that were used during the

3      testimony and, for the record, I believe that's 1 through

4      7, 11 through 18, 20 through 25, and 29.

5               MR. KLUCAS:  That's what I have, too.  And

6      we don't -- no objection.

7               THE COURT:  Yeah, they will be admitted.

8      Thank you.

9               MS. STERLING:  Thank you, Your Honor.

10              THE COURT:  We need to make sure, to the

11     extent we don't have those, and I'm not sure that we do

12     have all of them, you need to give them to Erica before we

13     leave or get them to her soon so they can become part of

14     the record, please.

15              MS. STERLING:  We certainly can provide a

16     digital copy of those items, Your Honor.

17              THE COURT:  Okay.  I believe even though

18     Mr. Klucas made the objection to the two enhancements, I

19     think, technically, you have the burden of establishing

20     them.  So I probably will let you go first in terms of

21     arguments about whichever one.  We'll do them both -- if

22     you are doing them both at the same time --

23              MR. KLUCAS:  I can do them both at the same

24     time.

25              THE COURT:  Are you okay with that,

 1  Ms. Sterling?

 2                  MS. STERLING:  That's fine.

 3                  THE COURT:  You can divide that up.  That

 4  doesn't mean one of you gets up and exhausts both of them.

 5  One of you can get up and pass the baton if you want to

 6  divide it up, but I just as soon hear from you guys and

 7  then him and --

 8                  MS. STERLING:  That's fine, Your Honor, if I

 9  could just have a moment.

10                  THE COURT:  Yes.

11                  MS. STERLING:  Certainly, Your Honor, with

12  regard to --

13                  THE COURT:  Would you like to argue from

14  your table?  Do you have notes there that you would like to

15  use?  I'm okay, you are welcome to come up to the podium,

16  you are welcome to argue from the table.  I understand this

17  is a little bit factually chewy, but we don't have a jury

18  sitting here listening to you, so wherever you guys are

19  most comfortable for your arguments is fine with me, and

20  that includes sitting or standing when we don't have a jury

21  here, so.

22                  MS. STERLING:  Thank you, Your Honor.  I

23  appreciate it.  As long as the court reporter can hear me,

24  I'll just stay here, and I'm getting an indication from her

25  that she can.

1          With regard to the law in this matter, the

2     government will rely upon the legal arguments previously

3     set forth in its sentencing memo herein where we

4     specifically addressed both the application of the role

5     enhancement as well as application for the obstruction of

6     justice.

7          With regard to role, I believe between our

8     argument and Mr. Klucas' argument, the crux of the issue is

9     this, Judge:  Did Amanda Hovanec direct or control another

10    person in committing any of the activities involved here.

11    And I think the testimony has shown, as articulated in our

12    memo as well as the evidence put forth today, that, in

13    fact, she did.

14          Not only does Anthony Theodorou say this was

15    all her idea, I did what she told me to do, I got these

16    hitmen because she told me to, I helped bury the body

17    because she told me to, but you hear from Ms. Hovanec,

18    herself, in her statements to Detective Little where she

19    says they weren't involved, they didn't want to do it, I

20    made them do it.

21          At the end of the day, that's all that

22    matters, and for those reasons, we believe that an

23    enhancement for role is appropriate.

24          I can move on to obstruction or --

25          MR. KLUCAS:  Go ahead.  I'll do both at the

1    same time, too.

2              MS. STERLING:  Okay.

3              You know, I think when you look at the

4    enhancement for role, Judge, and I should probably throw

5    this in there, too, although I believe it's in the memo,

6    the guideline section itself says you also need to look at

7    who had the most to gain, who was most involved, who had

8    the most to gain.

9              There are a litany of factors involved in

10   the application notes, and at the end of the day, there is

11   no question, as we stand here in this courtroom, that the

12   person that had the most to gain was Amanda Hovanec.  Not

13   only did she have her children to gain in the life that she

14   so desperately wanted, as demonstrated by the evidence put

15   forth here today, but she also was the only person who had

16   a financial motive.  She was still married to Tim Hovanec

17   at the time of the murder.  As his wife, she was the only

18   person who would benefit from his estate, not

19   Mr. Theodorou, and certainly not her mother.  And I think

20   when you look at all of the factors together, it becomes

21   clear, in the government's mind, that an enhancement for

22   role is appropriate.

23             Moving on to the obstruction enhancement, we

24   argue three different prongs in our memo that are

25   applicable here.  Again, I'm not going to repeat all of

1  them.  The facts, as supported by not only the attachments

2  to the memo as well as the evidence put into the record

3  here today, support the enhancement.  Our argument is on

4  all three of those bases and certainly in combination with

5  one another.

6          But, to be frank, Judge, at the end of the

7  day, it's the government's position it does not matter that

8  a lot of these things were done before she was aware that

9  there was a law enforcement, official law enforcement

10  investigation.  The application note says so itself.  If

11  her actions were designed to thwart that investigation, it

12  counts.

13          Clearly, her actions were so designed.  You

14  hear her on one of the dash cams that was played talking

15  about wiping down everything.  She's talking about what her

16  plan is to dispose of the car.  She gets rid of the license

17  plate.  She tells the detective about all of the evidence

18  that she got rid of.  Why else, if not to try and send them

19  on a different route.

20          Her statements about, I mean, her very

21  choice of going to Dayton, and then you match that up with

22  her statements to the detectives about, oh, well, you know,

23  I don't know where he might have gone.  Maybe, maybe

24  Dayton.  I mean, he has skydiving friends there.  And the

25  fact that they take time during an interview to go through

1   a list of potential skydiving friends is nothing more than

2   her saying, hey, look over here.  That is designed.  Those

3   actions beforehand as followed through in her interview

4   were designed to thwart the investigation.

5            And if that's causing you any problem or

6   doesn't sit well with you, then I point to the Family

7   Wizard app.  Certainly, at the point that the officers have

8   been out at her house on the recording that you heard today

9   and tell her, we are still looking for him, we haven't

10   found him, we are trying to get more information.  Between

11   that conversation, she is now unequivocally aware of an

12   official police investigation.  So between that

13   conversation and later in the day when she comes

14   voluntarily into the Sheriff's Department and they ask her

15   at the beginning, hey, have you heard from Tim since we

16   last spoke?  No, but since we last spoke, I sent him a

17   message on the Family Wizard app.  Hey, Tim, you didn't

18   check out of your hotel.  You left your belongings.  The

19   police have them.  They are worried.  You need to contact

20   them.

21            Judge, I submit that there is absolutely

22   zero explanation for why she would send that message on

23   that app knowing full well that she already murdered him

24   and buried him if not to cover her butt and throw the

25   police off of her tail.  It matters not that she wasn't

1  successful in her efforts.  And you know why?  Because

2  attempts count under the guideline.  Attempts count.  And

3  certainly, she was trying to do that.  That she wasn't

4  successful is irrelevant.  She did not know there was a

5  dash cam video.  She does not know at the time that she's

6  committing these acts that there's a dash cam video and

7  that she's never going to get away with it.  She's trying

8  to obstruct the investigation.  And again, attempts count.

9            We also believe that her efforts in

10  misleading this Court or attempting to mislead this Court

11  and the probation department warrant an obstruction

12  enhancement.  She came into here, not this building, in the

13  old courthouse, at the time of her change of plea.  We went

14  over the factual basis.  There was a to-do about, hey,

15  she's saying these drugs weren't shipped to her.  They were

16  body-carried.  She got them.  They weren't shipped.  They

17  were not shipped.  That's what she said.  It's in the

18  transcript.  Because I did not believe that it affected the

19  elements of the crime, we didn't have a Plea Agreement, I

20  altered the language that I used, which said she received

21  them in the United States.  But you caught it.  Because we

22  had a discussion about it in chambers, and you asked about

23  it.  And again, it's in the transcript, which has been

24  prepared and is a part of the record in this matter.  She

25  stood by that.  That is unequivocally not true.  Not only

1   did Mr. Theodorou tell the agents both in his initial

2   interview, but his proffers that he obtained that substance

3   at her request, but he shipped it to her, at her request,

4   through DHL because she told him how to do it, how to get a

5   liquid in through the mail.  She told you in the interview

6   or she told the detective in the interview it was mailed to

7   me.  It was mailed to me.  The DHL records show that a

8   substance -- I'm sorry, that items were shipped by

9   Mr. Theodorou from South Africa in close proximity to when

10  he received the substance and accepted here by Amanda

11  Hovanec on March 1st of 2022.

12              She told the forensic psychologist that was

13  hired, in the report, yeah, I know I said that, but really,

14  he did, he shipped them, after the hearing where she said,

15  no, they weren't shipped, they were body-carried.  She

16  admits that that was not true.  And in her revised

17  acceptance statement that she sent in September of this

18  year, she admits it.  What is that, Judge?  That's

19  dishonesty to the Court.

20              Let's talk about that revised accepted

21  statement.  It is submitted to the probation department; I

22  believe the report indicates September 9th of 2024.  Her

23  first statement is consistent with her statement to law

24  enforcement in April of 2022.  She's sticking with that

25  story.

1    Come August, her attorneys become aware that

2 Mr. Theodorou has entered into proffers with the

3 government.  Mr. Klucas comes into my office, he reviews

4 those statements.  I can only imagine, being the good

5 attorney that he is, that he went and discussed those

6 matters with his client.  And it's a matter of weeks later

7 before a revised statement is offered to the probation

8 department now admitting the salient points as it relates

9 to Ms. Hovanec of Mr. Theodorou's proffers, and that is

10 that discussions about the murder, she had been thinking

11 about it since about the time the divorce was filed, which

12 the records indicate was in December of 2020.  She admits

13 that the grave was pre-dug.

14    The statement as given to the probation

15 department, and the dishonesty the government argues is

16 false is that the statement is submitted because she's in

17 therapy, she understands it's really important to be

18 completely honest.  We beg to differ.  We think it's

19 abundantly clear why that second statement was made.

20 That's another false statement to an officer of the court.

21    And so for all of those reasons, we believe

22 that an enhancement for obstruction of justice is also

23 appropriate.

24    I will address, I suppose, the acceptance

25 enhancement after Mr. Klucas responds, if that's okay with

```
 1    the Court?

 2                    THE COURT:  That's fine.

 3                    Mr. Klucas.

 4                    MR. KLUCAS:  Okay.  Thanks, Judge.  I'm

 5    going to take a page from Ms. Sterling's book and stay

 6    right here.

 7                    Are you getting me?

 8         (Whereupon, a discussion is held off record.)

 9                    THE COURT:  I think I had Mr. Bailey raise

10    it so it wouldn't be at his bellybutton, but that's the one

11    Achilles heel, sight lines in the courtroom.  Judge Helmick

12    probably spent a hundred hours trying to figure out where

13    to put that podium and then another 150 or 200 designing

14    it.  The problem is it screens the court reporter's view of

15    your table, but it always provides a good view from that

16    table of the witness stand, so that's why it is where it

17    is, so.

18                    MR. KLUCAS:  Okay, thank you.

19                    Judge, I'm going to begin with the 3B1.1(c)

20    enhancement for leader and organizer.

21                    Similar to the government, I'm not going to

22    recite all of the authority that we put in our case law,

23    but I really do think that the Minter case is dispositive

24    here.  What the government needs to show is control over a

25    person, not somebody taking direction, not somebody who's
```

1    leading activity, but what they need to show is control

2    over a person.  Do it or else, for some reason.  You don't

3    have any evidence of that.  What you have is Mr. Theodorou

4    agreeing to whatever aspects of the plan that were being

5    discussed and then executing them, okay.

6                    THE COURT:  My problem, Mr. Klucas, and if

7    you don't mind, I'd like to interact with you a little

8    bit --

9                    MR. KLUCAS:  Sure.

10                   THE COURT:  -- on this.

11                   MR. KLUCAS:  Yeah, sure.

12                   THE COURT:  I was probably seeing this your

13   way on the papers that I had this -- up until this morning.

14   Those text messages, in particular, took me to a little

15   different place in terms of it really felt like your client

16   was, in fact, controlling Mr. Theodorou through their

17   relationship and directing him to do things, if nothing

18   else, pulling his heartstrings, which I submit is a method

19   of controlling someone.  That's where I'm getting --

20                   MR. KLUCAS:  I'm not --

21                   THE COURT:  Well --

22                   MR. KLUCAS:  I'm not sure I'm really with

23   the Court.  First off, I'm not sure that the text messages

24   really allow the Court to get to that point, okay.  There's

25   certainly text messages indicating affection for each

1  other.  We all saw them.  But I don't think that's an

2  exercise in control.

3                   Here's the main point, okay.  When

4  Mr. Theodorou is getting the drug, he's in South Africa.

5  He doesn't have to get the drug.  She's not forcing him to

6  get the drug.  She's not exerting any control over him to

7  get the drug.  While the Court may think that the text

8  messages represent an exercise in affection, there's,

9  there's no -- there's nothing in that text message that

10  says get that drug or you'll never see me again, okay.

11  That's control.  That's what -- that's what the guidelines

12  require.  They require an "or else."  Do what I say or else

13  you won't get the money.  Do what I say or else you won't

14  get future opportunities.  Do what I say or else, okay.

15  That's missing.  There isn't anything like that here.

16                   Nobody testified that Mr. Theodorou said she

17  made me do it.  Nobody said that, okay.  Nobody said

18  Mr. Theodorou felt compelled for reasons that we don't know

19  to do it even if he didn't want to.  Every single thing he

20  did was a voluntary decision.  Every single thing he did

21  could be rejected because he's 8,000 miles away and he

22  doesn't have to do this.

23                   THE COURT:  But it sure feels like it was

24  all her idea.

25                   MR. KLUCAS:  You know what, I think the

1  *Minter* case talks about that, okay.  Coming up with the

2  idea isn't control.  It's coming up with the idea.

3              This is -- this is the bottom line here,

4  okay.  And the *Minter* case is recent, so this isn't some

5  archaic, right, they just talked about this last year.  It

6  is control over a person, and we don't have it here.  Being

7  an essential participant isn't control.  Directing the

8  actual activity isn't control.  And those text messages,

9  for whatever the Court may think, are the only thing that

10  the government can point to and it is not preponderant.

11  They are text messages.

12              THE COURT:  Didn't the words come out of her

13  mouth "I made them do it"?

14              MR. KLUCAS:  Of course.  So let me talk

15  about that.

16              She says in November -- or in April of 2022,

17  okay, I made them do it.  All right.  I took testimony from

18  the agent, okay.  People often say things that are

19  misdirected, not true, covering for others, covering for

20  themselves in their initial interrogation.  That is common,

21  okay.  If the Court wants to latch onto that and say that

22  gets them over the preponderant hump, that suggests a bit

23  of predisposition, because the Court has to recognize the

24  context of which that statement was made.  The agent

25  recognizes the context.  The Court should recognize the

1    context.

2               THE COURT:  And I do, it's just all of the

3    circumstances here, it sure feels like Mr. Theodorou was

4    sent off in a direction that he would not have otherwise

5    gone by Ms. Hovanec.

6               MR. KLUCAS:  Okay.

7               THE COURT:  That's -- and then you factor in

8    I made him do it.  I'm not saying you are not going to

9    prevail on this, I'm just telling you where I'm coming

10   from.

11              MR. KLUCAS:  So if you are going to tell me

12   where you are coming from, my question to the Court is

13   where does the Court get the idea that to go in a direction

14   where he otherwise would not go?  Where is that evidence?

15   There isn't any evidence for that.  He's not taking

16   direction, he's taking action.  He's finding hitmen.  When

17   the first one doesn't work out, he's finding the second

18   one.  When the second one doesn't work out, he's finding

19   the third one.  And then he's paying them, okay.  It's not

20   where he otherwise would not go.  There is no evidence of

21   that.

22              THE COURT:  Okay.

23              MR. KLUCAS:  So I just, you know, I think

24   when you apply the case law here, and it's clear, okay,

25   being the essential participant, not control.  Directing

1    activity, which is what the government's evidence really

2    is, I'll be the first to admit.  They've put on super

3    compelling evidence that Amanda is directing the activity

4    here, okay, with help from Mr. Theodorou and from

5    Ms. Green, but she's not controlling anybody.  Nobody is

6    being compelled for any reason to participate in this

7    exercise, okay.  It's incumbent upon the government to show

8    the "or else," to show the Court where he otherwise would

9    not go, okay.  And the Court may feel that way, but you

10   can't make the decision based on feelings, and there has to

11   be some evidence, and there isn't any evidence that

12   Mr. Theodorou didn't want to do any of these things, and,

13   in fact, there is evidence that he's proactive.  So that

14   application, that guideline enhancement we don't think has

15   been established by preponderant evidence.

16             With respect to the obstruction, and I'm

17   going to kind of start where the government left off.  And,

18   you know, the law, statements, false statements made to law

19   enforcement not under oath or specifically addressed in the

20   commentary, and there's an exclusion, and that exclusion is

21   unless those statements significantly impede the

22   investigation, okay.  This investigation was not impeded,

23   all right.  This was -- this was good police work that

24   resulted in everybody being in custody, everybody being

25   charged.  Everybody --

1           THE COURT:  I'm just -- I'm finding the code

2   section, because, I'll tell you, the totality of the

3   circumstances here, you know, I think you make the great

4   argument that there's a lot of stuff, if we have a murder,

5   there's a lot of stuff that's part of the murder.  And

6   probably burying the body is part of the murder, and maybe

7   even lying to the police and saying I didn't do it is part

8   of the murder.

9           I think, at some point, we cross over that

10  threshold and get into some combination of destroying,

11  affirmatively destroying evidence after the fact.  You

12  know, the ditching the stuff in dumpsters and that.  And

13  I'll tell you, the thing that really I think is

14  indisputably an obstruction play is the text message, after

15  she's talked to the police, trying to throw them off the

16  scent, sending a text message to a dead man's cell phone.

17  How is that part of the murder?  It's not; that's an

18  obstruction play.

19          And, you know, this all had a pretty fair

20  likelihood of working.  I think they would have had a good

21  chance of getting away with this but for that dash cam, but

22  it doesn't matter if they actually got away with it, I'm

23  seeing an affirmative, a really clear, affirmative act in

24  that text message to a dead man's cell phone.

25          MR. KLUCAS:  So --

1          THE COURT:  That's a bad fact.

2          MR. KLUCAS:  So here's where I would

3  disagree with the Court, okay.  They are not getting away

4  with this, okay.  No matter what the Court may think, these

5  things were not going to because -- because they never

6  considered the location data, which is the first thing law

7  enforcement looked at, okay.  So when you talk about things

8  that are -- that occur pre-investigation, the guideline

9  says that they have to be likely to succeed.  These things

10 are not likely to succeed.

11          We said in our memo, none of those people

12 had any criminal history and it shows, okay.  What was the

13 first investigative thing that law enforcement did?  They

14 went for location data from the provider.  That's why none

15 of this was going to work.  Because they don't know what

16 law enforcement's going to do.  But, thankfully, law

17 enforcement knows what to do, which is exactly what we

18 meant in our sentencing memo when we said law enforcement

19 knows what to do with these standard efforts at this

20 direction, okay.  They didn't go looking for Tim's car all

21 over the state of Ohio, they went to his cell phone

22 provider and said give us precise location.  First

23 investigative step.  Plan blown out of the water.  This was

24 never going to work because law enforcement knows what to

25 do.  So it's not likely to succeed at all.

```
 1              We think this is a part of the crime.  It is
 2   inherent in the offense itself.  It is baked into the base
 3   offense level.  We don't think that the pre-investigation
 4   conduct that's been elicited by the government here
 5   sustains the enhancement.
 6              I do want to say something with respect to
 7   Ms. Hovanec's statements of acceptance of responsibility.
 8              THE COURT:  Well, okay.  We'll go ahead --
 9              MR. KLUCAS:  Because she said --
10              THE COURT:  We'll go ahead and do that, too.
11              MR. KLUCAS:  Well, I'm --
12              THE COURT:  No, no --
13              MR. KLUCAS:  I just want to respond to that
14   part of the argument, okay.
15              THE COURT:  No, no, that's fine.  You are
16   entirely correct, yes.
17              MR. KLUCAS:  All right.
18              So, initially, the reason that there was no
19   acceptance of responsibility statement submitted to the
20   probation office is on me.  I didn't get it to them, okay.
21   That's the first explanation.
22              But the second statement that the government
23   characterizes as self-serving, you are only getting a
24   little bit of the back story here.  I did go to the U.S.
25   Attorney's Office and I did look at some of Anthony's
```

1    statements, and I said to Ms. Sterling there is way too

2    many here, would you consider disclosing them for me, and

3    she said let me think about it.  And I said I'm not talking

4    to Amanda about these until I know how I'm going to get

5    them.

6            And I, at the same time, contemporaneously,

7    Amanda had asked to talk to Dr. Brams again.  Dr. Brams

8    wasn't planning on coming back a second time, okay.  Amanda

9    is asking to talk to Dr. Brams.  I don't want a

10   self-serving statement of acceptance of responsibility, so

11   I hadn't disclosed Anthony's cooperation until she had

12   talked to Dr. Brams, because I didn't know how I was going

13   to get the material.  It turns out I got it this morning

14   like regular pure *Jencks*, which is fine; that's what the

15   law permits.  But, you know, the idea that I went over

16   there and told Amanda all of the things that I had seen

17   that Anthony had said and, you know, you better come up

18   with a different acceptance statement, that's nonsense,

19   okay.  It's nonsense.

20           That's what I want the Court to know about

21   the acceptance.  That acceptance, that revised acceptance

22   statement is a byproduct of Amanda's second interview with

23   Dr. Brams.  That's what brought that around.  And that's

24   all we have on the obstruction.

25           THE COURT:  Thank you, sir.

```
1              Anything further, Ms. Sterling?

2              MS. STERLING:  Thank you, Your Honor.

3              Just by way of response to Mr. Klucas'

4    arguments.  First on role, we are tracking the Court's

5    thought here.  We certainly agree with the Court's thought.

6    And I, frankly, encourage you, if you haven't, although I

7    would be surprised if you haven't, but if you haven't, to

8    read the Minter case.

9              THE COURT:  I have.

10             MS. STERLING:  It is a recent case, and

11   Mr. Klucas is right, it directly addresses the issue of

12   role and, in particular, it says, "Factors relevant to a

13   leadership enhancement include if the defendant exercised

14   decision-making authority, recruited accomplices, received

15   a larger share of the profits, was instrumental in the

16   planning phase of the criminal venture, or exercised

17   control or authority over at least one accomplice."

18             It goes on to say, "Importantly, a district

19   court need not find each factor in order to warrant the

20   enhancement."

21             And, in fact, in this particular case, the

22   Court did find a role enhancement to be appropriate.

23   Notably, it's a drug case, and the distinguishing here in

24   what I think was causing some trouble was the defendant was

25   arguing a buyer-seller relationship with kind of the head
```

 1    of the conspiracy, and so the question was, well, I mean,

 2    if it's a buyer-seller, is that really, you know, a

 3    situation where you ought to be looking at a role

 4    enhancement.  That's not this case.  Unequivocally,

 5    Ms. Hovanec has admitted involvement in a conspiracy, so

 6    she's part and parcel of it.  She and Mr. Theodorou are

 7    not -- I mean, they are in it.  They are both involved in

 8    these crimes.  I think that we are parsing hairs here.

 9              And I take issue with Mr. Klucas'

10    representation that somehow, you know, what's required for

11    this Court to make a finding of control, first of all, that

12    control is required.  I don't think it's required.  I think

13    it is but a factor.  I think direction is enough along with

14    all the other factors that we've argued.  But I take issue

15    with his representation to the Court that somehow there's

16    case law out there that says control has to be forced

17    against their will, holding a gun to his head, you do it or

18    else.  We all know that that's not what the case law says.

19    We apply this enhancement routinely in this courthouse in a

20    multitude of cases, and we think the Court is spot-on when

21    it says, look, these text messages make clear, her own

22    statements make clear.  We believe that a role enhancement

23    is appropriate and we ask the Court to impose one.

24              You know, this issue about the acceptance

25    statement, I just want to point out to the Court that the

1     dates that Ms. Brams went to see Ms. Hovanec are listed on

2     her report, and the last two dates postdate when Mr. Klucas

3     was in my office.  Now I'm not trying to throw shade at

4     him.  I don't know what he said to his client.  I'm sure he

5     discussed it with her because, as I said, we all know he's

6     an excellent attorney, but I -- I add that to the record so

7     the Court is aware of the timing here, although I think

8     that is but a small part of the argument that we've made

9     about why this Court should find that obstruction

10    enhancement is also appropriate.

11                I remind the Court, also, of Sixth Circuit

12    case law wherein the Court has found that a defendant who

13    makes misleading statements to law enforcement officers

14    about their involvement in a murder constitutes sufficient

15    evidence for a jury to find the defendant had committed an

16    obstruction of justice charge.  This was not "I didn't do

17    it, I don't know, I don't know what happened."  This is a

18    concerted effort on her part to cover up, to make them say,

19    "Look over here, look over there, he's a bad guy."  This is

20    not going into a situation where she's just not trying to

21    inculpate herself.  She is creating narratives that are not

22    true to try to get them to look elsewhere.  And, again, the

23    fact that she was not successful is irrelevant because

24    attempts count.

25                We believe both enhancements are

1    appropriately applied, and ask the Court to so rule.

2                THE COURT:  What about Mr. Klucas' statement

3    about likely to succeed?

4                MS. STERLING:  I think she would have

5    succeeded.  I think the Court has noted now, several times,

6    she was completely unaware that there was a dash camera in

7    that car.  That's how they broke this case so quickly.

8    They found the car abandoned in Dayton, in an area where he

9    apparently has skydiving connections, as she well knew, in

10   a bad part of town with the license plate off, tracked his

11   phone down there because she left it on on the way down

12   before getting rid of it.  She would have succeeded.  And

13   the only reason that this case was solved as quickly as it

14   was was because of the dash cam that Tim Hovanec had the

15   forethought to put in his car, a fact that was unknown to

16   her until she's sitting in the interview and confronted

17   with it.

18                She would have, Judge.  You saw those

19   pictures about where the body was found.  We are in the

20   heart of farmland.  You saw the aerial.  There's nothing

21   there.  There is empty fields and woods.  There's nothing

22   there.  They go 178 feet in through brush, and bury him

23   two feet deep.  What's the likelihood that the police are

24   ever going to find his body if Mr. Theodorou doesn't say

25   I'll show you?  What's the likelihood?

1              And if they do, Judge, what's the likelihood

2    that they are ever going to know what the murder weapon

3    was?  We saw the video.  We know she's there when he dies.

4    We know he's dead because, you know, here's his body.  What

5    is the likelihood that we are ever going to know what the

6    murder weapon was but for Mr. Theodorou's saying it's M99?

7              She would have gotten away with it but for

8    the dash cam and Mr. Theodorou's statement.

9              THE COURT:  So this isn't -- let's talk

10   about -- let's talk about the role in the offense.

11             I do believe, looking at the *Minter* case,

12   that the government has established by a preponderance

13   several of the factors, if not all of the factors.  Let's

14   look at them.

15             Did she exercise decision-making authority?

16   Yes, I find that.  Did she recruit accomplices?

17   Absolutely.  Received a larger share of the profits?  Well,

18   she was in line.  I've not heard a lot of evidence that

19   that was a specific motive of hers, but, factually, it is

20   true that she would have presumably benefited, as she was

21   still married to him, but she also would have benefited by

22   getting her children.

23             And I find that she exercised some emotional

24   control over Theodorou.  You may -- Mr. Klucas, I don't

25   agree that you have to have a gun over someone's head.  I

1   think she was manipulating him, and I became more convinced

2   of that today than I was before, so I am going to find that

3   they've carried the burden by a preponderance on the issue

4   of the control.

5           As to the obstruction, I really never had

6   any doubt about that one since I've first come onto this

7   case in terms of everything that happened here.  And I

8   share Ms. Sterling's observations that this did have some

9   likelihood of succeeding.  I hear what you are saying about

10  them tracing cell phones and so forth, but, at the end of

11  the day, they wouldn't have had a body.  If they had a

12  body, they would have not -- it's my understanding in the

13  background that etorphine is not something that's routinely

14  tested for in toxicology.  It may well have appeared to the

15  medical examiner that Mr. Hovanec had a heart attack.

16          And, as I said, I mean, all of the things

17  that Ms. Sterling pointed out I think are accurate, but

18  particularly this misdirection stuff.  It crossed over

19  from, you know, I can probably look past digging the grave

20  the day before, the day beforehand out in the woods and

21  everything, but the concept of staging a carjacking, and I

22  think there was some statement at some point about making

23  it look like a carjacking, taking the car to a bad part of

24  town and then leaving it, destroying the evidence, and

25  then, you know, making -- she, I do remember her quibbling

1  with me, which we'll get to in a minute, about the

2  acceptance, you know, about where the drug came from,

3  giving them bad information about where the body had been

4  taken.  I find that the government has established, for

5  several of the reasons under *Minter*, the enhancement for

6  obstruction.  So I'm going to apply both of those.

7  Next, I know the government has an objection

8  to the enhancement -- I'm sorry, to the acceptance of

9  responsibility.

10  Ms. Sterling, I would like to hear your

11  argument about that.

12  MS. STERLING:  Certainly, Your Honor.

13  As the Court may or may not be aware, when

14  the initial Presentence Investigation Report came out, the

15  probation department did not award a reduction for

16  acceptance of responsibility.

17  THE COURT:  Okay.  But I know from talking

18  to Ms. Truesdell that she didn't have the first acceptance

19  statement, so, and --

20  MS. STERLING:  Understood.

21  THE COURT:  -- Mr. Klucas has fallen on the

22  sword.  So let's not dwell on that too much because I think

23  there was some logistical problem, because Officer

24  Truesdell has told me, in no uncertain terms, she just

25  didn't have the enhancement -- she didn't have the

1    acceptance statement when she released the initial draft.

2              Right, Officer Truesdell?

3              PROBATION OFFICER:  Yes, Your Honor.

4              THE COURT:  Okay.

5              MS. STERLING:  Understood, Your Honor.

6    That's not where I was going, Your Honor.  Where I was

7    going was this.  The government did not file an objection.

8    You'll note in the final report, it says the government had

9    no objections.  We didn't note an objection to there being

10   an assessment for acceptance because there wasn't one.

11   There was nothing to object to.

12             THE COURT:  Right.

13             MS. STERLING:  That's the only reason I

14   bring it to the Court's attention to the extent its asking,

15   well, hey, you didn't raise that before.

16             THE COURT:  And I promise I'm not raising

17   that, either, okay.

18             MS. STERLING:  Okay.

19             So, again, you know, we've covered the --

20   our basis for this objection pretty thoroughly both with

21   case law and argument in our memo, and I don't want to beat

22   a dead horse here, but what it comes down to, in our mind,

23   it this.  It's two things.  She continues to falsely deny

24   and frivolously contest relevant conduct.

25             You have heard today the aggressive

1    arguments about role and obstruction, and while I do

2    believe the case law allows her to challenge those things,

3    it's apparent, based upon the Court's ruling, that it was

4    frivolous to do so, and it always has been, based upon her

5    statements to law enforcement in April of 2022.  And the

6    case law in this Circuit says, hey, you are allowed to

7    challenge it, but if you go whole hog and you don't -- and

8    you are frivolously denying something that is apparent,

9    that is a basis for this Court to deny acceptance.

10             We also think, because as the Court has now

11   properly found, because of the obstruction enhancement, it

12   would have to be the extraordinary case for this Court to

13   rule that a reduction for acceptance is appropriate after

14   giving her an enhancement for obstruction.

15             THE COURT:  Okay.  I'm probably not on the

16   same page with you there.  I think those can very much be

17   different points in time, so I hear what -- I hear what you

18   are saying there, just --

19             MS. STERLING:  Sure, yeah.

20             THE COURT:  You guys can accuse me of a lot

21   of things, but you can't accuse me of not telling you what

22   I'm thinking.  I disagree with that proposition.  I

23   understand that it says that there's case law that says

24   it's an exceptional case, but, in my mind, chronologically,

25   you put some space between those, you can obstruct and then

1   be, frankly, contrite and admit what you did and get

2   acceptance for responsibility, so that's --

3           MS. STERLING:  If you so find, Judge, that's

4   fine.  The burden is upon the defendant, however, to show

5   that this is an extraordinary case, and I haven't heard

6   that yet.  But that's our argument.

7           We'll also say, as we note in the memo, and,

8   you know, none of these is more important or weighs heavily

9   over another in our mind, they are all equally a sufficient

10  basis for this Court to make a finding, but her complete

11  and utter lack of remorse is a basis under the case law of

12  this Circuit to deny her, as we sit here today at her

13  sentencing, an adjustment for acceptance of responsibility.

14          And what is before the Court, what is before

15  the Court is this:  The video, her completely cool and calm

16  demeanor as she wrestles her husband to the ground and

17  waits for him to stop moving, her sliding out from

18  underneath of him, picking up his cell phone that she's

19  knocked out of his hand, taking his watch off of his arm,

20  walking to the car and shutting it off, fifty some minutes

21  later, turning it back on to go and ditch the car and

22  saying, "Fuck, yeah."  That's what's before the Court.

23          What's before the Court is Detective

24  Little's testimony that throughout her interview, she

25  showed no remorse.  "I don't know why I'm apologizing," she

1    said.  Blaming the victim.  It's his fault.  He did this.

2    He did that.  In the PSR, "I hated him."  That's what's

3    before the Court.

4              The acceptance statements:  I regret this

5    decision.  I've come to regret this decision.  Regret what?

6    Nowhere in the first statement or the second does the word

7    sorry appear.  Nowhere.  Heck, in her sentencing memo, it

8    says she has a growing remorse.  For what?  I have never

9    heard her, and there isn't a shred of evidence in this

10   record for this Court to find that she has any remorse at

11   all for killing Tim Hovanec, let alone the manner in which

12   she's done so, which we'll get into later.  That is a

13   sufficient basis for this Court to find that she is not

14   entitled to a reduction for acceptance of responsibility.

15             We've noted that case law in our memo, and

16   we ask the Court to deny her acceptance.  At a minimum, to

17   be clear, the government will not be moving for the third

18   point regardless of what this Court's decision is as to the

19   other two.

20             THE COURT:  Thank you, Ms. Sterling.

21             Mr. Klucas.

22             MR. KLUCAS:  Thanks, Judge.

23             So, apparently, the government has a

24   different definition of frivolous than what the rest of us

25   do.  I saw a Court considering arguments that were advanced

1    on both sides, not dismissing them, not pretending they

2    didn't exist.  And, in fact, indicating on the record that,

3    prior to the hearing, you were leaning one way, but now

4    that you've heard some evidence, you are leaning a

5    different way.  Well, if you were leaning one way, then

6    there's nothing frivolous about that, okay.  Nothing.

7                      You indicated in response to the obstruction

8    argument that you may be with me, with the defense on

9    the -- on the digging of the hole and things that were

10   otherwise attendant to the actual commission of the crime.

11   What is frivolous about that?  Here's what -- let me

12   finish, please?

13                      THE COURT:  Go ahead.

14                      MR. KLUCAS:  Here's what the government is

15   really saying.  It's frivolous because I have the temerity

16   to disagree with them on the application of a guideline

17   enhancement.  That's their definition of frivolous as

18   applied to this proceeding.

19                      Did you want to interrupt me?

20                      THE COURT:  Well, I just wanted to perhaps

21   cut you short by saying you win.  I'm not going to hold

22   against Ms. Hovanec's -- Hovanec or Hovanec -- I'm not

23   going to hold against her her challenge to these

24   enhancements on the issue of her acceptance of

25   responsibility.  I'm going to find that she is entitled to

1   the two points, because I think there is enough in her

2   statements, collectively, for me to get there in terms of

3   the two points.

4           Ms. Sterling has said they are not going to

5   move for the third point, I can't fault them for that.

6           MR. KLUCAS:  Right.

7           THE COURT:  Because she's challenging the

8   whole kit and caboodle, which I don't think I've ever said

9   in court before, but anyway, so I am finding that

10  Ms. Hovanec is entitled to the two points acceptance that

11  are set forth in the PSR over the government's objection in

12  their memorandum.  And I've excused that that, you know,

13  was not initially filed, that's fine.  We didn't know that

14  it was even going to be in there until the final version.

15          I'm overruling the government's objection,

16  finding that you have established the two points, but I'm

17  not going to award the third because the government is

18  objecting to it.

19          MR. KLUCAS:  That's fine with us.

20          THE COURT:  Okay.  If you want to argue some

21  more, go ahead, but.

22          MR. KLUCAS:  Well --

23          THE COURT:  Well, I'm just saying once you

24  win, it's a good time to stop, all right.

25          MR. KLUCAS:  No, I'm happy to stop.

```
 1                    THE COURT:  Okay.

 2                    MR. KLUCAS:  I'm arguing, I was arguing for

 3  the two points.

 4                    THE COURT:  Right.

 5                    MR. KLUCAS:  But you just awarded it.

 6                    THE COURT:  Exactly.

 7                    MR. KLUCAS:  So I'm done.

 8                    THE COURT:  That's why I interrupted you;

 9  otherwise, I would have let you go.

10                    MR. KLUCAS:  No problem.

11                    THE COURT:  But my mind was made up.

12                    So let's get our score cards out.

13                    Does anybody need a break?  Are we okay to

14  keep going?

15                    MS. STERLING:  I'm fine, Your Honor.

16                    THE COURT:  We are sort of in the final

17  stretch here I would say.  And my apologies to the folks

18  that are here for the 1:00.  This started pretty promptly

19  at 9:00 this morning, and here we are.

20                    Anyway, by my scoring, we start off with a

21  base offense, and you guys please listen carefully here, we

22  start off with a 43 base offense level.  We have the two

23  points for organizer, leader, which I find the government

24  has established by a preponderance.  We add the two points

25  for obstruction -- and that was 3B1.1(c), the two points
```

1  for organizer, leader.  Two points for obstruction, 3C1.1,

2  takes us to an adjusted offense level of 47.

3          We take the two points for acceptance, which

4  I find that the defendant has indicated they are entitled

5  to, that takes us to a 44.  Is that -- no, 45.  47 minus

6  two is 45.  But that's going to go down to a 43, because

7  the maximum is 43.

8          MR. KLUCAS:  Correct.

9          THE COURT:  I'm not asking anybody to agree

10  with any of my rulings there, but can we all agree with my

11  math?

12          MS. STERLING:  Yes, Your Honor.  We agree.

13          MR. KLUCAS:  Right.  We are not waiving any

14  objection, but.

15          THE COURT:  You are not.

16          MR. KLUCAS:  But we agree with the math,

17  yeah.

18          THE COURT:  You are absolutely not waiving

19  any objections.  I wouldn't expect you to, Mr. Klucas.

20          So a guideline calculation of 43 with a

21  Criminal History Category of I results in a guideline

22  calculated sentence of life.  That, obviously, is not

23  binding.  We can vary downward from that.  I'm not sure

24  anybody is on notice of any departures, but we could vary

25  downward from that if I determine that that's not -- that

1    that sentence is excessive, okay.

2                So we have to now look at the 3553(a)

3    factors.  And you don't have to repeat anything you've

4    already said, but if you want to bullet point it to re-hit

5    it again, that's fine.  I just -- I don't need you to plow

6    the whole field over again, but I would like to hear from

7    both of you in terms of where you think this should wind up

8    with the guideline recommended sentence being life.

9                Ms. Sterling.

10               MS. STERLING:  Thank you, Your Honor.

11               May I suggest to the Court that this might

12   be an appropriate time for the Court to take victim impact

13   statements?

14               THE COURT:  Oh, yeah.  I sort of -- that

15   would certainly be an appropriate time for that.  I almost

16   forgot that we had that coming.  Are we prepared to proceed

17   with that or do you need a minute?

18               MS. STERLING:  I believe that we are

19   prepared to do that at this time.

20               THE COURT:  Please proceed.

21               MS. SLOAN:  Permission to be seated?

22               THE COURT:  Yeah, sure.

23               And get the microphone back there for her.

24               Whenever you are ready to proceed, ma'am,

25   please tell us who you are and say whatever you would like

1    to say.

2              MS. SLOAN:  Yes.  My name is Andrea Sloan.

3    I'm Tim Hovanec's mother.

4              Imagine, Your Honor, sitting at your dining

5    room table and being told your son is no longer alive.

6    Imagine, Your Honor, having to go into a room with three

7    beautiful young children and say your daddy is dead.  The

8    daddy that just took you swimming and golfing last weekend,

9    your daddy is dead.  You'll never see him again.  And your

10   mommy killed him.  Kenzie said, why can't we just be a

11   normal family, grandma?

12             Before I continue, I do want to take one

13   moment to thank the Court for this opportunity to make the

14   victim statement and to thank everybody, starting with the

15   State Department, the federal, local officials, the

16   attorneys, everybody who has worked so hard to bring us to

17   justice today, because, otherwise, I believe she could have

18   gotten away with it.  They are very heroic in their

19   efforts, and we do appreciate them.

20             We have heard from family, friends,

21   neighbors, professional colleagues and even strangers about

22   how much they were impacted by Tim's loss.  We heard from

23   people all over the world.  I have emails, I have letters

24   telling us how much Tim meant to them.

25             This is just an example.  This was at his

1  memorial service telling him how much he meant to them, how

2  much they were going to miss him.

3              THE COURT:  I think I've seen that before,

4  right?

5              MS. SLOAN:  This is an exhibit.

6              THE COURT:  That was an exhibit.  And I've

7  never seen a more comprehensive -- obviously, you're an

8  estate and guardianship attorney.  You are used to dotting

9  I's and crossing T's.  I read every word that you guys

10 submitted, and there were a lot of them.  But I compliment

11 you on the thoroughness and the completeness of the

12 record-keeping, which you did, and what you do for a living

13 was not wasted on me being able to see that.  So thank you

14 for that.

15             MS. SLOAN:  Thank you.

16             The impact has been incalculable on us, but

17 I want to focus for these few minutes on what she did to

18 these three beautiful children.  She abandoned them.  She

19 betrayed them.  She killed their father.  What, as Your

20 Honor said, what more heinous crime could there be than for

21 her to do this to these children.  Then she lied and tried

22 to cover it up.

23             She stole from these children their

24 childhood.  They can't look back and remember, oh, our

25 third birthday or the time we went to Disney World or this

1   or that.  She stole that from them, and for the rest of

2   their lives, they are going to have to be in therapy and

3   they are going to know what she did to them.  And we are

4   going to tell them, Your Honor.  We are going to be very

5   honest and truthful at such time they are willing to hear

6   this.

7            We've had to protect -- when I took -- I'm

8   going off page.  When I took these little -- I set up a

9   zoom meeting so that they could say goodbye to their little

10  friends at school and just so that they would know they

11  were okay.  And even at that time, one of -- two of the

12  little boys had to be taken out of the room because they

13  were taunting them.  What did your mother do?  And that was

14  just a few days after the murder.  Imagine what's going to

15  happen when they get on the internet and they, as they will

16  do, they already are, they are more sophisticated than we

17  are, and their high school friends or their college friends

18  just happen to look up the name Hovanec and see what

19  happened and see the ugliness that was in that case and the

20  details and the premedication and the hatred that came from

21  her.  Just imagine.

22           We've been lucky, because, and I've said

23  this in my papers, we are lucky for so many things, lucky

24  to have all of these people, lucky to have friends and

25  neighbors, lucky not to have any financial problems, lucky

1    do have the skill set we were that's enabled me to be the
2    guardian and to fight people to get the guardianship and to
3    get all the papers to do the Slayer statute to keep her
4    from getting any money, to do the estate work without
5    having to charge these kids.  We've been very lucky in that
6    point.

7             But so much, so much has happened.  The
8    depravity of it all is unbelievable, and these children are
9    going to suffer for the rest of their lives.  $575 a week
10   for therapy, to just to give an idea.  And it's nothing.
11   We are fine.  We can take care of that.  But they will
12   never be free from this.  We are very fortunate that they
13   are doing extremely well, because we've worked so hard,
14   countless hours, thousands of hours.

15            And it's not bad enough that we are
16   suffering from this, we are suffering because the family of
17   the murderer is harassing us.  She's -- she thinks they
18   should have custody of these girls.  I'm sorry I'm yelling.
19   She's harassing us.  We are going to court next week again
20   in Fairfax because she's followed me down.  I finally got
21   Ohio out of the picture, and she's following me to Fairfax
22   to do this at the behest of the murderer's family,
23   including one of the criminals who has supplied her with
24   money for this.

25            This, I couldn't have imagined, along with

```
1    after we first heard how this could continue, how it could
2    get any worse, and yet I have to sit here and watch my son
3    die this morning and it shows no signs of letting up.  We
4    are just tormented by this family.
5              But let me talk about the girls.  Just a few
6    more things, and because I could go on for hours and hours
7    about the suffering.  We had to clean out Tim's house.  We
8    had to see the birthday presents and the Christmas presents
9    that he had bought for the girls and just put those aside
10   and give them to them a year later.  We had to stand in his
11   house and separate his life's work into dispose, give away.
12   We had to give away his favorite hats because there were so
13   many of them.  We had to give away all of the things that
14   he had done, all of the work that he had done so hard and
15   the plans that he had made, the dreams that he had had, the
16   time -- you could hear him on that phone on that recording
17   talking to the little girls and they were happy and they
18   loved their daddy, and all of that was taken away from her
19   for her boyfriend so she could live her best life.
20             One of the most horrible things, Your Honor,
21   that ever happened, was driving up the driveway with the
22   little girls in the car and finding this.  Priority mail.
23   Cremated remains.  All that Tim did, all his good deeds,
24   all his work, his love of his kids, is in a box here.
25             Thank you, Amanda.
```

```
 1                    This is what she did to him.  And now you

 2      have little girls who are worried who said to their

 3      therapist, am I going to grow up to be like mommy?  They

 4      are afraid they are going to grow up to be like her.  How

 5      horrible a sentence can you give to a 5-year-old?  This is

 6      a -- you worry all your life that you might grow up to be a

 7      murderer.

 8                    The first day they ended up in school in

 9      Virginia, they were doing Father's Day presents, and the

10      school was wonderful.  They took them out of there and said

11      they don't want you -- they didn't want them to even be

12      exposed to the fact that they lost their father.  And one

13      time when Zoey was asked why did you live with your

14      grandmother and grandpa, she said because both my parents

15      are dead.

16                    MR. KLUCAS:  Please talk to the Court and

17      not the client.

18                    THE COURT:  He's right --

19                    MS. SLOAN:  I'm sorry.

20                    THE COURT:  -- Mrs. Sloan.  You do need to

21      talk to me.

22                    MS. SLOAN:  We've lost our privacies.  We

23      have been in fear of further retaliations from this family

24      because family members continue to harass us personally.

25      They have made false statements to the police and had
```

1  police showing up at the doorstep accusing the family of

2  neglecting or abandoning these children.  The one who

3  neglected and abandoned them was Amanda.  She had them in

4  that home, and when we got them to our house, they drew

5  pictures that were sexually graphic indicating what they

6  had seen in their big common sleeping room where she and

7  Anthony slept.  She neglected their health, their dental,

8  their ophthalmological, they needed speech therapy.  She

9  neglected all of that.

10           And the last thing on the intrusion of the

11  privacy, we have been approached by 48 Hours, and even

12  within a few minutes, really, of this going online, there

13  was another post on there that said this is, you know,

14  ripped from the headlines.  Fortunately, we are in the

15  Washington DC area, and it didn't make the market there.

16  And we are trying to keep it that way.  We don't want any

17  part of anything.  But we just can't prevent that from

18  happening.

19           I showed, I mean, their therapy, we leave

20  their therapy to be very private.  We don't interfere,

21  because they have to know that there's one place on earth

22  that they are safe and they can say anything they want, but

23  they occasionally draw pictures, and I think we submitted:

24  Zoey, I'm mad and I'm sad.  And there's so many sad

25  pictures and things that this started out initially.  We

1    know how much they were suffering.  And they also had

2    nightmares and so physical reactions as well.

3              They also have -- we have told and been told

4    by the therapists that they, at times, blame themselves.

5    And that's the saddest thing of all.  Somehow or another,

6    they've made mom -- they were responsible for mommy killing

7    daddy.

8              The children have lost their normal

9    situation.  And that was what Kenzie said when she first

10   responded to this.  She said why can't we just be a normal

11   family.  Well, in spite of the rest of the family that we

12   have gotten them to a new normal with a mom and a dad, and

13   they are very picky, and they say don't ever call her

14   mommy.  She's mom.  So they made a new normal for

15   themselves.  They are getting along.  They are going to

16   school.  They are doing well.

17             But there's -- well, I guess one other

18   thing, and that is, in the snap of a finger, my son, Matt,

19   and his wife, Katie, became parents of five little girls.

20   Katie did not hesitate a nanosecond to say I would be

21   honored to take Tim's girls, and we will take, become their

22   parents, take good care of her.  It's a high regard that

23   they had for Tim and that we all had for Tim.  And the

24   saddest thing is we will never be able to answer the

25   question why.

1                    Thank you, Your Honor.

2                    THE COURT:  Thank you, Mrs. Sloan Hovanec.

3                    If you are going to use that, raise it up a

4    little bit.  There's a button on the -- I think it's --

5    there you go.

6                    MR. DANIEL HOVANEC:  Hello, Your Honor.  I'm

7    Daniel Hovanec.  I'm Tim's younger brother.

8                    THE COURT:  You are the one from Arizona,

9    right?

10                   MR. DANIEL HOVANEC:  Yes.

11                   THE COURT:  See, I read this stuff.

12                   MR. DANIEL HOVANEC:  Speaking here today

13   will be the fourth, fifth and sixth hardest thing I've ever

14   had to do in my life.  The first thing, hardest things I've

15   had to do in my life was to sit down and tell each one of

16   Tim's children that their mother killed their father.  In

17   that moment, I had to rip the innocence of childhood and

18   shatter their worlds.

19                   I'm forever haunted with that memory, and

20   then the hours and hours of pain from it and questions that

21   innocent young children have from being told something that

22   most adults, myself included today, can't handle hearing.

23                   I'm here to speak to you about the impacts

24   to myself, impacts to Tim, and the impacts to his children.

25                   For myself, I've spent the past two plus

1   years processing this, attempting to heal, attempting to

2   understand.  I've been in therapy and I've been trying to

3   put into words how this is impacting me.  I feel like what

4   I would imagine I would feel like if I had my leg

5   amputated.  The physical trauma has scarred over and I'm

6   not actively bleeding, but the wound is still there and

7   forever intertwined in my life.  I'm regularly reminded of

8   the trauma, whether it's an innocuous question from

9   somebody about if I have siblings and what they do, or

10   advertisement or a story about the number of places

11   associated with this, like Ohio or South Africa or DC or

12   Germany or anywhere that's involved in this.  Or it's even

13   just having to come today to a sentencing hearing.

14          The hardest thing for me is trying to accept

15   that I will never ever get to make any new memories with

16   Tim.  I'll never get to see his infectious smile.  I'll

17   never get to embark on a wild adventure that is something

18   that two brothers can do together.  I'll never get to see

19   Tim anywhere besides in my memories.

20          I'm here to speak for Tim.  He was a true

21   American hero.  He was serving his country's diplomatic

22   interests abroad making everybody in this courtroom and in

23   this state, in this country, and in this world safer.  He

24   was also raising three young children, and Tim had well

25   more than half of his life stolen from him.

1             Tim will never get to see the things that a

2 new father looks forward to.  He'll never get to see his

3 daughters playing softball, performing in ballet, getting

4 an A in school, taking them to a dance, or the other half

5 of becoming a father, consoling them after a rough day at

6 school, helping them back up after they've lost a sports

7 game or something and reminding them they tried their

8 hardest.  Or just consoling them when they are sick.  Tim,

9 nor his beautiful daughters, will never get to have a movie

10 night snuggled up on the couch.  They'll never get to go on

11 father-daughter adventures going to the zoo, going

12 anywhere.  Tim will never get to watch his daughters grow

13 up, and grow up they will, and grow up they will to become

14 amazing and beautiful women.

15             Tim's children lost the most from this

16 crime.  They lost the innocence from growing up without

17 having to undertake complex adult issues like murder.  They

18 lost both of their parents.  They lost a loving father who

19 was excited to show them the world, excited to teach them,

20 excited to watch them grow up and unconditionally love

21 them.  Thankfully, our extended family has extended all of

22 our love to his daughters.

23             Your Honor, I respectfully request you

24 sentence Amanda to life in prison.  The first time that I

25 had to consider what sentence I had thought would be

```
 1   appropriate for this crime was when one of Tim's children

 2   asked me how long mommy was going to go to jail for killing

 3   daddy.  I had to try and explain that it wasn't up to me,

 4   but that if it was, I would want her to go away for the

 5   rest of her life because daddy, my brother, will be gone

 6   for the rest of our lives.

 7                  My brother, Tim, loved his children.  He was

 8   dutifully working through a divorce process.  His love for

 9   his daughters is why he was fighting so hard for custody.

10   And for that love and wanting to be in his daughters'

11   lives, he was murdered in cold blood.  A premeditated,

12   remorseless murder in cold blood.  It's one of the most

13   heinous crimes and worthy of the harsher sentence, a

14   sentence of life in prison.

15                  Thank you, Your Honor.

16                  THE COURT:  Thank you, Daniel.

17                  MR. KURT SLOAN:  I'll keep this short.

18   Thank you, Your Honor, for indulging me and everybody here.

19   It's --

20                  THE COURT:  Who are you?

21                  MR. KURT SLOAN:  My name is Kurt Sloan.

22                  THE COURT:  Okay.

23                  MR. KURT SLOAN:  Uncle of Tim.

24                  THE COURT:  Okay.  Thank you.

25                  MR. KURT SLOAN:  I've known him since he was
```

1   born.  And pale in comparison, what I'm going to say,

2   compared to the first two.

3            But Amanda clearly took a self-centered,

4   permanent solution towards a temporary situation.  She's

5   much like the criminal who steals the apple.  Unless they

6   are smacked on the hand, just do it without thought of the

7   overriding consequence that so many regular criminals don't

8   think about.  I'll do it now, I'm not thinking about what

9   happens tomorrow if I get caught.  If she had any foresight

10  at all, she wouldn't have committed this crime.  Any

11  thought, any foresight.  All of this, we wouldn't be here.

12  We would not be here.  Just a moment of thought, say, wait,

13  if I do this, this could happen.  Couldn't have had any of

14  that, because as she sits there, she's looking at her hands

15  saying, damn, I wouldn't have done this.  I shouldn't have

16  done this.

17           And her actions have altered the lives of so

18  many different people, particularly her daughters.  We've

19  already heard that.

20           The real confinement here, the real

21  confinement will not be the physical confinement that she

22  is about to experience, but it will be her mental

23  confinement.  It will be the fact she will never see her

24  daughters again.  She will not see them graduate high

25  school.  She will not see them graduate college.  She will

 1  not see them get married and have kids.  She will not hold

 2  Anthony again.  None of that.  And she can sit there all

 3  day for the rest of her life, wherever she stays, and

 4  thinking this scenario again and again as she runs it

 5  through her mind a million times what she could have done,

 6  what wouldn't have had this permanent effect, what wouldn't

 7  have brought us all here to this courtroom.

 8           This is going to be tougher than any

 9  physical confinement she can ever have.  It's mental

10  duress.  I've always said when I've experienced something

11  bad, I would rather have somebody kick me in the teeth than

12  go through a mental duress.  Physical duress is easy,

13  mental duress is forever.

14           Because of this, her children are going to

15  be raised by the family.  Her family will never be a part

16  of those children's lives.  And those children will be

17  raised correctly with every opportunity in the world, but

18  it won't be because of her.  She threw all of that away

19  when she made a self-centered, narcissistic decision to

20  kill my nephew.

21           What she didn't realize was time passes so

22  quickly.  These marital strife issues, these custody

23  issues, they come and be gone.  They'll be gone in 10,

24  15 years and the life would be gone, everybody would almost

25  have returned to normal.  The kids would be suffering, Tim

1    and her would be fighting, but that would be gone and life

2    would be almost normal as it could be.  But no.  No thought

3    in this.  Just do -- let's do what I did in that driveway

4    that day.  Certainly, a shortsighted decision to change

5    lives forever.

6              As you lay there night after night confined

7    in your little space, replay that scenario over again in

8    your mind.  You will never do the things that I just spoke

9    about.  Over and over for multiple years.  This is your

10   life.  You ruined it for yourself.  You ruined it for

11   everybody else without any thought of what the final

12   consequence might be, a typical criminal mind.

13             Thank you for your indulgence.

14             THE COURT:  Thank you, sir.

15             MS. STERLING:  Your Honor, I believe we have

16   one final individual that would like to make a statement.

17             MR. STUART:  Good afternoon, Your Honor.

18             THE COURT:  Yes, sir.

19             MR. STUART:  My name is Ronald Stuart.  I'm

20   the Deputy Assistant Secretary, Assistant Director of

21   (Court Reporter interruption for clarity).  Little fast?

22             THE COURT:  His card is this long, so.

23             MR. STUART:  Ronald Stuart.  I'm the Deputy

24   Assistant Director, Deputy Assistant Secretary and

25   Assistant Director of the Diplomatic Security Service, the

1  Countermeasures Director within the U.S. Department of

2  State.

3            Here to discuss the impact that Tim's

4  untimely demise has caused on our programs and within the

5  department.

6            Mr. Hovanec's work at the National Defense

7  University and his ability to tie research together at a

8  critical juncture of emergent threats had provided deep

9  insight into the challenges of developing an effective

10  Counter-UAS program.  Mr. Hovanec's research could have

11  allowed our team to better understand the issues and devise

12  more effective detection methods.  This will all come into

13  play here in a few minutes.

14            To that end, Tim requested a demonstration

15  of our current Counter-UAS system and training methods to

16  be presented to a wide, interagency audience.  The attendee

17  list for this demonstration included the NIU students, the

18  National Security Council, U.S. Customs and Border Patrol,

19  Central Intelligence Agency, and representatives from

20  numerous government support contractors.

21            Selected and paneled for his position to

22  oversee the Department of State's Counter-UAS program

23  because of his expertise, Mr. Hovanec had been responsible

24  for the survey, research, design, testing, and installation

25  of the Department of State Counter-UAS systems.  This

1   included the integration of the Counter-UAS system into

2   existing security technologies.  His next position would

3   have provided oversight for the forward-deployed Field

4   Service Watch Standers including tracking maintenance and

5   operations as well as providing timely and accurate

6   information to Counter-UAS incidents to Senior Diplomatic

7   Security Officials.  The section Tim was selected for

8   remains responsible for providing situational awareness of

9   and current -- future and current UAS threats to our

10  facilities around the world.

11                  Mr. Hovanec's responsibilities would have

12  entailed coordinating with all our constituents to include

13  the broader Security Systems Integration Division of

14  numerous government agencies, our Security Technology

15  Office, the larger Department of State, other federal

16  executive agencies all over this Counter-UAS program.  He

17  would have been our liaison to national laboratories, to

18  research agencies, professional organizations and

19  committees, private sector companies as well as

20  international allies.  He shared a wide range of

21  conventional approaches, methods and techniques in his work

22  as well as groundbreaking solutions to new situations.  He

23  would have made decisions regarding appropriate mitigations

24  and recommended possible courses of actions, and worked

25  closely with the integration divisions.

1         Mr. Hovanec's knowledge was unique.  His

2    drive was unique.  And that was one of the main reasons he

3    was chosen out of 220 Security Engineering Officers to lead

4    this program.  He's responsible for our contingency

5    support.  It's usually only performed in our High Threat,

6    High Risk environments.

7         With Mr. Hovanec's direct involvement with

8    our program, we were looking forward to his contributions

9    to this program and helping develop solutions for the

10   evolving drone threats to our embassies and facilities.

11   His ultimate demise has had serious repercussions and

12   negative lasting effects on the safety of American

13   diplomats serving abroad.

14        The threat drones pose to the Department of

15   State are brought to full light more and more in the news

16   with the current conflicts in Ukraine and Israel.

17   Following the Hamas-led attacks in Israel, we've seen an

18   uptick in drone activities, especially weaponized drones.

19   These attacks and subsequent -- these attacks and

20   subsequent attacks against the U.S. and the region

21   highlighted how vulnerable we are to this new waive of

22   threats.

23        The drone challenge is evolving rapidly in

24   that any loss in time creating counter-drone defenses

25   creates impacts downstreams exponentially.  The most

1    valuable asset the department has against this threat and

2    this time is knowledge and the experience which SEO

3    Hovanec, Security Engineering Officer Hovanec, possessed.

4    With his tragic passing, the DSS lost a beloved colleague

5    and a friend whose miscontribution has set us back years

6    encountering this threat, which, ultimately, will cost

7    Americans their lives.

8              The bureaucracy of the U.S. Government

9    hopefully is not lost on anyone.  We just hired a drone

10   expert three weeks ago.  It took us this long to get

11   somebody there.  I'm deploying people to Beirut as we speak

12   to counter the drone threat on the ongoing conflicts with

13   Israel and Hezbollah.  They are not as prepared as they

14   should be.

15             Thank you.

16             THE COURT:  Thank you for your remarks and

17   your service.

18             Anything else, Ms. Sterling?

19             MS. STERLING:  I believe that is all that we

20   have to offer by way of victim impact statement today.

21             Your Honor, of course, you are aware, as

22   defense counsel, of the many documents that were submitted

23   as part of the PSR.

24             THE COURT:  I am.  Now, but where we started

25   with this was to make your argument about where you believe

1  an appropriate sentence should lie with this case, so why

2  don't you go ahead and conclude that, and then I'll ask

3  Mr. Klucas for his thoughts about that, and if Ms. Hovanec

4  wants to make a statement, we'll have that as well.

5                  MS. STERLING:  Certainly, Your Honor.

6                  We started this morning's hearing with the

7  Court giving a recitation of where we were in the

8  proceedings, and you made a comment, Judge, that -- you

9  asked a question, I guess more of a rhetorical question, I

10  thought, in speaking to Ms. Hovanec about the decision that

11  you have to make today.  And you said is this one of the

12  worst crimes?  And you said it's hard to think of one

13  worse.

14                  You said several times that you are

15  well-aware that this crime was premeditated and nothing

16  more than a cold-blooded murder.  This Court, of course, is

17  required to consider the nature and circumstances of the

18  offense.  I'm confident that it will do so.  And that

19  factor alone justifies the sentence here.

20                  The government has made clear in its

21  sentencing memo that it is seeking a sentence of life

22  imprisonment for this defendant.  Of course, the guideline

23  range is now set by the Court counsels a life imprisonment

24  sentence, and there is nothing about this defendant that

25  warrants a downward departure or variance.  The probation

1   officer, who very thoroughly went through the facts of this

2   case, notes that in her report.  She found no basis for a

3   variance.  No basis for a departure.

4            She deserves a life sentence for a multitude

5   of reasons, not the least of which is that that is exactly

6   the sentence that she imposed on Tim Hovanec, his family,

7   and I think, we can all agree, their children.  And they

8   are going to be dealing, obviously, with the consequences

9   of her conduct, her choices, for the rest of their lives.

10   We all agree that a life sentence should be reserved for

11   the most serious crimes.  There is no more serious crime

12   that she could have committed.  She intentionally took a

13   human life.

14            She says in her sentencing memo that, you

15   know, it's not aggravating that there's a death in this

16   case because in every homicide case, there is a death.

17   Well, yes.  And yes, that's factored into the base offense

18   level here, which is, in large part, what drives the

19   guideline.  But this case is different.  The premeditation,

20   Judge, the degree to which she went, the length of time

21   that she was thinking about and planning the death of her

22   husband.  She says it was as early as December of 2020 when

23   the divorce was filed, well over a year.  And this was more

24   than just talk or wishful thinking on her part, as she's in

25   the middle of an ugly divorce or custody battle.

1        You heard the statements of Mr. Theodorou.
2   You saw the text messages, that as early as the summer of
3   2021, there's corroboration of a plan B.  A plan B that
4   involves the hiring of a hitman.  And she's persistent.
5   First one, not going to do it.  State Department employee,
6   not touching that.  Second one, I'll do it.  Give me the
7   money, I'll do it.  That falls through, too.  And so
8   there's a third one.  All at her direction.

9        She admits that finally in her revised
10  acceptance statement.  Yeah, I've been thinking about it
11  for a long time, and, yeah, we've talked about a hitman.
12  But Mr. Theodorou's statements in that regard are not
13  challenged by this defendant.  They are not endowed to this
14  hearing.

15        Who the victim was in this case and his
16  relationship to the defendant makes this aggravating, too.
17  He's her husband.  Estranged or not, they are married.
18  He's the father of her children, the father of her kids.
19  He's an employee of the United States State Department.  It
20  matters.  It's aggravating who he was.  You've just heard
21  the final victim impact statement that the murder of Tim
22  Hovanec has, quote, set us back years.  It's affected the
23  security interests of this country.  It's certainly
24  aggravating who he was.

25        How about the manner of death?  That's

1   aggravating, too.  There are a lot of ways that you can

2   kill someone.  Countless, I'm sure.  When she couldn't get

3   someone else to do it for her, she took matters into her

4   own hands, and she did it herself.  When she chose to do

5   what she did, Judge, she ambushed.  There is no other word

6   for it.  She ambushed the father of her children after he's

7   just spent a weekend with them.  After being denied

8   visitation with them for months, she ambushes him in the

9   driveway.  She injects him with a drug that she obtained,

10  the sole purpose of killing him.  She knew what she was

11  doing, a drug that she couldn't obtain here, a drug that

12  she obtained from a foreign country.  And where does she do

13  this?  In the driveway of her house while their kids are

14  steps away inside being distracted by her mother.  They are

15  inside the door.  You see them walk in.  They are inside.

16              You saw the struggle on the video.  She's

17  aggressively trying to get him to the ground.  He's going

18  for his phone.  He, obviously, knows.  It's apparent to me,

19  and I'm sure the Court, he is trying to get in front of

20  that camera because he knows it's there.  She doesn't, but

21  he does.  And he is trying his darndest, and thank God he

22  got there.  He got in front of that camera.  You see how

23  aggressive she is.  He's trying to -- something is wrong

24  here.  He's trying to get on his phone.  She knocks it out

25  of his hand.  She wrestles him to the ground and holds him

1    while he takes his last breath.  She gets up, grabs the

2    phone, takes the watch off of his arm, walks over to his

3    car, and turns it off.  She tells us how she feels about

4    that when she turns the car back on to ditch it.

5                Her complete and utter lack of remorse in

6    this case, as I argued earlier with regard to the

7    acceptance adjustment, it's astonishing.  Just literally

8    astonishing, from the moment she committed the crime, to

9    today, to her multiple acceptance statements, to today.

10   She has never ever said I'm sorry.

11               You know, I'm sure that Mr. Klucas is going

12   to get up and make reference to the forensic psychology

13   report that he attached to the sentencing memo.  And he's

14   going to say, Judge, as he did in his memo, it's all bad.

15   We get it, it's all bad, but, you know what, she deserves

16   an out date.  She deserves mercy because she had a rough

17   childhood.  She suffered from toxic stress as a child.  I

18   mean, the report goes on for 19 pages.

19               You know, I am sure that I will get back up

20   on rebuttal to address the points that he may make with

21   that report, and as we stand here today, the government

22   understands and agrees that the Court can consider any

23   evidence that it wants in making this decision.  We don't

24   believe that report should be given any weight, and we'll

25   talk about that in more detail on rebuttal.  But one thing

1  I will ask you about that question, about whether she

2  deserves to have an out date and whether or not she's a

3  risk to reoffend is this:

4         Nowhere in that report, nowhere, nowhere

5  does it say, you know what, I think if she got this

6  therapy, I think if she had this programming, she might be

7  able to turn the corner.  We might be able to get a handle

8  on this.  There is absolutely nothing in that report that

9  suggests in any way that she can be rehabilitated.  In

10  fact, the report says she is still detached, dissociative,

11  and cannot see the bigger picture of her actions.  That's

12  on page 17.

13         She remains as much of a risk today as she

14  was then.  We can all sit here and say, well, you know, the

15  confluence of all of these factors is unlikely to occur

16  again in the future.  That's speculative at best, Judge.

17  We have no idea.  We have no idea.  She's acknowledged in

18  the report that she's quite promiscuous.  What's to say

19  that if you give her an out date, when she gets out, she

20  doesn't jump right into another relationship and right into

21  another bad situation where she dissociates from reality

22  and something bad happens again to someone else.  That's a

23  risk that you can't take, and it's a risk that the public

24  does not deserve to be put in.

25         There is no more serious offense, and this

1   isn't just a death, it's aggravated, by her.  She deserves

2   life, and that's the sentence you should give her, as

3   difficult as it may be for you to do it.

4               Thank you, Judge.

5               THE COURT:  Thank you, Ms. Sterling.

6               Mr. Klucas.

7               MR. KLUCAS:  Thanks, Judge.

8               So I want to start by acknowledging the

9   victim impact.  Natural, reasonable, understandable.  The

10  Court knows what kind of practice I have.  It's not the

11  first victim impact statement I've heard.  They are all

12  like that.  Because any life that's unnaturally abbreviated

13  is tragic for those that are left behind.

14              The anxiety that I have as an advocate is

15  how close to the decision as to what the sentence is going

16  to be that victim impact evidence comes.  It's right

17  before, okay.  The real fear, as we indicated in the memo,

18  is that it will overwhelm all the other sentencing factors.

19  And there are other sentencing factors that the Court has

20  to consider.

21              And I want to start by reminding the Court

22  that despite the government's characterization, and I don't

23  believe the word mercy appears in our sentencing memorandum

24  anywhere, okay.  We are not asking for mercy.  We are

25  asking for a fair application of the factors of 18, U.S.C.,

1    Section 3553(a).  Nobody asked for mercy and so be -- to

2    have the government characterize our remarks in our memo as

3    that I think is misleading.

4                I think one of the things that we've done

5    both in our sentencing memorandum and in our advocacy here

6    today is that we have acknowledged from the minute this

7    case got put into a sentencing posture that this is

8    terrible conduct, okay.  I said it in my sentencing memo.

9    You can look at the Indictment and see whatever they want

10   to charge, okay.  It's a murder case.  This is a murder

11   case, okay.  Not all murder cases are life without parole,

12   okay.  They are not all like that.  And, in this instance,

13   we think the sentencing factors merit the Court giving some

14   real consideration to a sentence of less than life.

15               And I think it's important that we

16   acknowledge that this is a homicide and that it was

17   deliberate and that it was done with prior calculation and

18   design, because if I don't acknowledge that to the Court,

19   then the Court's not going to take me seriously when I talk

20   about other things, okay.

21               I don't know about reserving comment for

22   rebuttal with respect to Dr. Brams' report.  I don't know

23   that there was ever going to be any rebuttal.  I think the

24   government is a little dismissive about that report, but we

25   are not dismissive in the allegation and the offense

1  conduct that brings us here.  We know it doesn't get a

2  whole lot worse than this, and we said so in our memo.

3          I just -- I think it's important for the

4  Court to recognize that defendants aren't fungible.  They

5  are not interchangeable.  They are not all the same, okay,

6  and that, to some extent, the Court does, in fact, sentence

7  a crime, but, more importantly, the Court sentences

8  individual defendants, because they are not all the same.

9          And for reasons not of Amanda's own

10  choosing, okay, she does not perceive, respond, react the

11  same way as somebody else who didn't have her upbringing.

12  And I think it's also important for the Court to

13  acknowledge, and I think you are going to hear from

14  Ms. Hovanec that, you know, not even -- nobody believes

15  that Mr. Hovanec deserved this, okay.  The government's

16  focus at Ms. Hovanec at the time of the offense, okay.

17  It's two years later, more than two years later, okay.

18  People don't freeze in time no matter how much the

19  government wants you to think that.  And I think that the

20  report from Dr. Brams and the way that Amanda has taken

21  advantage of the limited resources of the Lucas County Jail

22  allow the Court to conclude that this isn't the same

23  person, okay.

24          It's not that anybody's expecting to avoid

25  punishment for this.  We are not up here asking for

1  probation, okay.  But the idea that Amanda is exactly the

2  same now as she was in April of 2022 is simply not true,

3  okay.  I think the Court knows that just by reading

4  Dr. Brams' report.

5            What Amanda really recognizes now is that

6  nobody, not Mr. Hovanec, not her daughters, not

7  Mr. Hovanec's parents, relatives, okay, nobody deserves the

8  fallout that she's created.  And as I indicated, you are

9  going to hear that from her.  But, you know, one of the

10  things that the government said in their initial remarks

11  was, you know, that Amanda had made some choices in this

12  case, and that's true, she did make some choices in this

13  case.  But I don't think I need to draw a lot of pictures

14  for the Court for the Court to recognize, you know, what

15  abuse and neglect and domestic violence and alcoholism and

16  pervasive fear throughout your childhood does on the

17  development of sound decision-making and rational problem

18  solving.  It may be true that some people are able to rise

19  above it, but most people can't.  And that was the -- that

20  was the atmosphere in which Amanda was raised.  She sees

21  irrational dangers where others do not.

22            And nobody is suggesting that she's cured

23  today, okay.  That's not what the defense is saying.

24  Amanda will be the first one to tell you it's going to take

25  many, many years to fix this.  And she's on her way to

```
 1   fixing it, right.  I think one of the most telling things
 2   in Dr. Brams' report was given the way that Amanda was
 3   raised and her marriage and her marriage not making
 4   anything better is that incarceration was the safest and
 5   most stable environment she had ever experienced in her
 6   life.  That's in the report, okay.  What does that tell you
 7   about the quality of the life up to that point, okay.
 8                 This is the safest place for her to
 9   reassemble herself, and it's important for the Court to
10   recognize that it doesn't make any difference what the
11   sentence is here today, that she is going to continue to
12   reassemble herself, okay.  It's, you know, the government,
13   they are dismissive of the upbringing and dismissive of the
14   background, but I know the Court knows better than that,
15   and I know everybody in this room knows better than that
16   because that's why we parent so hard ourselves, because it
17   matters and we recognize it, and when it doesn't happen the
18   way it's supposed to happen, there are consequences for
19   that, and this is one of them.
20                 Amanda is 35 years old.  Even with the
21   sentence of less than life, she would not be released from
22   prison until her late 60s or early 70s.  I know the Court
23   is aware of the recidivism rate for people that are
24   released from prison at that age.  It is negligible.  These
25   people don't reoffend.  And it's easy for the government to
```

1   say these circumstances may arise again, but I think if the

2   Court maintains a foothold in reality, it recognizes it's

3   not, okay.  That's decades of Amanda taking advantage of

4   the programming that the BOP offers, which is pretty

5   intensive and pretty successful, and she's not going to be

6   the same person when she comes out, okay.  That's just a

7   fact.  I mean, none of us remain the same person with the

8   passage of time.  She's not going to be the same person

9   that -- when she comes out as when she went in, and my fear

10  here is that there are not enough people in this room who

11  recognize that 28, 30, 35 years in prison is harsh.  Man,

12  it's harsh.  And if you don't think so, that's an attitude

13  of people who haven't spent enough time in the

14  incarceration environment, okay.  Anybody that spends any

15  amount of time in a lock-up environment knows that 30,

16  35 years of that is a harsh penalty.

17              The Court is required to impose a sentence

18  that is sufficient to punish the crime, but not greater

19  than necessary.  We believe that the factors that the Court

20  has to consider, Amanda's history and characteristics, the

21  absolute certainty of a prison sentence measured in

22  decades, okay, all of those factors marshal towards a

23  sentence of less than life.  You know, the probation report

24  indicated that the average sentence for somebody in

25  Amanda's position was 415 months, less than life.  Really

```
 1   harsh.

 2               Thank you.

 3               THE COURT:  Thank you.

 4               Ms. Hovanec, you don't have to say anything,

 5   but you are welcome to say anything at all you would like

 6   to say right now.

 7               THE DEFENDANT:  Thank you, Your Honor.

 8               I wish I could explain to you and everyone

 9   else why I did what I did.  But over the past two years, as

10   I have sat, time reflecting and discovering God in my life,

11   He has helped me come to the realization that no matter how

12   I try to explain my actions, it all comes down to me being

13   selfish.

14               I was so desperate and determined to put an

15   end to my own problems that I failed to think about the man

16   whose life I took away.  I failed to think about the father

17   that I took from our daughters.  I failed to think about

18   how their love for him could have overcome the hurt, and I

19   failed to think about the son and the brother that he was

20   to his family.  And I also failed to think about the hurt

21   and shame I brought upon my own family.

22               Instead, I had let my abuse and my fear turn

23   my heart into resentment and hatred, and I allowed that to

24   distort my reasoning, and I let that hatred turn my actions

25   into violence.  I refused to give any forgiveness and I
```

1    lacked all self control.

2             I know I still need a lot of help, and I

3    want more than anything to continue down the path that I

4    have been on since being incarcerated.  I have been blessed

5    with help and guidance from my attorneys, my counselors, my

6    therapists, spiritual mentors, and many others, all of whom

7    I am extremely grateful for.

8             I know that every part of what has happened

9    was wrong, and I wish I could undo it all.  I have told

10   myself that I would do anything to protect my children, but

11   it should not have been at the cost of hurting so many

12   undeserving people.

13            All I ask is for understanding, Your Honor.

14   Not for me, but for the sake of my three young daughters

15   who have not only suffered their own abuse, but for the

16   last two years of us, both their parents, because of my own

17   selfishness.

18            I hope that, in the future, I will be able

19   to prove to all of those I've hurt that I could be better,

20   and I do take full responsibility for what I did.  And I am

21   sorry for all the pain that I have caused.

22            THE COURT:  Thank you.

23            Ms. Sterling, anything further?

24            MS. STERLING:  Yes, Your Honor.

25            Judge, to the extent that I want to comment

1  on the Court's consideration or any weight that it may give

2  to the psychological report, I'll say this.  Dr. Brams was

3  not called as a witness in this hearing, so we have only

4  her report to rely on.

5            Her report does not indicate how much she

6  charged for the 19 single spaced typed pages of primarily

7  self-reporting by Ms. Hovanec that she regurgitates on the

8  page, or the basis, frankly, for the conclusions that

9  Mr. Klucas wants you to consider that are contained in the

10  report.  There is absolutely no independent, objective, or

11  reliable testing noted in the report.  None.  Nothing about

12  her intelligence level, her functioning level, whether or

13  not she's malingering, whether or not she truly suffers

14  from autism, as Dr. Brams at one point notes at one point

15  in the report.  The report doesn't note that she considered

16  any medical records, any school records, other psyche

17  records, et cetera.

18            We don't know if she ever watched the video

19  of the murder.  We don't know what police reports she may

20  or may not have looked at.  She acknowledges in the report

21  that the Green family is fractured; that's obvious.  She

22  gives credence to the statements that Ms. Hovanec makes

23  because she corroborated it by talking with two of her five

24  sisters.  It doesn't say whether or not she knew that one

25  of the two who she spoke to was present on Friday,

1    April 22nd, 2024, in the kitchen of the Green residence

2    where Ms. Hovanec announced her intent to kill Tim.

3                    We are not dismissive of the report, Judge,

4    just articulating for the Court that nothing in there was

5    substantiated.

6                    We sit here today, is Amanda Hovanec a

7    victim of abuse?  Is she?  Are her girls?  She says she is.

8    There's no evidence to substantiate that conclusion but her

9    words.  No evidence.  Certainly, no evidence that her

10   girls, their children, Tim's daughters were the victim of

11   abuse.  You heard Special Agent Eilerman testify.  That's a

12   serious allegation, and he ran that to ground.  He didn't

13   rely on reports, he interviewed the people that were

14   involved.  He flew overseas, so committed was he, to

15   determining whether there was any truth to this allegation,

16   and he found none.  None.

17                    Ms. Hovanec would have you believe that her

18   actions and her decision to murder Tim are because she was

19   trying to protect her children.  There's no evidence that

20   they needed protection from anyone let alone their father.

21                    You know, Judge, it begs the question, if

22   she really grew up the way she says she grew up, why would

23   she, state-side, does she choose her mother's home as home

24   base, and her mom as the alternate caregiver when she's not

25   there?  She's got five siblings, according to the PSR, all

1   live here.  All live in Ohio.  There's really a history of

2   extreme abuse and violence in her home so much so that she

3   is traumatized by the stress of it all, why is it that the

4   Auglaize county sheriff's detective who looked into the

5   matter found one report, and it didn't even involve her.

6   One report.  And that involving a father backhanding his

7   daughter, rightly or wrongly, after she called him a mother

8   fucker.  One report.

9           She says to Dr. Brams that she grew up in a

10  trailer in abject poverty.  Records in this court indicate

11  that the family home was purchased in 1994.  I'm

12  specifically referring to document 24-5.  That indicates

13  that the time of the purchase, there was a house, one-story

14  frame home, main dwelling, located on the property.  You

15  saw the property, Judge, at least part of it, in the video.

16  It's a gorgeous property.  You saw it driving up the

17  driveway.

18          We are not dismissive of the report.  We

19  question its validity, because it's not substantiated, and

20  in some cases, refuted.  What we do know about this report

21  is what she continues to think.  In the report, she

22  continues, just as she did today, to blame Tim for being an

23  abuser to her and to their girls.  Specifically referring

24  to pages 12 and 13 of the report.

25          You know, Mr. Klucas says who she is today

1    is not who she was two years ago.  I mean, I'm sure in some
2    abstract sense, that's true.  We all change, and I'm sure
3    years down the road, she won't be the same person.  That's
4    an accurate statement.  I don't refute that.  That's not
5    really the question, though.  And to the extent that I
6    argued she's still a danger as she was then, that's a
7    direct quote.  It's a direct quote out of the report.
8    Today, she is still detached, dissociative, can't see the
9    bigger picture.
10            There is even a conversation in here.  I
11   believe it's page 14, that first paragraph.  The doctor is
12   questioning her about the incident.  She says, Ms. Hovanec
13   says, she told Mr. Hovanec that she would, quote, kill him,
14   if he ever hit the kids again.  She shared if he did
15   anything to hurt the children, I would shoot him in the
16   face.  When this examiner inquired if this was just a
17   statement or reality, she responded I would.  My
18   interpretation of that is that she would do it again.
19            The real motive here, Judge, has nothing to
20   do with protecting herself or her children.  The real
21   motive here, as you saw in the extensive text messages that
22   were presented to the Court this morning, is that she
23   wanted the dream.  She wanted to move back to South Africa
24   with her rich boyfriend and live unencumbered by her
25   husband and the father of her children.  And she couldn't

```
 1   do that because Tim Hovanec loved his kids too much.

 2   That's the real reason why she killed him.

 3              You know, Mr. Klucas argues we all change,

 4   we are not the same people.  Down the road, after

 5   programming, et cetera.  Under that theory, no one should

 6   get life imprisonment.  I ask you, Judge, given all the

 7   facts and circumstances of this case, given the guideline,

 8   given all the factors that you are required to consider, if

 9   not her, if not under these circumstances, then who?

10              THE COURT:  You look like you are really

11   itching to say something?

12              MR. KLUCAS:  I am.  I don't think the

13   government should get the last word at sentencing.

14              THE COURT:  Okay.  Go ahead.

15              MR. KLUCAS:  All right.

16              So there's been a lot of suggestions and

17   argument advanced by the government regarding the lack of

18   evidence of abuse.  I think that's a bit disingenuous,

19   okay.  We all know not all abuse is reported.  We all know

20   that.

21              Here's what I submit to the Court.  If the

22   government wanted us, the defense, or the Court, to believe

23   a witness who had been abused but there was no record or

24   reporting of it, that's what they would say.  Not all abuse

25   is reported, okay.  That's exactly what the government
```

1   would say if they were advocating for credibility on behalf

2   of one of their witnesses.  We all know not all abuse is

3   reported.

4              Ms. Sterling concluded her remarks by saying

5   if not for Amanda, who is life in prison for, and the

6   answer to that is life in prison is for people who have

7   criminal histories on top of their homicides.  That's whose

8   life in prison is for, okay.  That's the answer to the

9   question.  The people who get life in prison in other

10  courts and in other jurisdictions are those who have

11  criminal history over and above.

12             Last thing I want to say is this.  I haven't

13  said a single thing here this morning and into this

14  afternoon to represent, suggest, or advocate for the idea

15  that on today, October the 1st, 2024, Amanda doesn't remain

16  a danger.  I haven't said that, okay.  It's one of the very

17  few things the government has said with which I do agree.

18  It's what happens in the future that matters.  She pled

19  guilty to these charges so she acknowledges she is a

20  danger.  It's what happens after she has years to

21  reassemble and reevaluate and get the help that she needs.

22  That's what the Court has to consider, okay.  And given the

23  lack of criminal history and the lack of propensity for

24  this sort of behavior and any other context other than this

25  limited one, okay, I think the Court can conclude that

1    there is no danger to the public, and that she does deserve

2    an out date, and we are asking the Court to fashion a

3    sentence that includes an out date.

4              THE COURT:  Thanks.

5              I'm going to take about a five-minute break

6    just to clear my head for a minute and maybe confer with my

7    probation officers.

8              So we'll be in recess for five minutes,

9    please.

10             (Whereupon, a break is taken.)

11                        - - -

12             (Proceedings resumed in open court.)

13             THE COURT:  Well, it's I don't think a

14   secret to anybody here that I've already said that

15   sentencing is the toughest part of my job, and I'll just

16   say this is the toughest case I've ever had to work on.  I

17   have, probably, I can't count how many tens of hours I have

18   spent agonizing about this case both in my office and,

19   frankly, staring at my eyelids at night thinking about

20   this, dreading this day, knowing, at some level, that we

21   are talking about as bad -- bad of a crime as I've probably

22   seen or could imagine.

23             Now knowing that the recommended sentence is

24   life under the guidelines, but I have to look at all the

25   3553(a) factors, I can't just say the guideline is life.

```
 1   Okay, life, there we go.  I have to weigh all of those
 2   guidelines.  I have to look at everything we've talked
 3   about in terms of what happened here.  And, again, this is
 4   a premeditated -- it's hard to imagine a crime more
 5   premeditated and more thought out and more carefully
 6   executed.  And the thought of what you did to those three
 7   little girls, that's tough for me to reconcile.  And I even
 8   read the statement about their new family where their new
 9   parents have -- it's one of those things where something
10   jumped off the page at me where sort of like when somebody
11   says something funny at a funeral and it makes you laugh
12   tears, but they talked about going from playing man-on-man
13   parenting to zone parenting.  I just thought that was
14   clever.
15                  I can't fathom doing something worse than
16   what you did, okay.  But, by the sake token, as Mr. Klucas
17   points out, you don't have any criminal record, but man,
18   you sure picked one to go off the rails on here in terms of
19   when you finally do decide to have a criminal record, you
20   literally, in cold blood, murder the father of your
21   children.  And that's -- that's really tough for me to wrap
22   my mind around.
23                  I, obviously, Ms. Sterling, take Dr. Brams'
24   report with the not grain of salt, but shaker of salt that
25   you've poured on it.  I get that.  I get that she's a hired
```

1    advocate.  Frankly, it reads a little bit like mitigation

2    in a capital; it reads that way.  It's also hard for me not

3    to fathom that there were at least a few missing pieces in

4    Ms. Hovanec's life coming up to get her to where she was,

5    but I tend to agree more than I disagree with your

6    observations about that, Ms. Sterling.

7              I have to look at what are the odds of

8    recidivism here at some point.  And let's be clear, we are

9    not talking about -- we are not talking about a life

10   sentence.  We are either talking about yes or no on an out

11   date, not whether we are talking about an out date in 10 or

12   20 years or something like that.  Frankly, I'll spoil the

13   surprise, not even 30 years.  We are talking about

14   something beyond that, yes or no.  And I've wrestled with

15   it more than I ever have on another decision.  You know,

16   the guidelines suggest, with premeditated murder where the

17   death penalty is not imposed, that the sentence should be

18   life.  I think that's in Chapter 2.  I think it says if we

19   are talking about premeditated murder, the guidelines are

20   life and you shouldn't come off of that.

21             But to get to that, I have to look at

22   Ms. Hovanec and say that I am just utterly convinced that

23   there is nothing about her that could possibly be redeemed

24   here.  And I'm not sure I can get all the way there.  So

25   that's the -- that's the wrestling that's going on inside

1    my head.  And you all have done nothing, while, on the one

2    hand, you've done excellent advocacy on both sides, that's

3    made my job harder, not easier, but I guess that's your job

4    to make my job hard, and you've both done that.

5                And I think we've plowed and replowed all of

6    the 3553(a) factors that come in here.  You know, the

7    elephant in that room is the punishment fitting the crime

8    and what public deterrence are we going to send here to say

9    certainly to Ms. Hovanec that this wasn't okay, but to the

10   world.  It's not okay to solve a legal problem and a

11   domestic dispute with murder.  That can't be okay.  But I

12   also am not unmindful of the fact that, under other

13   circumstances, there would likely be, at some point in the

14   future, the potential, even with a life sentence in state

15   court, there would be the potential for someone else to

16   take a look at that at some point in the future, and that's

17   not the case here.  So our life sentence is life without

18   parole.  That's what life means here as opposed to a term

19   of imprisonment which would have an out date, so that's

20   what I'm wrestling with here.

21               And so, just to be clear, we are talking

22   about a level 43 with a Criminal History Category of 1 and

23   the guideline sentence would be life.  I'm going to vary

24   downward slightly from that.

25               Pursuant to the Sentencing Reform Act of

1    1984 and 18, U.S.C., Section 3553(a), it is the judgment of

2    the Court that the defendant, Amanda Hovanec, is hereby

3    sentenced to the custody of the Bureau of Prisons to be

4    imprisoned for a term of 480 months on each of Counts 1, 2,

5    4 and 5 to be served concurrently.

6              Upon release from imprisonment, you shall be

7    placed on supervised release for a term of 10 years.  This

8    term consists of 10 years on each of Counts 1, 2, 4 and 5.

9    All such terms to run concurrently.

10             Within 72 hours of release from the custody

11   of the Bureau of Prisons, you shall report in person to the

12   U.S. Pretrial Services and Probation Office in the

13   sentencing district or in the district to which you are

14   released.

15             Based on review of the defendant's financial

16   condition as set forth in the Presentence Report, the Court

17   finds that the defendant does not have the ability to pay a

18   fine.  The Court, therefore, waives a fine in this case.

19             You must pay the United States a special

20   assessment of $400, which is due immediately.

21             What shall we do about restitution, counsel?

22   I'm wondering because it's going to be joint and several

23   for all the cases if we should do that by motion for all

24   three defendants at one time, or what would be your

25   preference?

```
 1                MS. STERLING:  Judge, it's my understanding,
 2   in speaking with Mr. Klucas and Mr. Bailey earlier this
 3   morning, that they are in agreement with the government's
 4   request for restitution as set forth in the restitution
 5   memo filed in this court as document 106, and,
 6   specifically, are agreeing, and we, therefore, ask this
 7   Court to impose restitution upon Amanda Hovanec in the
 8   amount of -- tell me when you are ready.
 9                THE COURT:  I'm ready.
10                MS. STERLING:  $2,108,559.36.
11                We are asking that that be imposed jointly
12   and severally with Mr. Theodorou in full, and $126,000 of
13   it also joint and several with Anita Green.
14                THE COURT:  126 is joint and several with
15   Anita Green?
16                MS. STERLING:  Yes, sir.
17                THE COURT:  But I'm going to have to give
18   them a chance to argue about that at their sentencings.
19                MS. STERLING:  Agree.  Agree.
20                THE COURT:  Okay.
21                Where are you at with that, Mr. Klucas?
22                MR. KLUCAS:  Judge, Ms. Sterling is correct.
23   We had talked about this prior to the hearing this morning,
24   and we are -- we concur with the government's request for
25   restitution as it applies to Amanda.
```

```
 1                    THE COURT:  Thank you.

 2                    So that will be the Order of the Court.

 3                    The defendant is ordered to pay

 4   $2,108,559.36 jointly and severally with Mr. Theodorou, and

 5   126,000 of that is joint and several with Ms. Green through

 6   the Clerk of the U.S. District Court.  Restitution is due

 7   and payable immediately.

 8                    The defendant must pay 25 percent of her

 9   gross income per month through the Federal Bureau of

10   Prisons Inmate Financial Responsibility Program.  If a

11   restitution balance remains upon release from imprisonment,

12   payment is to commence no later than 60 days following

13   release from imprisonment to a term of supervised release

14   in monthly payments of at least a minimum of ten percent of

15   her gross monthly income during the term of supervised

16   release and thereafter as prescribed by law.

17                    Notwithstanding establishment of a payment

18   schedule, nothing shall prohibit the United States from

19   executing or levying upon property of the defendant

20   discovered before and after the date of this judgment.

21                    While on supervision, you must comply with

22   the mandatory and standard conditions that have been

23   adopted by this Court and set forth in part D of the

24   Presentence Investigation Report.  And you must comply with

25   the following additional conditions:
```

1            A periodic drug testing mandated by the

2     Violent Crime Control and Law Enforcement Act of 1994 is

3     hereby suspended based on the Court's determination that

4     you pose a low risk of future substance abuse.

5            Mental health treatment.  You must undergo a

6     mental health evaluation and or participate in a mental

7     health treatment program and follow the rules and

8     regulations of that program.  The probation officer in

9     consultation with the treatment provider will supervise

10    your participation in the program.

11            The defendant shall submit her person,

12    property, house, residence, vehicle, papers, computers,

13    other electronic communications or data storage devices or

14    media or office to a search conducted by a United States

15    Probation Officer.  Failure to submit to a search may be

16    grounds for revocation of release.

17            The defendant shall warn any other occupants

18    that the premises may be subject to searches pursuant to

19    this condition.  An officer may conduct a search pursuant

20    to this condition only when reasonable suspicion exists

21    that the defendant has violated a condition of supervision

22    and that the areas to be searched contain evidence of such

23    a violation.  Any search must be conducted at a reasonable

24    time and in a reasonable manner.

25            Defendant has been detained without bail

1   since her arrest.  She's, therefore, not a candidate for

2   voluntary surrender because of the provisions in

3   18, U.S.C., Section 3143(a)2.

4           Ms. Hovanec, you have the right to take an

5   appeal from anything in this case.  That appeal needs to be

6   made within 14 days.  The appeal would be to the United

7   States Court of Appeals for the Sixth Circuit, which sits

8   in Cincinnati, but, for our purposes, that appeal would be

9   filed in the Clerk of this court.

10          Tell your attorneys if you want to file an

11  appeal.  You have 14 days to do that.  The world changes

12  after 14 days, so make sure, if you want to file an appeal,

13  tell your attorneys to file an appeal.  If they don't do it

14  for you, do it for yourself because that date is critical,

15  14 days.

16          Ms. Hovanec, the guidelines said I should

17  have sentenced you to life in prison with no -- no hope of

18  ever getting out.  That's what the guidelines say.  The

19  statute authorizes that.  I didn't do that.  Forty years

20  may sound like forever, and, to some extent, it is.  I

21  mean, the world, I think about, what, 40 years ago, I was a

22  20-year-old man.  That's a long time ago.  I don't envy you

23  the time that you are going to be away, but at least there

24  is a date out there on the horizon.  You, as Mr. Klucas

25  said, you will have an out date, but it's going to be a

```
 1    long time down the road.

 2              To the family that are here, I thank you all

 3    for the words spoken, written, said and unsaid.  I have

 4    been thinking about Tim Hovanec and I have been thinking

 5    about those three little girls a lot over the past week and

 6    probably more than that.  I -- I understand -- I understand

 7    why they are not here, but I -- I hope you'll send my

 8    regards to Katie and Matt and thank them for what they have

 9    done for these young ladies.  I can't imagine taking in

10    three extra kids on top of two that you already have.  But

11    that's all that.

12              I'm sorry to this family for what has

13    happened here for what you've gone through.  I'm sorry that

14    you all had to come here today.  And I'm sorry that you

15    didn't get the satisfaction of hearing me say the word

16    life.  I have to give this my best shot, and I've agonized

17    about this, and I just believe, looking at all those

18    3553(a) factors, that the word life didn't come into play,

19    but that something awfully close to that in terms of

20    40 years, which, let's put all the cards on the table,

21    there are some opportunities for good time credit.  It

22    works out to be about 15 percent less than that, so we are

23    still talking about well in excess of three decades over

24    and above the time she's already served.  So it will be a

25    very long time until Ms. Hovanec breathes free air.  I've
```

1   given this my best shot.

2               I'll ask, does the government have any

3   procedural or subjective -- any procedural or substantive

4   objections to my sentence here today?

5               MS. STERLING:  Judge, we would just note our

6   objection to the downward variance.

7               THE COURT:  Yes.

8               Mr. Klucas, does the defense have any

9   procedural or substantive objections?  You've, obviously,

10  preserved your right to argue about the two enhancements.

11              MR. KLUCAS:  Correct.

12              THE COURT:  So protecting that --

13              MR. KLUCAS:  Correct.

14              THE COURT:  -- any other procedural or

15  substantive objections to my sentence?

16              MR. KLUCAS:  We do not.

17              THE COURT:  Okay.

18              With that -- yes?

19              MR. KLUCAS:  We do -- we are in a position

20  to ask the Court to make a recommendation to an institution

21  if the Court is willing to do that.

22              THE COURT:  Yes.  What do you want?

23              MR. KLUCAS:  Victorville, California.

24              THE COURT:  Okay.  I will make that

25  recommendation.  As you know --

1                MR. KLUCAS:  I do.

2                THE COURT:  -- the BOP doesn't, doesn't care

3 really what I say, but, and I'm always happy to entertain a

4 request, so counsel has requested that the Bureau of

5 Prisons carefully consider Ms. Hovanec for --

6                MR. KLUCAS:  Victorville.

7                THE COURT:  Victorville, California, if she

8 meets the qualifications for that facility.

9                With that, we'll be adjourned.

10               MR. KLUCAS:  Thank you, Judge.

11           (Proceedings adjourned at 2:59 p.m.)

12                   - - -

13

14

15            **C E R T I F I C A T E**

16

17

18              I, the undersigned, hereby certify
that the above and foregoing is a true
19 and accurate record of the proceedings
held in the above-entitled matter prepared
20 from my stenotype notes.

21

          _**/s/ Diana M. Ziegelhofer**_____**12/30/2024**__
22 Diana M. Ziegelhofer, RPR, RCR
Official Court Reporter
23 United States District Court
1716 Spielbusch Avenue, Suite 118
24 Toledo, Ohio 43604
419-213-5538

25